IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PETER P. MOE, | \| |
| Plaintiff | \| CIVIL ACTION |
| | \| |
| v. | \| |
| | \| **COMPLAINT AND JURY DEMAND** |
| GRINNELL COLLEGE, | \| |
| | \| |
| Defendant. | \| |

Plaintiff Peter P. Moe ("Plaintiff"),[1] by his attorneys Nesenoff & Miltenberg, LLP and

Babich Goldman, P.C., as and for his Complaint against Defendant Grinnell College alleges as

follows:

## THE NATURE OF THE ACTION

1.     This case arises out of the actions taken and procedures employed by Defendant

Grinnell College ("Grinnell" or the "College"), concerning false allegations of sexual misconduct

jointly lodged against Plaintiff, a male student, by three female students, who were close friends,

and simply disliked Plaintiff. All three complainants gave conflicting statements about their own

sexual encounters with Plaintiff. One complainant stated that she came forward after "being told"

that what occurred was nonconsensual. Yet another complainant said she was not sure that a

violation even occurred but that her friends compelled her to come forward with a charge of sexual

misconduct—she said she did not believe that Plaintiff ever acted with any malicious intent.

2.     As a result of these allegations—the motives behind which were never

---

[1] Plaintiff has filed herewith a motion to proceed by pseudonym. There was a recent case pending against Grinnell captioned "John Doe v. Grinnell College et al.," Case No. 4:17-cv-00079-RGE-SBJ, so Plaintiff, here, has elected to use Peter P. Moe in order to avoid confusion between the cases.

questioned—Plaintiff was immediately banned from campus and then put through the paces of a flawed and biased process that took four months instead of the announced sixty (60) days. The administrators in charge of the case could not even accurately recount the policy violations with which Plaintiff was charged, and consolidated the three complaints for investigation, and adjudication, even though the conduct at issue in each case was different from the others. The complainants fabricated or imagined a "pattern" through which Plaintiff allegedly took advantage of them by speaking with them about his "problems." There was insufficient evidence to support any finding of a wrongful pattern of behavior.

3.      Regardless, the adjudicator, justifying her decision to punish Plaintiff for misconduct which he did not commit, embraced the complainants' allegation of a pattern as an accurate take on reality, and found Plaintiff responsible for one count of nonconsensual sexual intercourse and one count of nonconsensual sexual contact. The adjudicator, the Honorable Justice Marsha Ternus ("Justice Ternus"), used the "pattern" to recommend the more severe sanction of dismissal from the College. With respect to one complainant, Justice Ternus found Plaintiff *not responsible* for nonconsensual sexual intercourse and then—even though she was not authorized to do so—found Plaintiff responsible for a policy violation with which he was not charged. Even though Plaintiff was not responsible for one of the three counts, Justice Ternus relied on all three complainants' allegations when recommending sanctions.

4.      Justice Ternus' findings and recommendations were, further, unwarranted because the evidence did not support the allegations. Moreover, Justice Ternus deemed Plaintiff to be not credible despite that he consistently recounted what happened with each complainant. In contrast, each complainant made inconsistent and unreliable statements and fell back on character statements and hearsay when pressed for details about what happened. They did not so much deny

2

that there was consent, rather than explain how they consented.

5.      Justice Ternus's observations, thinking and analysis showed the impact of gender bias in the decision-making process. As she has in other cases that she has adjudicated for Grinnell, including the recent *Doe v. Grinnell College*, Justice Ternus made biased assumptions about female passivity, weakness of character, physical weakness and naïveté in order to bolster her findings. In Plaintiff's case, she saw and understood Plaintiff to be a male respondent despite the fact that he identified as a nonbinary[2] person in the proceedings.

6.      As a result of the erroneous finding, Plaintiff was dismissed from Grinnell, just a semester shy of obtaining a degree. Plaintiff appealed. His appeal was decided by a decisionmaker who lacked the requisite impartiality. Upon information and belief, the appeal officer tasked with deciding Plaintiff's appeal let implicit gender bias infect the appeal process by allowing Justice Ternus to weigh in on Plaintiff's appeal.

7.      When Grinnell subjected Plaintiff to disciplinary action it did so in a way that deprived him of a fair process and discriminated against him because of his gender (perceived or misperceived, as the case might be). Grinnell's policies and regulations as promulgated, and as applied, are gender-biased and discriminatory.

8.      Plaintiff therefore brings this action to obtain relief based on claims for violations of Title IX of the Education Amendments of 1972, state law breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful discipline/lack of fundamental fairness in disciplinary proceedings.

---

[2] A person who identifies as nonbinary rejects the idea that all persons fall into one of two genders—male or female. Here, Plaintiff identified as nonbinary but appeared to the Adjudicator as male during the Title IX proceedings.

## THE PARTIES

9.      Plaintiff Peter P. Moe is a natural person and a resident of Iowa. During the events described herein Plaintiff was a student at Grinnell College who resided in Grinnell, Iowa.

10.     Defendant Grinnell College is a private liberal arts college located in Grinnell, Iowa. It is the recipient of state and federal funding through grants and contracts.

## JURISDICTION AND VENUE

11.     This Court's federal and supplemental jurisdiction is invoked pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq. are civil rights claims; and (iii) the state law claims are so closely related to the federal law claims as to form the same case and controversy under Article III of the U.S. Constitution.

12.     This Court has personal jurisdiction over Defendant because it is located, and conducting business, in the State of Iowa.

13.     Venue for this action properly lies in this District pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CLAIMS

**I.      The April 4, 2011 Dear Colleague Letter**

14.     On April 4, 2011, the United States Department of Education's ("DE") Office for Civil Rights sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "2011 Dear Colleague Letter").

15.     The 2011 Dear Colleague Letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20

U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." 2011 Dear Colleague Letter at p. 4.

16.     The 2011 Dear Colleague Letter responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which had proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

17.     The 2011 Dear Colleague Letter, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." 2011 Dear Colleague Letter, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/. Relying on these faulty numbers, the 2011 Dear Colleague Letter minimized the value and merit of due process protections for the accused by, among other things, eschewing a firm presumption of innocence, mandating a preponderance

of the evidence standard,[3] limiting cross-examination, limiting the right to an attorney, and forbidding certain forms of alternative dispute resolution.

18.     The April 2011 Dear Colleague Letter advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct. Most notably, the 2011 Dear Colleague Letter required schools to adopt a relatively low burden of proof—"more likely than not"—in cases involving sexual misconduct, including sexual assault. Several colleges had previously been using a "clear and convincing," standard of proof and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

19.     The 2011 Dear Colleague Letter stated that schools should "minimize the burden on the complainant," and suggested that schools focus more on victim advocacy. It required schools to give both parties the right to appeal a decision, which in too many instances affords Grinnell the opportunity to double down on its gender bias.

20.     The Obama Administration, through the DE and OCR, treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon ("Lhamon"), former Assistant Secretary of the Department of Education in charge of OCR, delivered the following message to colleges and universities:

21.     In February 2014, Lhamon told college officials attending a conference at the University of Virginia that schools needed to make "radical" changes. According to the Chronicle

---

[3] Recent District Court decisions have held that the preponderance of the evidence standard is not the proper standard for university sexual misconduct proceedings given the significant consequences, including expulsion and the permanent marking of a student's transcript. *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (Sept. 20, 2018) (Doc. No. 36), at p. 3 ("the Court concludes that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion"). *See Doe v. DiStefano*, 2018 WL 2096347, at *6 (May 7, 2018) ("'[T]here is a fair question whether preponderance of the evidence is the proper standard for disciplinary investigations such as the one that led to Plaintiff's expulsion.'").

of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

22.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a "trauma informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant," *Id.* at p. 31, which works to enforce a presumption of credibility of the alleged victim.

23.     In April 2014, the White House issued a report entitled "*Not Alone*", which—like the April 2011 Dear Colleague Letter—relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p. 2. The report also suggested that college and universities undergo "trauma-informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further,

if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to respondents accused of sexual assault.

24.     In June 2014, Lhamon testified at a Senate hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter. Lhamon further told the Senate Committee, "Th[e] [Obama] Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She also told the Committee that if OCR cannot secure voluntary compliance from a recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the Department of Justice.

25.     In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working."[4]

---

[4] Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

26.     Grinnell receives federal funds, including Pell Grants, grants from the National Science Foundation, and other research grants.

27.     In Fall 2014, Grinnell's Title IX Coordinator at the time, Angela Voos ("Voos"), and Dean of Students at the time, Andrea Conner ("Conner"), gave a Title IX presentation to Grinnell staff that discussed compliance with the 2011 Dear Colleague Letter and noted that the College's federal funding was at stake, and that the "stakes [we]re high." Grinnell's Title IX counsel also advised that compliance with Title IX was tied to government funding. The understanding amongst Grinnell administrators was that if they did not comply with OCR guidance that Grinnell would take a financial hit.

## II.     Campus Activists Prompt OCR Investigation

28.     During Grinnell's Fall 2014 semester, a campus activist group was formed—known as "Dissenting Voices"—which publicized Grinnell's alleged retaliation against, and failure to protect, female sexual assault complainants and criticized the College's leniency towards males accused of sexual misconduct.

29.     Grinnell administrators have described the group's philosophy as aligning with "feminist philosophy." Dissenting Voices regularly criticized Grinnell's administration for fostering a campus "rape culture."

30.     Dissenting Voices was particularly critical of Voos, Grinnell's Title IX Coordinator at the time, whom they believed had a conflict of interest and lacked the experience necessary to carry out her duties.

31.     In response to a list of the group's demands, Voos and Andrea Conner ("Conner"), who was Dean of Students at the time, met with members of Dissenting Voices in Fall 2014. At

that time, Voos had internally expressed concerns about Title IX compliance and the threat of the loss of Grinnell's federal funding.

32.     Grinnell responded to, some say "catered to" certain of the group's demands by publishing a revised sexual misconduct policy mid-year, in Spring 2015. The revised policy did away with student/faculty conduct board hearings in sexual misconduct cases and the respondent's right of cross-examination. The revised policy also adopted an adjudicator model, in which a single individual, typically the Hon. Justice Marsha Ternus ("Justice Ternus"), decides whether a student is responsible for violating the College's sexual misconduct policy. This model currently remains in place.

33.     Apart from pushing for policy changes, Dissenting Voices pushed for safe spaces for women on campus, called for "anti-sexist" training for men and demanded trauma-informed training for the administrators responsible for issuing sanctions so that more serious penalties would be imposed on respondents, including dismissal from the College.

34.     Dissenting Voices was responsible for female students filing of a number of complaints with OCR in or around March 2015, and for the publication, in March 2015, of an article in *The Huffington Post*, which criticized Grinnell's handling of sexual misconduct cases and publicized the OCR complaints. The article included a quote from Conner, who served as the appeal officer in Plaintiff's case and numerous other cases, that "[w]hen a student is found responsible for sexual misconduct the college's first consideration is always dismissal."

35.     Shortly prior to publication of *The Huffington Post* article, Grinnell's President, Raynard Kington ("President Kington"), attempted to ward off an OCR investigation by requesting "technical assistance" from OCR, in essence requesting that the OCR conduct a review of Grinnell's sexual misconduct policies and procedures.

36.     On March 6, 2015, Dissenting Voices published an editorial in the campus newspaper which criticized President Kington's request for technical assistance as "redundant" and "a way of providing cover to the institution after years of betraying survivors."[5]

37.     Shortly after President Kington requested technical assistance from OCR, allegations surfaced accusing him of being verbally abusive to a female student, a sexual assault complainant, who had come to him for assistance and to lodge a complaint about the male respondent in her case, who was found responsible for sexual misconduct and went on to become the baccalaureate speaker for his class.[6]

38.     On March 24, 2015, OCR denied the College's request for technical assistance.

39.     On April 2, 2015, an opinion piece was published in the campus newspaper, *The Scarlet & Black*, calling for President Kington to resign.[7] The article noted that "I am …concerned about your personal treatment of sexual assault survivors, namely that you told a survivor you don't want to hear her voice and that you were ashamed a student like her would graduate from Grinnell."

40.     In July 2015, the OCR notified Grinnell that it was launching an investigation into allegations that the College had subjected female students to a hostile environment based on sex by failing to appropriately respond to complaints of sexual violence and by retaliating against female students who engaged in advocacy and were critical of Voos and the College.

41.     Grinnell's response focused on the manner in which it had changed its sexual misconduct policy and training programs, noting the mid-year change to the sexual misconduct

---

[5]  *See* http://www.thesandb.com/news/dissenting-voices-responds-to-grinnell-administration.html.
[6]  *See* http://www.thesandb.com/opinion/letter-to-the-editor-can-you-hear-me-now-a-survivor-responds-to-the-chair-of-the-board-of-trustees.html
[7] http://www.thesandb.com/opinion/letter-to-the-editor-admin-created-hostile-environment-for-survivors.html.

policy—which stripped respondents of a right to a hearing and cross-examination—all in response to student advocacy.

42.     In August 2015, the female OCR complainants threatened litigation.

43.     On September 28, 2015, Grinnell announced several changes to its sexual misconduct policy, including the use of Husch Blackwell for conducting investigations, and new timelines for the investigation and appeal process.

44.     On October 2, 2015, *The Scarlet &Black*, published a letter to the editor from Dissenting Voices, discussing their amended aims and goals, which had been handed out on campus. The group urged the College to "address racism, sexism and homophobia within the sexual misconduct process."[8]

45.     In October 2015, Grinnell settled with the female OCR complainants and they withdrew their complaints. Upon information and belief, the settlement cost Grinnell millions of dollars.

46.     Though the OCR complaints were withdrawn, OCR continued the investigation until July 28, 2017.

47.     On August 28, 2016, Dissenting Voices hosted a "Disorientation" table at new student orientation which informed students that Grinnell was under OCR investigation, and for which flyers were distributed which stated "Grinnell has a sexual assault problem and no one is talking about it."

48.     On or about September 17, 2016, members of Dissenting Voices handed out information in the campus center during Family Weekend. Per Dissenting Voices' Facebook page:

> For Family Weekend we decided to distribute information about the federal investigation of Grinnell to students, their families, and prospective students. A staff member of Student Affairs told us that we were not allowed to be in the JRC

---

[8] http://www.thesandb.com/opinion/letter-to-the-editor-dissenting-voices-releases-aims-and-goals.html

lobby because it was hosting the Family Weekend Welcome and Information Table. However, we continued to hand out our materials in a different area of the JRC.

The school is interested in preserving a perfect, marketable image of Grinnell, regardless of the real issues students face on campus. As a school that markets itself as progressive and focused on social justice, why do we continue to hide the fact that we have a sexual assault problem? We, as an institution, continue to retraumatize and not help survivors. We must continue to push for policy change and increased resources.

49.     Shortly thereafter, in Fall 2016, Dissenting Voices held a demonstration during Trustee's Weekend calling for a new Title IX Coordinator who did not have so many conflicts of interest and wasn't "so closely tied to the image and standing of the college." The motivation for this criticism was that Voos held multiple roles besides Title IX Coordinator, including Chief of Staff and Vice President of Strategic Planning for Grinnell.

50.     On November 4, 2016, *The Scarlet & Black* published an article about Dissenting Voices' efforts to combat sexual assault during the Fall 2016 semester.[9] The article noted that the group had gained faculty support. More specifically, English Professor Theresa Geller ("Professor Geller") had joined their cause, Faculty Against Rape. Dissenting Voices member Leah Barr said that one of Dissenting Voices' goals was "to keep the momentum going and make sure that people are still angry, because there's a lot to be angry about." Barr pointed out that at new student orientation the OCR investigation was not mentioned by administrators. Barr further stated:

For the most part, rapists on this campus are not expelled. They sometimes receive sanctions, no contact orders…[which] don't do anything…Rapists know they can rape with impunity. They know that they're not really going to be punished. So it doesn't deter them. So if we create these policies with more stringent punishments or sanctions, I think the incidents of rape would go down. But the general consensus on campus is you can rape multiple people and not much is going to happen to you.

51.     On November 8, 2016, Dissenting Voices and Professor Geller held an Open House to discuss Dissenting Voices Aims and Goals and grassroots activism.

---

[9] http://www.thesandb.com/news/dissenting-voices-combats-campus-sexual-assault-throughout-semester.html

52.     On November 17, 2016, Dissenting Voices sponsored a lecture by Dr. Caroline Heldman on "The New Campus Anti-Rape Movement: Networked Activism for Change." The focus of the lecture was about how student activists could use social media to shame institutions and hold them accountable for failing to address sexual assault.

53.     On November 19, 2016 Dissenting Voices organized a women's self-defense seminar.

54.     On April 9, 2017, Dissenting Voices held a protest during programming for prospective students. Per coverage in *The Scarlet & Black*, the location and time of the protest were meant to be provocative.[10] Some of the protesters held signs noting "Expel Rapists." The article further noted, without support, "As 90 percent of campus rapes are committed by repeat offenders, Dissenting Voices sees the establishment of this minimum outcome as not only a justice issue, but one of safety as well." Leah Barr noted "It makes financial sense for the Title IX coordinator to be wrapped up in the president's office because part of the president's job is fundraising and image control. So if you have full control over which rape becomes publicly known…the image is protected."

55.     On April 28, 2017, Dissenting Voices published a letter to the Board of Trustees, raising concerns about serial assailants on campus and calling for minimum outcomes in sexual misconduct cases.

56.     On April 29 and May 6, 2017 Dissenting Voices hosted a "teach-in series" on Feminist Theory, including the "Politics of Sexual Violence."

57.     On September 1, 2017, *The Scarlet & Black* announced the closure of the OCR investigation at Grinnell.[11] In the article a co-leader of Dissenting Voices expressed concerns

---

[10] http://www.thesandb.com/article/protests-at-admitted-students-weekend.html
[11] http://www.thesandb.com/news/ocr-administratively-closes-the-colleges-title-ix-investigations.html

regarding the closure of the investigation and said that Dissenting Voices planned to file a FOIA request to determine whether Grinnell settled with the complainants and, as part of that settlement, required them to withdraw their complaints. The article noted that the closure of the investigation may have had more to do with the Trump administration's change in investigation strategy rather than the lack of any problems in Grinnell's sexual misconduct process. Voos noted that Grinnell would be changing its sanctioning policy with respect to sexual misconduct, to reflect "typical outcomes" such as "dismissal or suspension." This change was made in response to Dissenting Voices repeated calls for "mandatory minimum" sanctions in sexual misconduct cases.

III.     **The U.S. Department of Education Rescinds 2011 Dear Colleague Letter**

58.     On September 7, 2017 the United States Secretary of Education, Betsy DeVos ("DeVos") vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos stated that "one person denied due process is one too many."[12]

59.     The failure of educational institutions to provide fair and impartial policies and procedures led DeVos to declare that "the current approach isn't working. Washington has burdened schools with increasingly elaborate and confusing guidelines that even lawyers find difficult to understand and navigate. Where does that leave institutions, which are forced to be judge and jury?" Moreover, DeVos stated, "It's no wonder so many call these proceedings 'kangaroo courts.' Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students."

60.     Regarding pressure from the OCR on institutions to adhere to "the failed system imposed policy by political letter," DeVos stated, "No school or university should deprive any

---

[12] https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement

student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington."

61.     Significantly, DeVos proclaimed that the "era of 'rule by the letter' is over."  The "April 2011 Dear Colleague Letter" has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined."  Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one," DeVos stated.

62.     On September 22, 2017, the OCR rescinded the 2011 Dear Colleague Letter and "Questions and Answers on Title IX and Sexual Violence," dated April 29, 2014.

63.     The OCR noted that the 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added).[13] .

64.     On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "2017 Guidance").[14] The 2017 Guidance prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

65.     Regarding interim measures, the 2017 Guidance states:

> It may be appropriate for a school to take interim measures during the investigation of a complaint. In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make measures available only to one party. Interim measures should be

[13] *See* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf
[14] *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

16

individualized and appropriate based on the information gathered by the Title IX coordinator, making every effort to avoid depriving any student of her or his education. *Id.* at p. 3.

66.     The 2017 Guidance also requires that (i) a person free from actual or perceived conflicts of interest or biases lead sexual misconduct investigations; (ii) training materials or investigative techniques that "apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; (iv) "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided" to ensure objective and impartial investigation; and (v) those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. *See id.* The 2017 Guidance also permitted schools to apply the clear and convincing evidence standard in sexual misconduct proceedings. *Id.* at p. 5.

67.     On September 25, 2017, Grinnell's Title IX Office issued a campus memo to address the rescission of the 2011 Dear Colleague Letter and 2014 Q&A, and the OCR's issuance of new guidance.[15] The memo informed students that the College would continue to employ the "preponderance of the evidence" standard in sexual misconduct cases. The memo noted that the new guidance permitted colleges to facilitate informal resolution, including mediation, and that the College was "looking into the implications of this change." It continued "At this time, we do not believe the announcement will affect our policies and procedures."

68.     Voos gave a statement to *The Scarlet & Black* in which she stated "Our disciplinary process already addressed the issue that they're looking at-that is, do you have a fair and thorough

---

[15] www.grinnell.edu/news/special-campus-memo-title-ix

and impartial way of investigating and adjudicating…. most of this guidance is about choices. It's permitting some scaling back—we're not scaling back."[16]

69.     On November 9, 2017, Dissenting Voices held a vigil for survivors of sexual assault in response to the DE's rescission of the 2011 Dear Colleague Letter. During an interview about the vigil, one of the co-leaders of Dissenting Voices was asked whether the process in place under the 2011 Dear Colleague Letter was biased against male students accused of sexual misconduct. In response, she said "the system doesn't do enough to back survivors and ensure that rapists are kept from becoming serial rapists. And the fact that the Trump administration is lessening this is quite worrisome."[17]

70.     Part of the November 9, 2017 vigil was the creation of a display supporting sexual assault survivors. It was immediately removed by campus officials after the event. On November 14, 2017 Dissenting Voices published an opinion piece complaining about the removal.

71.     On January 25, 2018, a former member of Dissenting Voices and Grinnell alumna wrote a letter to the editor of *The Scarlet & Black*, "An Elegy For Feminist Justice At Grinnell," that stated that, through "radical feminist praxis" Dissenting Voices "accomplished many things, including….directing Grinnell's issue to national attention through the Huffington Post, and most importantly, the opening of an official Title IX Complaint to the Office of Civil Rights….While the OCR is no longer investigating …it set an important precedent at Grinnell that rendered visible the possibility of legal action against parties responsible for sexual discrimination, and the weight that legal action can have on changing policies and procedures."

---

[16]http://www.thesandb.com/news/college-to-uphold-most-obama-era-title-ix-guidelines-reconsider-mediation-approach.html
[17] http://www.thesandb.com/news/dissenting-voices-holds-national-vigil-to-support-survivors-of-sexual-assault.html

72.     The article went on to state "Feminist theorists such as Susan Brownmiller have re-theorized sexual violence as crime of power, not a crime of passion. Sexual violence has been used historically to control and dominate women's bodies to reinforce women's place as one in the private and domestic sphere… Dissenting Voices have received critique from the administration for our protests against policies and practices from our Title IX office. The reason why feminist activists have critiqued the administration is because our campus does not provide an equal access campus. It is not equal access when a countless number of serial rapists graduate while their peers affected by their violence are on medical leave. In May 2017, I walked Commencement stage with a banner that read: 'We are Graduating with Two Serial Rapists' only to learn two days later that number should have been five."

73.     Finally, the article stated "Dissenting Voices has been effective because of the recognition of the College's investment in its image. We've hit them where it hurts: their public identity and their money."[18]

## IV.     Grinnell College's Endorsement of A Trauma-Informed Approach to Title IX Cases

74.     Grinnell's Annual Title IX Report, for the 2017-2018 fiscal year, noted that Title IX Deputy Jen Jacobsen was a contributor to the American College Health Association's ("ACHA") "Addressing Sexual and Relationship Violence: A Trauma-Informed Approach" ("ACHA Report") and that Grinnell followed this "evidence-based guidance." As noted in the report, one of Grinnell's "ongoing goals" was to respond in a "trauma-informed way" to reports of prohibited conduct.

75.     The ACHA Report urges colleges to adopt a "trauma-informed approach," defined as:

---

[18] *See* http://www.thesandb.com/article/letter-to-the-editor-an-elegy-for-feminist-justice-at-grinnell.html.

Trauma-informed approaches emphasize physical, psychological, and emotional safety for both providers and survivors, which allows survivors to rebuild a sense of safety, control, and empowerment. Trauma-informed approaches further involve vigilance in anticipating and avoiding institutional practices and processes that are likely to re-traumatize individuals with histories of trauma.

76.    The ACHA Report defines women as a "marginalized and vulnerable population"

"at greater risk for victimization."

77.    The ACHA Report discusses, among other things:

- "Rape Culture" on college campuses, defined as "a complex of beliefs that encourages male sexual aggression and supports violence against women." *Id.* at p. 15. "A prominent element within rape culture is the endorsement of rape myths. These myths widely define 'real rape' as violent, physical, forced acts of sex often perpetrated by strangers and met with much resistance from victims. Such myths purport narratives that shift blame from the offender to the victim/survivor."

- "Male Involvement With Prevention Education," noting "sexual assault and relationship violence exist in a culture that encourages men to see themselves as different from and better than women. The hallmark of western masculinity is often seen as power and control." *Id.* at p. 17. The Report notes "many men may commit a broad range of violence acts in order to procure their manhood when structurally excluded from traditional male power structures due to race, ethnicity, class, sexual orientation or other identities." *Id.*

- "Sexual and relationship violence must be conceptualized as an issue of gender dynamics." *Id.* at 17.

- "Far too many men have done little more in the area of preventing sexual and relationship violence than to make a personal decision to not be a rapist or violent. This choice is often commended but is not sufficient." *Id.*

- "What is often difficult is to move beyond change at the individual and interpersonal level—the change in attitudes and behaviors of men towards women and others who do not conform to the dominant masculine ideal. College campuses are uniquely situated in that each campus can create its own culture and social change and broader impact can be reached." *Id.* at 18.

- "It is recommended that these discussions of gendered power be approached indirectly to help minimize resistance." *Id.* at 18.

- "It is essential to recognize that a male…who does not recognize the structural dimensions of masculinity and who takes for granted his structural privileges will likely perceive women's empowerment as an actual loss and have a real sense of

victimization. Being able to empathize, while not supporting the assumptions of men's victimization at the hands of women's empowerment, can help engage men." *Id.* at 19.

- "Specifics for Targeting Men in Prevention of Sexual and Relationship Violence"—"Understand the 'patriarchal dividend' that may have left many men unaware and complicit. Additionally, many people become defensive when discussing issues related to privilege and have trouble seeing how they benefit when they are often stuck in the oppressed status of their identity." *Id.*

78.    The ACHA Report also viewed the Title IX Coordinator, as a "first responder" to traumatized victims. *Id.* at p. 31.

79.    Grinnell administrators, including those involved in Plaintiff's Title IX proceedings, and Justice Ternus, the external adjudicator, were trained to use a "trauma-informed" response in sexual misconduct cases.

80.    A central tenet of trauma-informed training is the purported "neurobiological change" that occurs during a sexual trauma wherein the body releases a flood of chemicals that allegedly directly affect the individual's actions during the event as well as her memory of the event. Thus, investigators and adjudicators are taught in trauma-informed trainings that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of sexual assault as opposed to considering them to be indicators that the complainant's story may lack credibility.

81.    Such training has recently come under fire from scientists and courts alike. *See* "Memory and Neuroscience Experts Warn Title IX Training Is Driven By Junk Science, at https://www.thecollegefix.com/bulletin-board/memory-neuroscience-experts-warn-title-ix-training-driven-junk-science/ ("One of the 'self-styled experts in the neurobiology of trauma' is Michigan State University's Rebecca Campbell,[19] who is not a neuroscientist and admits it's an

---

[19] Campbell's work was cited in the ACHA report described *supra* Paragraphs 74-78, which Grinnell endorsed as part of its trauma-informed approach.

'overreach' to use her research as gospel in Title IX investigations"); "Judge Rebukes UC Santa Barbara for Using Trauma-Informed Approach in Title IX Proceeding" at https://www.thecollegefix.com/judge-rebukes-uc-santa-barbara-for-using-trauma-informed-approach-in-title-ix-proceeding/ *See also Norris v. U. of Colorado, Boulder*, 2019 WL 764568 at * 9 (D. Colo. 2019) (among other things, trauma-informed training supported plausible allegations of gender bias in Title IX proceedings).

82.     The Association of Title IX Administrators ("ATIXA") recently issued a position statement to colleges and universities warning that a complainant's perceived trauma must not be used as evidence that the alleged sexual misconduct has occurred. ATIXA further warned that the improper use of trauma-informed methods, such as to interpret evidence is junk science and must be avoided.[20]

83.     On January 25, 2018, *The Scarlet & Black* reported that Grinnell's Student Health and Counseling Services ("SHACS") had welcomed a new group on campus. "Defining Masculinity," the purpose of which was, in part, to facilitate a discussion among male-identifying students about healthy and toxic masculinity. Referencing the #metoo movement, the founder of the group noted that masculinity can often be toxic, with men "stuck thinking/feeling/acting in ways that are traditionally accepted, not representative of who we are, and that are harmful to self and others.... [It is] absolutely imperative that male-identity groups need to address the different factors that may perpetuate men's physical and sexual violence."[21] Notably, a similar group was not offered with regard to notions of femininity, suggesting that only male-identifying individuals

---

[20] https://cdn.atixa.org/website-media/atixa.org/wp-content/uploads/2019/08/20123741/2019-ATIXA-Trauma-Position-Statement-Final-Version.pdf
[21] http://www.thesandb.com/article/shacs-embraces-healthy-masculinity.html

need assistance with "toxic" character traits and to avoid perpetrating acts of violence against women.

## V.   **Grinnell's Sexual Misconduct Policy and Procedures**

84.    On an annual basis, typically at the beginning of the Fall semester, Grinnell provides its enrolled students with a copy of its "Policy, Procedures and Guide to Preventing Reporting, and Responding to Sexual Misconduct and Other Forms of Interpersonal Violence" (the "Sexual Misconduct Policy") via email. Students are also provided with a copy of Grinnell's Student Conduct policies and processes, or access to same via email.

85.    Under Iowa law, these policies and procedures create a contractual relationship between Grinnell and its students. *See, e.g. T.E. v. Linn-Mar Community School Dist.*, No. LACV 35077, 2000 WL 34514000 (Iowa Dist. Ct. Aug. 30, 2000); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443 (1984).

86.    Grinnell's relevant Sexual Misconduct Policy, last revised in September 2017, provided as follows:

(i)     The College would "respond promptly and equitably" to reports of sexual misconduct "while tailoring the resolution to best fit the facts and circumstances and the goals of Title IX." *Id.* at p. 2.

(ii)    The Sexual Misconduct Policy was intended to "[p]rovide the Grinnell College community with a clear set of behavioral standards and clear definitions of Prohibited Conduct." *Id.*

(iii)   "The College does not discriminate on the basis of… sex, gender, sexual orientation…gender identity or expression." *Id.* at p. 3.

(iv)    "Grinnell College is committed to a policy of nondiscrimination in…access to and participation in its education programs, services and activities." *Id.*

(v)     "The College, as an educational community, will promptly and equitably respond to reports of Prohibited Conduct in order to eliminate the conduct, prevent its recurrence, and address its effects on any individual or the community." *Id.* at p. 7.

23

(vi)     "[T]he College will act using the educational lens of Title IX." *Id.*

(vii)    "[T]he College is committed to ensuring that all reports are referred to the Title IX response team to ensure *consistent* application of the policy to all individuals and allow the College to respond promptly and equitably." *Id.* at p. 9 (emphasis added).

(viii)   "Resources are available for students, staff, and faculty, whether as Complainants, Respondents, or witnesses to provide guidance throughout the investigation and resolution of the complaint." *Id.* at p. 10.[22]

(ix)     "In any report, investigation, or resolution of a report under this policy, every effort will be made to protect the privacy interests of all individuals involved." *Id.*

(x)      "Privacy means that information related to a report under this policy will only be shared with those who 'need to know' in order to assist in the review, investigation or resolution of the report." *Id.*

87.     The Sexual Misconduct Policy sets forth the following definitions:

(i)      "Non-consensual Sexual Intercourse" means "[h]aving or attempting to have sexual intercourse or sexual contact with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact." *Id.* at p. 16.

(ii)     "Non-consensual Sexual Contact" means "[h]aving or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, causing the other to touch their own intimate

---

[22] In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct."* The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.  In a process governed by the enforcement of Title IX gender equality, and in which overwhelming the majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal."  While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available."  The study suggests that accused students are left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services." *See* https://www.naspa.org/files/dmfile/Expanding_the_Frame_DOWNLOAD.pdf.; https://www.mindingthecampus.org/2020/02/03/survey-confirms-unfairness-of-campus-title-ix-on-due-process/

parts, or disrobing or exposing of another without permission. Intimate parts may include the breasts, groin, genitals, buttocks, mouth or any other part of the body that is touched in a sexual manner. Non-consensual Sexual Contact can occur whether individuals are clothed or unclothed." *Id.*

88.     Regarding incapacitation, the Sexual Misconduct Policy states "[a]n individual who engages in sexual activity with someone the individual knows, or reasonably should know, is incapacitated is in violation of this policy." "Incapacitation is defined as the inability, temporarily or permanently, to give consent, because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that the sexual activity is occurring. Incapacitation means that a person lacks the ability to make informed, rational judgments about whether or not to engage in sexual activity." *Id.* at p. 21. The Sexual Misconduct Policy further states:

> A person is not incapacitated merely because they have consumed alcohol or other drugs. The impact of alcohol and other drugs varies from person to person. Although every individual may manifest signs of incapacitation differently, typical signs that a person may be approaching incapacitation may include slurred or incomprehensible speech, vomiting, unsteady gait (i.e. a manner of walking, stepping, or running), incontinence, odor of alcohol or other substance, combativeness, and/or emotional volatility.

89.     Regarding alcohol and drugs, the Sexual Misconduct Policy states as follows:

> In general, the College considers sexual contact and/or intercourse while under the influence of alcohol and/or other drugs to be risky behavior. Alcohol and other drugs impair a person's decision-making ability, awareness of the consequences, and capacity to make informed judgments. From the perspective of the Complainant, the use of alcohol and/or other drugs can limit a person's ability to give consent knowingly, voluntarily and affirmatively. Regardless of their level of intoxication or impairment, however, a Complainant is never responsible for the intentional actions of another individual. From the perspective of a Respondent, the use of alcohol and/or other drugs can create an atmosphere of confusion over whether or not consent has been given knowingly, voluntarily and affirmatively. It is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication. If there is any doubt as to the level or extent of the other individual's intoxication or impairment, the prudent course of action is to forgo or cease any sexual contact or activity.

> The perspective of a reasonable person will be the basis for determining whether a Respondent knew or should have been aware of the extent and amount of the

ingestion of alcohol and/or other drugs by the Complainant or of the extent to which the use of alcohol and/or other drugs may have impacted a Complainant's ability to give consent. For example, *an individual who is in a blackout may appear to act normally and be giving consent but may not actually have conscious awareness, the ability to consent, or later recall the events in question. The extent to which a person in this state affirmatively gives mutually understandable words and/or clear, unambiguous actions indicating a willingness to engage in sexual activity and the other person is unaware—or reasonably could not have known—of the person's level of alcohol consumption and/or level of impairment must be evaluated in determining whether consent has been given.* (emphasis added).

Being intoxicated or impaired by alcohol and/or other drugs is never an excuse for an act of Prohibited Conduct and does not diminish one's responsibility to obtain consent. (emphasis in original). *Id.* at pp. 21-22.

90.     With respect to handling reports of sexual misconduct, the Sexual Misconduct Policy states that the "College will approach the assessment of each report with an earnest intent to understand the perspective and experience of each individual involved in order to ensure fair and impartial evaluation and resolution." *Id.* at p. 29. "Choosing to make a report, and deciding how to proceed after making the report, can be a process that unfolds over time." *Id.* The "*Complainant* can help set the pace and make decisions about how best to proceed." *Id.* at p. 30 (emphasis added).

91.     "The College does not limit the timeframe for reporting." *Id.* at p. 32. Moreover, "A Complainant's belief that there may be a lack of corroborating evidence or 'proof' should not discourage them from reporting Prohibited Conduct under this policy…as College investigator(s) receive specific training in the dynamics of sexual misconduct and the investigation of Prohibited Conduct." *Id.*

92.     The Sexual Misconduct Policy sets forth a process through which sexual misconduct complaints are formally investigated and adjudicated, known as formal resolution:

(i)     An initial assessment and resolution process are overseen by the Senior Official, defined as the Dean of Students. The Dean of Students, in consultation with the Title IX Coordinator will determine whether a report should be informally or

formally resolved. *Id.* at p. 35. The initial assessment includes "explicit consideration of a Complainant's requested course of action." *Id.* at p. 36. A respondent is not notified unless and until actions taken by the College will impact the respondent. *Id.* at p. 37.

(ii)     Protective and remedial measures may be issued, to respond to "immediate health and safety concerns." *Id.* Interim protective measures must be "reasonable and appropriate" and "designed to eliminate the reported hostile environment." These measures include "remedial" measures meant to "address the Complainant's well-being and continued access to educational and employment opportunities" and "protective" measures involving "action against a Respondent." Protective measures include "[a]n interim suspension, ban or paid/unpaid leave pending the outcome of a conduct proceeding" and changing the *respondent's* course schedule, work schedule or campus housing.

(iii)    The College will maintain "consistent contact with the parties to ensure that all safety and emotional and physical well-being concerns are being addressed." *Id.* at p. 39.

(iv)     The College seeks to resolve all reports of Prohibited Conduct within 60 calendar days of the initial report or Notice of Investigation. This timeframe can be extended with good cause, but only upon written notice to the parties of the delay and the reason for the delay. *Id.* at p. 41.

(v)      When the College initiates an investigation, the Senior Official will issue a written Notice of Investigation which will include the "names of the parties, a brief description of the alleged conduct and the potential policy violations." *Id.* at p. 44.

(vi)     The College will appoint a "trained investigator or investigators to conduct a prompt, equitable, thorough and impartial investigation of reports of Prohibited Conduct." "The investigation is designed to provide a fair and reliable gathering of facts. Information gathered during the review or investigation will be used to ensure the safety of the Complainant and the College campus community." *Id.* at p. 44.

(vii)    The investigator(s) are tasked with composing a chronology of events and preparing a written report documenting the complete investigation. *Id.* at p. 45.

(viii)   "The Complainant and Respondent will have an equal opportunity to be heard, to submit information, to ask and respond to questions of the other party through the investigator, and to identify witnesses who may have relevant information. Both parties will also have equal and timely access to information that will be used in the adjudication of the report, and timely notice of meetings or proceedings at which their presence will be required or requested." *Id.*

(ix)     "Witnesses must have observed the acts in question or have information relevant to the incident and cannot be participating solely to speak about an individual's

character…. Witnesses will not be called to meet with the adjudicator." *Id.* Any student or faculty witness who refuses to cooperate may be subject to sanction. *Id.*

(x)    "The prior sexual history of the Complainant or Respondent will never be used as evidence of character or reputation." *Id.* at p. 46.

(xi)    "Where a sufficient informational foundation exists for prior sexual history or pattern evidence, the investigator(s), in consultation with the Title IX Coordinator or Deputy Coordinator for Case Management, will assess the relevance, form and reliability of the information and determine if it is appropriate for inclusion in the written investigation report for consideration by the adjudicator in determination of responsibility and/or assigning of any sanction." *Id.* at p. 46.

(xii)    "The determination of relevant pattern evidence will be based on an assessment of whether the previous or subsequent conduct was substantially similar to the conduct under investigation or indicates a pattern of similar prohibited conduct." *Id.* at p. 46.

(xiii)    "The Dean of Students, in consultation with the investigator(s) and Title IX Coordinator or Deputy Coordinator for Case Management, has the discretion to consolidate multiple reports against a Respondent into one investigation and resolution if the evidence related to each incident would be relevant and probative in reaching a determination on the other incident. Matters may be consolidated where they involve multiple Complainants." *Id.* at p. 47.

(xiv)    "Information that is irrelevant, more prejudicial than probative, or immaterial may be redacted" from the investigation report. *Id.*

(xv)    "The purpose of the investigation is to gather facts that may help establish whether there is a reasonable basis for concluding that it is more likely than not the alleged violation of this policy has occurred." *Id.*

(xvi)    At the conclusion of the investigation, the investigator(s) issue a preliminary investigation report, which may be reviewed by the Complainant and Respondent. The Complainant or Respondent may provide comments, propose questions for the investigator(s) to ask the other party, or identify additional witnesses or sources of evidence within five (5) business days after receipt of the preliminary report. *Id.*

(xvii)    A final investigation report is then issued, which serves as the basis for adjudication. A single adjudicator—the Dean of Students, College administrator, or "trained individual external to the College"—determines responsibility by a preponderance of the evidence whether there was a violation of "conduct standards or policy." *Id.* at p. 48.

(xviii)    The Dean of Students will email information to the Complainant and Respondent about the adjudication process, the date, time and place of the meeting and the name

of the adjudicator. *Id.* at pp. 48-49. The College "may engage an outside individual or firm (typically experienced judges trained in the intricacies of Title IX) to adjudicate cases of sexual assault or other forms of Prohibited Conduct as needed." *Id.* at p. 49.

(xix)   "The adjudication meeting is not intended to be adversarial; rather it is intended to be educational, corrective, and developmental." *Id.* at p. 50. Yet, at the adjudication meeting, the Respondent is required to enter a "plea" of responsible or not responsible for each "charge." *Id.* at 50. The adjudicator, frequently a judge, is tasked with recommending sanctions for policy violations, including suspension or dismissal from the College. *Id.* The Sexual Misconduct Policy also provides that College counsel may be present at the adjudication meeting. *Id.* at p. 49.

(xx)   "The adjudicator is required to review all pertinent information regarding the incident, including written statements, the investigation report, documents, items, and/or oral information from the Complainant(s), Respondent(s), and witnesses prior to the adjudication meeting(s)." *Id.*

(xxi)   The adjudicator meets separately with a "member of the investigation team," the Complainant and the Respondent. *Id.* The Respondent may not participate in the Complainant's adjudication meeting, nor is there an opportunity for Respondent to submit questions to the adjudicator to be asked of the Complainant and, thus, no form of cross-examination. The adjudicator is solely responsible for determining responsibility.

(xxii)   The Respondents, even if asserting defenses to the allegations, is required to submit a "mitigation statement" to the adjudicator, before any decision is made as to responsibility. *Id.* at 51. The Complainant is also required to submit an "impact statement" before any decision is made. *Id.* at 50.

(xxiii)   At the adjudication meeting, the Complainant "if they wish" may present their own account of the events in a narrative format. *Id.* at 50. In contrast, the Respondent "will be given an opportunity, and is encouraged, to present their response" to the "charges" against them. *Id.* at 51.

(xxiv)   After the adjudicator meets with the investigator, Complainant and Respondent, the adjudicator "must reach a decision on responsibility by using the preponderance of evidence. This means that the adjudicator will decide whether it is 'more likely than not,' based upon the information provided through the investigation and at the adjudication meeting(s), that the Respondent is responsible for the alleged violation(s)." The findings are then documented in a case opinion, issued to both Complainant and Respondent, within five (5) business days of completion of the meetings.

(xxv)   If the adjudicator finds a student responsible for sexual misconduct, they will recommend sanctions to the Dean of Students (or designee). The Dean of Students

is not bound by the recommendations of an external adjudicator and has the "final authority to impose appropriate educational outcomes." *Id.* at 52.

(xxvi)  A student found responsible for Non-Consensual Sexual Intercourse will "typically receive educational outcomes (sanctions) of suspension or dismissal, including a ban from campus." *Id.* at 52. Conduct dismissals are permanently noted on a student's transcript. *Id.* at p. 53. Affirmative findings of responsibility in matters resolved by formal resolution become part of a student's permanent conduct record. *Id.*

(xxvii) A student found responsible for Non-Consensual Sexual Contact "(where no intercourse has occurred) will typically receive educational outcomes (sanctions) ranging from conduct warning to dismissal." The Dean of Students "reserves the right" to broaden or lessen any range of recommended sanctions, "in the case of serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior." *Id.* at 52. The adjudicator, Dean of Students and appeals officer may deviate from the range of recommended outcomes if "compelling justification exists to do so." *Id.*

(xxviii) The Complainant and Respondent may appeal the outcome within five (5) business days of receiving notice of the outcome. *Id.* at p. 54. The only grounds for appeal are (i) new evidence and (ii) procedural errors that had a material impact on the outcome. *Id.* at 54. The burden of proof lies with the appellant and "the original determination and educational outcomes (sanctions) are presumed to have been decided reasonably and appropriately." *Id.* at p. 55.

(xxix)  The appeal officer designated for student appeals is the Assistant Vice President of Student Affairs. *Id.* at 54. If the appeal officer "has been involved in the conduct at issue in the complaint/grievance, or if the individual was consulted about the conduct at issue in the complaint/grievance, then the Title IX Coordinator will direct the appeal to another" appeal officer. *Id.* The appeal officer is designated as an "impartial decisionmaker." *Id.*

(xxx)   The appeal officer has ten (10) business days to decide and communicate the results of the appeal. *Id.* at 55. Appeal decisions are final. *Id.*

## V.   <u>The Definition of Consent Under Grinnell's Sexual Misconduct Policy</u>

93.    The Sexual Misconduct Policy is based on "affirmative consent." "Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to the end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually

understandable words and/or clear unambiguous actions that indicate a willingness to engage freely in sexual activity."

94.     The Sexual Misconduct Policy further states as follows:

a. Each participant in a sexual encounter is expected to obtain and give consent to each act of sexual activity. Consent to one form of sexual contact does not constitute consent to engage in all forms of sexual contact.

b. Consent consists of an outward demonstration indicating that an individual has freely chosen to engage in sexual activity. Relying on non-verbal communication can lead to misunderstandings or potential policy violations. Consent may not be inferred from silence, passivity, lack of resistance, or lack of an active response alone. A person who does not physically resist or verbally refuse sexual activity cannot be assumed to be giving consent.

c. If at any time it is reasonably apparent that either party is hesitant, confused or unsure, both parties should stop, decide whether to continue, and obtain mutual verbal consent before continuing such activity.

d. Consent may be withdrawn by either party at any time. Withdrawal of consent must also be outwardly demonstrated by mutually understandable words or clear, unambiguous actions that indicate a desire to end sexual activity. Once withdrawal of consent had been expressed, sexual activity must cease.

….

e. An individual who is physically incapacitated from alcohol and/or other drug consumption (voluntarily or involuntarily), or is unconscious, asleep, unaware that sexual activity is occurring, or otherwise mentally or physically helpless is considered unable to give consent.

When evaluating consent "the College will consider the *objectively apparent* indications of consent (or lack of consent) from a reasonableness perspective." *Id.* at pp. 19-20 (emphasis added).

## VII.     The Allegations Against Peter P. Moe

95.     On February 12, 2018, "Complainant 1"[23] made a report to the Title IX office, alleging that Plaintiff had engaged in sexual misconduct with her and "indicating" that he "may have engaged in similar behavior with other students." Upon information and belief, Complainant

---

[23] A pseudonym is being used to protect the identities of the three complainants, all female, Grinnell students.

1 then solicited her two friends "Complainant 2" and "Complainant 3" to make reports against Plaintiff. The three Complainants appeared together at the Title IX office on February 20, 2018. No one questioned their motives.

96.     The Complainants appeared to be motivated by their dislike of Complainant. Complainant 1, in particular, was upset with Plaintiff because she believed he had told a number of his friends about their sexual encounters, which occurred over the weekend of December 8-10, 2017.

97.     On February 22, 2018, the Title IX office banned Plaintiff from campus, including his off-campus housing (which was sponsored by the College). As a result, he had to resign from his work-study positions and had to pay his obligation out of pocket. Plaintiff's GPA was also impacted because he could not attend classes.

98.     On that day, Plaintiff met with Sarah Moschenross ("Moschenross"), the Dean of Students, and Bailey Asberry ("Asberry"), a Deputy Title IX Coordinator, and they informed him of the campus ban and that he had 48 hours to comply. They did not provide him with any specifics of the allegations, nor did they ask for any form of response from him, including any written statement. Upon information and belief, written statements had been taken from the complainants but were not shown to Plaintiff. Moschenross and Asberry erroneously informed Plaintiff that Complainant 3 had alleged non-consensual intercourse, which she had not.

99.     During the meeting, Plaintiff notified Moschenross and Asberry that he had recently committed to sobriety due to mental health and substance abuse issues. This information went ignored, and no assistance was offered to Plaintiff specific to his substance abuse problem.

100.    At the meeting, Plaintiff told Moschenross and Asberry that he preferred being addressed as "they" or "their" and that he identified as nonbinary, meaning he did not wish to

categorize himself as male or female or be referred to as "he" or "him." As will be explained further below, throughout the proceedings Plaintiff, who was assigned the male gender at birth, is legally a male, and appeared, or presented, as male during the Title IX proceedings, was treated as male by Grinnell. Biased assumptions about masculinity were attributed to Plaintiff, while biased assumptions about femininity were attributed to the complainants.

101.    Moschenross and Asberry told Plaintiff that the investigation and adjudication of the charges would take 60 days. Instead, it took four months.

102.    The investigation was conducted by an attorney from the law firm of Husch Blackwell. At no point during the investigation was Plaintiff allowed to confront his accusers or to cross-examine the complainants directly, via the investigator or by submitting written questions.

103.    A preliminary investigation report was drafted by the attorney investigator, to which Plaintiff provided comments. No further investigation occurred. On May 17, 2018 a final investigation report was issued by the investigator. The investigator did not make any findings in the report. The final investigation report was provided to Adjudicator Justice Ternus, who was solely responsible for determining whether Plaintiff violated the Sexual Misconduct Policy.

**A.  <u>Complainant 1</u>**

104.    Plaintiff and Complainant 1, who were both in their third-year of college, became friends at the beginning of their first year at Grinnell.

105.    Complainant 1 studied abroad during the Fall 2017 semester, during which time she and Plaintiff stayed in touch via Snapchat. It was not unusual for them to exchange sexually explicit messages. They also discussed their fluid sexualities and their sleeping together.

106.    Upon Complainant 1's return from overseas, she and Plaintiff agreed that she would stay with Plaintiff at his off-campus housing for 2-3 days. On or about December 8, 2017—one of

the days on which Complainant 1 had arranged to sleep over—there was a party at Plaintiff's house. Both Plaintiff and Complainant 1 were drinking at the party.

107.    At one point in the evening, Complainant 1, Plaintiff and another student were laying on the living room floor. Complainant 1 announced that she felt like making out with "anyone." In response to that comment, Plaintiff, who was next to Complainant 1 on the floor, kissed Complainant 1. According to Complainant 1's account, she told Plaintiff "no not right now" and he stopped kissing her. According to Plaintiff, Complainant 1 kissed him on a number of occasions during the evening, before the two went upstairs and had consensual sexual intercourse.

108.    Complainant 1 alleged that Plaintiff violated the Sexual Misconduct Policy by having sexual intercourse with her without her consent. However, by Complainant 1's own account to the Husch Blackwell investigator assigned to the case:

(i)     She was drunk and went along with having sex with Plaintiff, she wanted to at the time and she okayed it.

(ii)    She was just going "through with" filing a complaint because she was "told" that what happened was nonconsensual.

(iii)   She didn't remember everything that occurred on the evening in question.

(iv)    Kissing Plaintiff felt good and she went along with having intercourse. She was not going to stop Plaintiff even though she "didn't really want it."

(v)     She "seemed enthused" during sex but only because she was drunk and "wasn't really paying attention to who it was."

(vi)    Complainant 1 and Plaintiff performed oral sex on one another and she outwardly appeared to be enjoying it.

(vii)   The two had sex with a condom, and it is possible that she asked him to put it on beforehand.

(viii)  She did not remember if Plaintiff asked for consent prior to intercourse.

(ix)     Complainant 1 stayed with Plaintiff in his bed that evening and slept over the next night, in the same bed, as well. The two engaged in more sexual activity two nights after they had sex.

109.     When questioned, Plaintiff told the investigator that he and Complainant 1 engaged in consensual sexual intercourse, and that he asked for, and received, consent to have sex. Plaintiff further stated that he was nervous that if Plaintiff did not give Complainant 1 what she wanted that she would be upset with him. Her body language, embrace and that she was kissing him demonstrated her continuing interest in the encounter. They undressed each other and Complainant 1 asked Plaintiff if he had a condom. During intercourse, the two continued to verbally communicate about what each liked and wanted.

110.     Plaintiff acknowledged that he and Complainant 1 had been drinking on the night in question but said that she was able to hold a conversation and walk under her own power both before and after the two had sex.

111.     When asked pointed questions by the investigator about Plaintiff's recitation of the events of the evening, Complainant 1 exaggerated her level of intoxication, and lack of memory, in an attempt to avoid answering the questions.

112.     Comments made by Complainant 1 to the investigator suggested that she was coached by someone who told her that nonconsensual sexual intercourse had occurred. By her own statements, she believed the activity appeared consensual to Plaintiff. She was "going through with" making a report because she was "told" it was non-consensual. She further stated that she the fact that her body made noises during the activity did not mean she consented to it. Rather than follow up on these suspicious comments, the investigator asked questions of Complainant 1 that led her to come to the conclusion that she had not consented.

113. Per the investigator's report, in which the investigator was tasked with providing "areas of agreement," both parties *agreed* that Complainant 1 was enthused and participated during sexual intercourse. Per the Sexual Misconduct Policy, referenced *supra*, consent is demonstrated through "mutually understandable words and/or clear unambiguous actions that indicate a willingness to engage freely in sexual activity" and also an "outward demonstration indicating that an individual has freely chosen to engage in sexual activity."

114. The investigator noted that Plaintiff and Complainant 1 were in disagreement about whether or not the kiss that occurred while they were laying on the living room floor was consensual. Complainant 1 offered the names of six witnesses who were present in the living room during the time in which Plaintiff kissed her. The investigator did not interview these witnesses.

115. The investigator also declined to interview a friend of Plaintiff and Complainant 1 who spoke to Complainant 1 and Plaintiff immediately after they had sex.

116. At some point in late January 2018, Complainant 1 told Plaintiff that she did not want to continue "hooking up" because she had difficulty balancing friend relationships and intimate relationships. The two texted back and forth a few times in February 2018. In one text Plaintiff told Complainant 1 that in working with a therapist he had come to realize that he has a problem with "self worth and sex which has realized itself in a sort of addiction. I know I've hurt you and others and maybe there's no going back but…I'm trying to be a better me." The investigator asked Plaintiff no questions about the meaning of this text or what prompted it.

B. **Justice Ternus' Adjudication of Complainant 1's Allegations**

117. The allegations of Complainant 1 were consolidated with the allegations of Complainants 2 and 3, detailed *infra* Paragraphs 137-190, for adjudication by Justice Ternus, as well as for recommending sanctions.

118.    On May 23, 2018, Complainant 1 and Justice Ternus met by video conference to discuss her allegations against Plaintiff. Prior to the video conference, Justice Ternus reviewed the Final Investigation Report compiled by Husch Blackwell, which consolidated the information gathered with respect to the three complainants, provided a summary of the evidence gathered and appended witness statements and evidence to the report.

119.    On May 23, 2018, Justice Ternus also had a video meeting with Plaintiff. During the meeting Justice Ternus read the "charges" against Plaintiff to which Plaintiff responded that he was not responsible. Justice Ternus asked very few questions of Plaintiff during the adjudication meeting, and focused primarily on the text message that Plaintiff sent to Complainant 1. Her tone was condescending. During the meeting, Plaintiff attempted to explain that he had been struggling with substance abuse and sobriety during the timeframes at issue. He denied that he engaged in sexual misconduct, which was consistent with the statements he made to the Husch Blackwell investigator

120.    Pursuant to the Sexual Misconduct Policy, Justice Ternus was required to meet with the Husch Blackwell investigator as part of the adjudication process. *Id.* at p. 49. This did not occur.

121.    Plaintiff was not permitted to participate in the adjudication meetings with any of the complainants. He was not given an opportunity to provide questions to be asked of the complainants by Justice Ternus as part of the adjudication process. Without such opportunities, and because there was no hearing, Plaintiff was denied the right of cross-examination during the adjudication process.[24]

---

[24] Courts have recently held that in sexual misconduct proceedings, where credibility is at issue, restrictions on the respondent's right to cross-examine the complainant violate the respondent's right to due process, including in the private university setting. *See Doe v. Rhodes College*, Case No. 2:19-cv-02336, Docket # 33, Order, at pp. 8-9 & n.4;

122.     Justice Ternus issued findings regarding Complainant 1 as part of a consolidated opinion concerning all three complainants.

123.     Justice Ternus' opinion incorrectly stated that Plaintiff did not provide a mitigation statement for consideration in the event that he was found responsible. On or about May 23, 2018, Plaintiff submitted a mitigation statement to Moschenross who, upon information and belief, failed to provide that document to Justice Ternus.

124.     With regard to Complainant 1, Justice Ternus considered the following, unsupported and prejudicial, character statements made by Complainant 1 even though they had not been corroborated:

- Plaintiff had "an issue with consent and blurry lines…with …others that I've heard of." Ternus Op. at p. 18.

- Plaintiff had a "history" of "edging their way in to getting like more and more sexual contact without ever explicitly asking if it was okay." Ternus Op. at p. 18. Notably, Grinnell's Sexual Misconduct Policy did not require a person to *explicitly ask* for consent. *See supra* ¶¶ 93-94.

- Plaintiff was "really good at …gaslighting." Ternus Op. at p. 19.

- Complainant 1 "heard from other girls who had similar experiences with" Plaintiff. Ternus Op. at 21. These other girls led her to start the Title IX process.

125.     Justice Ternus' "findings" regarding Complainant 1 noted that Complainant 2, who was friends with Complainant 1, told Complainant 1 that Complainant 2 was blackout drunk when she had sex with Plaintiff and that it was "rape." Complainant 1's conversation with Complainant 2, "helped her interpret what had happened to her as not just 'drunk sex' but 'nonconsensual sex.'" Ternus Op. at 21.

---

*Doe v. Baum*, 903 F.3d 575, 585 (6th Cir. 2018); *Doe v. Brandeis U.*, 177 F. Supp. 3d 561, 604-605 (D. Mass. 2016) *Doe v. Allee*, 30 Cal. App. 5th 1036, 1063-1070 (Ct. App. 2019).

126.    Justice Ternus included in her opinion Plaintiff's text message to Complainant 1 misconstruing it as an admission that Plaintiff had violated the Sexual Misconduct Policy.

127.    Even though Complainant 1's statements to the Husch Blackwell investigator, outlined *supra* Paragraphs 108, 111-112, 113, flatly contradicted her allegations that Plaintiff did not obtain consent for the sexual activities in which she engaged with Plaintiff, and Plaintiff's statements to the investigator regarding Complainant 1 were clear and consistent, Justice Ternus "did not find [Plaintiff] to be credible, and, therefore [did] not consider their statements that they expressly asked for and received verbal consent from [Complainant 1] to be reliable." Ternus Op. at p. 23.

128.    Despite a lack of any evidence to support her findings—and that *both* Complainant 1 and Plaintiff had been drinking on the evening in which they engaged in sexual intercourse— Justice Ternus found that Plaintiff "knowingly took advantage of [Complainant 1's] impaired state to initiate sexual contact." Justice Ternus ignored Plaintiff's statement to the investigator that he felt pressured to engage in sexual activity with Complainant 1 because if he did not give her what she wanted she would be upset with him. She also ignored Complainant 1's conflicting statements about her own level of intoxication.

129.    Justice Ternus then found that even though, as set forth *infra* Paragraphs 137-150, the circumstances alleged were quite *dissimilar*, that Plaintiff's "approach with [Complainant 1] was quite similar to their earlier actions with [Complainant 2], causing this adjudicator to conclude that their decision to engage in sexual activity with [Complainant 1] when she was intoxicated was deliberate, if not pre-meditated." Ternus Op. at p. 23. Thus, the consolidation of the complaints against Plaintiff caused Justice Ternus to view the evidence through a biased lens and find Plaintiff to not be credible, despite objective evidence to the contrary, and appeared to weigh what she

understood or misunderstood about Plaintiff's earlier sexual desires, plans, fantasies, or whatever the Adjudicator deemed them to be, as possible evidence of pre-meditation to do something forbidden.

130.     Justice Ternus went on to find Plaintiff responsible for nonconsensual sexual *contact* though she conceded that Plaintiff *had not been charged* with that form of misconduct. In cases involving male respondents Justice Ternus often found them responsible for misconduct with which they had not been charged, leading to harsher sanctions.

131.     Justice Ternus found—despite a lack of evidence to support the finding—that Plaintiff "initiated" sexual activity without Complainant 1's consent. She did not clarify how "initiating" sexual activity equated to sexual *contact* or what evidence this finding was based upon. Justice Ternus also overlooked Complainant 1's statements to investigators that: i) kissing Plaintiff felt good and she went along with having intercourse. She was not going to stop Plaintiff even though she "didn't really want it;" and ii) Complainant 1 and Plaintiff performed oral sex on one another and she outwardly appeared to be enjoying it. By objectively reasonable standards, applicable under the Sexual Misconduct Policy, there was simply no basis for Justice Ternus' alternative, unauthorized finding of nonconsensual sexual contact other than her bias towards Plaintiff.

132.     Justice Ternus' presumption that Plaintiff was the aggressor in the encounter with Complainant 1 and that having sexual contact with her was "pre-meditated," despite Complainant 1's numerous statements about her outward demonstration of enthusiasm and eagerness towards Plaintiff indicates gender bias—that Justice Ternus viewed Plaintiff as male despite his preference to identify as non-binary and, through this lens, she found him responsible for misconduct for which he had not even been charged.

133.    This was in keeping with Justice Ternus' pattern of decision making when adjudicating sexual misconduct cases at Grinnell. As fully set forth *infra* Paragraphs 191-193, Justice Ternus' opinions and recommendations were punitive toward male respondents and rehabilitative towards female respondents. Justice Ternus frequently attributed qualities of helplessness, inexperience, innocence and confusion about sex to female complainants even though the male accused may lack sexual experience or feel the same way about sexual activity.

134.    Ultimately, Justice Ternus found that Plaintiff was *not responsible* for the sexual misconduct with which he was charged—non consensual sexual intercourse.[25] Notably, though Justice Ternus at once said that Plaintiff took advantage of Complainant 1 because she had been drinking, Justice Ternus also concluded that "there is very little indication that [Complainant 1] exhibited any signs that she was incapacitated or approaching incapacitation." Ternus Op. at p. 27. Though Plaintiff's statements confirmed this, Justice Ternus "relie[d] very little on [Plaintiff's] statements…for the reasons discussed above regarding [Plaintiff's] credibility." *Id.*

135.    Though Plaintiff was found not responsible for nonconsensual sexual intercourse with Complainant 1, her allegations, and Justice Ternus' findings and opinions, described *supra* were grouped together with the other complainants' allegations and used to determine sanctions against Plaintiff under the theory of a "pattern of behavior"—for which there was no evidence.

136.    Justice Ternus issued a report called "Recommended Educational Outcomes" which was not provided to Plaintiff and which he had no right to contest or respond to as part of any appeal.

### C.  Complainant 2

---

[25] Plaintiff does not contend that the finding of "not responsible" was an erroneous outcome but that the finding of nonconsensual sexual contact was erroneous, as was the consolidation of the three complaints, and inclusion of Complainant 1 in Justice Ternus' finding of a purported pattern of behavior.

137.    Complainant 2 was good friends with Complainant 1. Per Complainant 1, Complainant 1 and 2 had a conversation about Plaintiff before making Title IX complaints against him.

138.    Complainant 2's allegations concerned a sexual encounter that occurred one year prior (though she, herself, could not remember the date, citing that it occurred in April rather than February and then revising her account).

139.    Plaintiff and Complainant 2 were acquaintances and were "never close." Prior to the night of February 18, 2017, the two had not had any contact that was sexual in nature.

140.    Complainant 2 and her female friend "H.A." attended a concert on the evening in question and met up with Plaintiff afterwards. Plaintiff and Complainant 2 then attended a party, and spent considerable time having a one-on-one conversation on "the loggia," which they each climbed through a window to access.

141.    Prior to meeting up with Complainant 2, Plaintiff experienced a panic attack. He took two Xanax and smoked a joint to calm down. After meeting up with Complainant 2 he had a few vodka drinks at the party they attended. In his statements to the Husch Blackwell investigator, Plaintiff described himself as tipsy.

142.    According to Plaintiff, after the party and the conversation on the loggia, he walked Complainant 2 back to her dorm. He reported to the investigator that, prior to arriving at her room, Complainant 2 was able to walk, talk and hold a conversation with Plaintiff. Complainant 2 had no trouble speaking or forming sentences.

143.    When they arrived at Complainant 2's dorm, Plaintiff asked if he could come inside, to which she agreed. At that time, Plaintiff had no intention of spending the night with Complainant 2 as his dorm was close by. Nor did Plaintiff intend to have sex with Complainant 2 that evening.

144.    Once in Complainant 2's room, she began to undress and got ready for bed. After that, Complainant 2 and Plaintiff laid on her bed, at which point Plaintiff kissed her on the cheek. Complainant 2 then began acting sexually forward towards Plaintiff. She began kissing him aggressively, pressed her body against his, and pressed Plaintiff's leg in between her legs.

145.    Plaintiff responded in a similar manner and then asked Complainant 2 if she wanted him to perform oral sex on her, to which she agreed. Plaintiff removed Complainant 2's pajama bottoms and she removed her top. After 8-10 minutes of oral sex, she pulled Plaintiff by the hair and started kissing him.

146.    Plaintiff asked Complainant 2 if she wanted to have sex and she said yes. Plaintiff took off his pants and Complainant 2 moved her body into position so that they could have sexual intercourse. During intercourse, which lasted for about 10 minutes, Plaintiff and Complainant 2 talked about what felt good and she asked him to adjust his position. Afterwards, the two fell asleep and woke up the next morning.

147.    Complainant 2 reported to the Husch Blackwell investigator that she and H.A. ran into Plaintiff after the concert and at the party, where H.A. asked Plaintiff to walk Complainant 2 home. Complainant 2 claimed to be extremely drunk, and that she was falling and could not stand.

148.    H.A. was interviewed and contradicted these allegations. Per H.A., she did not attend the party with Complainant 2. She and Complainant 2 ran into Plaintiff at the concert and Plaintiff said he would go to the party with Complainant 2. H.A. described Complainant 2 as intoxicated, meaning that she was more extroverted than normal. Per H.A., Complainant 2 could walk with no problems and was "speaking fine."

149.    Complainant 2 also reported to the investigator that, after crawling into bed with Plaintiff, Plaintiff was suddenly on top of her, having sex with her. In a follow up interview

43

Complainant 2 confirmed that Plaintiff performed oral sex on her prior to intercourse but she could not remember whether she said yes to that. Complainant 2 also said that she could not recall details about the two having sexual intercourse but that it was "possible" that, per Plaintiff's statement, Complainant 2 gave him directions during sex and told him how it felt. During the follow-up interview, Complainant 2 attempted to redirect the conversation from the inconsistencies in her story by making unfounded allegations that Plaintiff was "manipulative in that he gets people to hang out with him because they feel sorry for him." Yet Complainant 2 was never close to Plaintiff, nor did she have a history of "hanging out" with him. The investigator did not question Complainant 2 about the basis for this statement, even though there was no indication from Complainant 2's prior account that she had been manipulated into spending time with Plaintiff.

150.    Complainant 2 said that she immediately told H.A. about the encounter with Plaintiff and "she said that's not okay." When interviewed, H.A. told the investigator that Complainant 2 "told me she had ended up hooking up with [Plaintiff] and that she wasn't sure how she felt about it." Per H.A. it was *not until she filed a complaint* with Title IX—a year later—that Complainant 2 told H.A. the encounter was not consensual.

### D.  Justice Ternus' Adjudication of Complainant 2's Allegations

151.    On May 24, 2018 Justice Ternus had a video conference with Complainant 2 to discuss her allegations against Plaintiff.

152.    During the video conference Complainant 2 changed her account of what happened earlier in the evening on the night in question and added that her friend, H.A. had tried to talk her out of going to a party with Plaintiff because she was too drunk. This change was made after Complainant 2 read the Final Investigation Report. In her statement to the investigator, H.A. said that Complainant 2 was drunk but that she was able to walk and talk with no problem.

153.    In her written narrative of Plaintiff's account of what happened with Complainant 2, Justice Ternus referred to Plaintiff as "he" rather than "they," indicating that when she first wrote the opinion she had referred to Plaintiff as male throughout. It also suggests that Justice Ternus viewed Plaintiff as a male respondent, as opposed to a nonbinary respondent.

154.    In her opinion, Justice Ternus claimed that she did not "reach the issue of capacity to consent" because she concluded that Complainant 2's allegations that she did not consent to sexual intercourse with Plaintiff were enough to show by a preponderance of the evidence that Complainant 2 did not give consent. Yet a large section of Justice Ternus' opinion concerned Complainant 2's level of intoxication.

155.    Despite the fact that Complainant 2 changed her story when re-interviewed, and again during her video conference, Justice Ternus found that Plaintiff was "inconsistent and not credible."

156.    First, Justice Ternus found that because Plaintiff kissed Complainant 2 on the cheek when they got into bed that Plaintiff was dishonest about not intending to have sex with Complainant 2 when they went back to her dorm room. Ternus Op. at 11.

157.    Second, Justice Ternus incorrectly concluded that Plaintiff was inconsistent regarding who initiated oral sex. Per Justice Ternus, Plaintiff initially said that Complainant 2 asked him to perform oral sex on her and then said that he asked her if he could do so. ***This was a clear error***. In the first statement provided to Husch Blackwell Plaintiff stated "Um, I asked her if she wanted me to perform oral sex on her and she said yes. Um, so did that for awhile." When he spoke to the investigator one month later, Plaintiff stated "I mean, I asked-as I said before, I asked her if, um, she wanted me to perform oral sex on her and she said yes. I asked her if she wanted to

have sex after that, and she said yes." Thus, Plaintiff's statements concerning the evening in question were **_consistent._**

158.    Third, Justice Ternus then erroneously found Plaintiff's assertion that Complainant 2 was "tipsy" during their encounter to be "unbelievable." She based this finding on H.A.'s statement to the investigator that Complainant 2 was drunk earlier in the evening—before Plaintiff and Complainant 2 attended the party. H.A. did not attend the party that evening. Justice Ternus ignored that H.A. referred to Complainant 2's extroverted behavior—when she was usually shy— as an indication that she was drunk. Per H.A., Complainant 2 was walking and talking "fine." Justice Ternus then misread H.A.'s statement to the investigator as stating that Plaintiff told her he was "sober" and could take Complainant 2 to the party. H.A. actually said that Plaintiff said he was "pretty sober."

159.    Justice Ternus then presumed—though she did not ask Plaintiff—that Plaintiff was attempting to "assuage H.A.'s fears for [Complainant 2's] safety." H.A. raised no concerns about Complainant 2's safety when questioned by the investigator and stated that when Plaintiff and Complainant 2 went to the party together, Complainant 2 was "relatively drunk." In her opinion, Justice Ternus did not explain how H.A.'s description of "relatively drunk" but walking and holding a conversation just fine differed from Plaintiff's description that Complainant 2 was "tipsy." Instead, she deemed Plaintiff's account "implausible." Justice Ternus also ignored that, per Complainant 2's and Plaintiff's account, they engaged in a long conversation prior to returning to Complainant 2's dorm. One year later, Complainant 2 even remembered the subject matter of that conversation.

160.    Justice Ternus next contended that Plaintiff "insisted" that Complainant 2 initiated sexual contact and that Plaintiff verbally asked for consent before engaging in sexual intercourse

with her. Yet Plaintiff did not insist, he merely made consistent statements as to the fact of what occurred on the evening in question.

161.    Justice Ternus found that Complainant 2's level of intoxication made it unlikely that she was sexually aggressive, or forward, towards Plaintiff once they got into bed, even though H.A. stated that Complainant 2 became more extroverted when she drank.

162.    In contrast, Justice Ternus found that Plaintiff's use of alcohol and substances on the evening in question did not diminish Plaintiff's responsibility to obtain consent from Complainant 2 (which Plaintiff consistently stated he had done).

163.    These findings indicate that gender bias, implicit or explicit, was in play, because they portray Complainant 2 as passive and unable to initiate sexual activity despite failing to find that she was incapacitated. Justice Ternus' operative guiding belief appeared to be that any woman who expresses no prior romantic interest in a person cannot then be sexually interested in, or forward with, them is indicative of traditional and antiquated notions of gender roles.[26] Justice Ternus presumed that Plaintiff, whom she viewed as a male respondent, was the aggressor in the situation despite Plaintiff's consistent statements to the contrary.

164.    Justice Ternus credited the two female witnesses over the male respondent, despite Plaintiff's consistent account of what happened. Seeking a reason to find Plaintiff responsible, Justice Ternus even misread the evidence appended to the Final Investigation Report.

165.    Justice Ternus found Plaintiff responsible for nonconsensual sexual intercourse. As set forth *supra* she then leveraged this erroneous finding against Plaintiff to assert that they

---

[26] Gender bias may also be inferred where an adjudicator possesses "outdated and discriminatory views of gender and sexuality." *Doe v. Marymount U.*, 297 F. Supp. 3d 573, 584 (E.D. Va. Mar. 14, 2018). *See also Grinnell*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at p. 23 (denying summary judgment on Title IX erroneous outcome claim because the male plaintiff "presented sufficient evidence from which a reasonable jury could deduce the determinations of responsibility relied upon by Grinnell to dismiss Doe were based on a biased perspective regarding the behavior of women during sexual encounters.").

engaged in nonconsensual *sexual contact* with *Complainant 1*, even though there was no evidence to support that finding and Plaintiff had not been charged with any nonconsensual sexual contact with Complainant 1.

166.    Both Complainant 1 and Complainant 2 noted that they were angry with Plaintiff for telling others that he slept with them. They then jointly decided to file complaints against him with Title IX. Their motivation for filing complaints was never questioned.

**E.  Complainant 3**

167.    Complainant 3 was friends with Complainants 1 and 2. Complainant 3 filed her complaint against Plaintiff, alleging nonconsensual sexual contact, when she went to the Title IX office with Complainant 1 and Complainant 2, on February 20, 2018, ten months after the alleged incident between her and Plaintiff.

168.    Plaintiff and Complainant 3 became friends in Winter 2016, and remained friends through January 2018. On two occasions they engaged in consensual, sexual activity as part of a group. This occurred *after* the alleged incident. Plaintiff and Complainant 3 socialized numerous times over the course of their friendship and regularly communicated via Facebook Messenger.

169.    Plaintiff produced Facebook Messenger messages with Complainant 3 during the course of the investigation, some of which explicitly referenced sexual activity.

170.    The remainder of the messages related to socializing or visiting each other's pets. Complainant 3 alleged that Plaintiff had ulterior motives that were sexual in nature even though this was not evident from the plain text of the messages. She admittedly was not direct with him about only wanting to be friends even though they had engaged in sexual activity.

171.    Complainant 3 produced a "timeline" of messages that she, herself, drafted and submitted to the investigator which included a personal narrative of where she "set boundaries."

Complainant 3 then claimed to have accidentally deleted the actual messages and was, thus, conveniently unable to submit them.

172.    Ironically, Complainant 3 accused Plaintiff of providing excerpted messages to the investigator. In response, Plaintiff offered to produce additional messages.

173.    On April 7, 2017, Complainant 3 spent time at Plaintiff's off campus house, and in his room, so that Plaintiff could sketch her for his art class. Plaintiff's professor had suggested that he use his sketchbook more often. Plaintiff sketched many of his friends for art class. Complainant 3 sat on Plaintiff's bed fully clothed, and Plaintiff sketched her.

174.    Afterwards, Plaintiff and Complainant 3 lay down on the bed, fully clothed, and watched television. At some point, Complainant 3 expressed that she was uncomfortable laying down and the two sat up.

175.    Complainant 3 told the Husch Blackwell investigator that speaking to Complainant 1 and Complainant 2 caused her to "re-look" at her relationship with Plaintiff. Even so, she still had "pretty, like, positive, like interpretations of [Plaintiff]" and "wish[ed] the best for them." At the time she made the Title IX complaint, she considered him to be "somewhere in between classmate and friend." Regarding Complainant 1 and Complainant 2, Complainant 3 said that she did not believe that Plaintiff acted with any "malicious intent" towards them.

176.    When asked if Plaintiff engaged in any contact with Complainant 3 without her consent, her response was "Yes, kind of." Complainant 3 said that, on April 7, 2017, she and Plaintiff were laying on his bed and Plaintiff "kind of, like, pressed up against me and had an erection." Complainant 3 said that she told Plaintiff she was uncomfortable and Plaintiff was "receptive to that." After that, Complainant 3 alleged that the two continued laying down together and that Plaintiff came close to her and "she felt it again." At that point the two sat up and she

stated that she didn't feel comfortable getting physical with her friends, to which Plaintiff said OK. They finished watching the television episode. She then told Plaintiff she was going home to go to bed and left.

177.    When asked if Plaintiff intentionally rubbed up against her, Complainant 3 said "I think so." She then stated "what I've heard from friends and from, like, their instances of, you know, let's hang out and see each other's pets, etc. this is kind of a pattern where it will start out as a friendly situation but, like, slowly be turning into a sexual activity without verbal, like. Acknowledgment of that." Thus, Complainant 3 was motivated to retrospectively view Plaintiff as engaging in misconduct with her because of her conversations with Complainants 1 and 2. Even so, she could not clearly articulate what had occurred, nor was she even sure that Plaintiff had an erection.

178.    In a follow-up interview Complainant 3 said that after she first stated she was uncomfortable the two sat up and Plaintiff said OK. She said they continued watching television and "I think I felt him, like, kind of on me again, if not, like, his leg or something. Um, I wasn't sure if it was his leg or the erection again, and I said, like, that I was going to go home and I left."

179.    During the follow up interview Complainant 3 acknowledged that she did not take any of Plaintiff's Messenger messages as pressuring her into having sexual activity with him. Complainant 3 acknowledged on more than one occasion that she was never direct with Plaintiff about not wanting to have a sexual relationship with him.

180.    When interviewed by the investigator, Plaintiff denied having any sexual intentions towards Complainant 3 or that he made bodily contact with her.

F. **Justice Ternus' Adjudication of Complainant 3's Allegations**

181.    Complainant 3 declined to meet with Justice Ternus. Thus, Justice Ternus was unable to accurately assess her credibility. Justice Ternus relied only on the transcribed statements given to the investigator.[27] Per Justice Ternus, she was able to glean from the cold record that Complainant 3 was "very confident in her recollection." Yet, by her own account, Complainant 3 was not sure whether any misconduct had occurred, nor was she sure that Plaintiff's clothed genitals brushed against her on the alleged second occasion. Complainant 3 also changed the sequence of what occurred between her first and second interviews. She made clear that she had come forward because of what she heard about Plaintiff from her friends, Complainants 1 and 2.

182.    Justice Ternus applied her own biased assumptions about male physiology and sexuality to find that Plaintiff's version of events was not credible. According to Justice Ternus, even though Plaintiff and Complainant 3 were admittedly spooning while watching television, Plaintiff could not have inadvertently touched Complainant 3 with his erect penis. Moreover "If [Plaintiff] was aroused enough to have an erection, it is unlikely that they would have touched or rubbed their penis to or against [Complainant 3] without being aware of doing so." That assertion is made without noting the evidence that supposedly supports such an inference or the reason(s) the Adjudicator had for her inference of "unlikeliness."

183.    Justice Ternus also found that Plaintiff's erection was "inconsistent with [Plaintiff's] denial of any sexual interest in [Complainant 3]." Plaintiff did not tell the investigator that he had no sexual interest in Complainant 3. Indeed, the two subsequently engaged in consensual sex on two, separate occasions. Rather, Plaintiff said that he did not have any sexual intentions towards Complainant 3 when inviting her over on the evening in question and did not

---

[27] In college sexual misconduct proceedings, "[t]o adequately assess credibility, which concerns both the accused and the accuser, there must be some form of live questioning of the accuser in front of the fact-finder; written statements of the accuser will not suffice." *Rhodes College*, Docket #33, at p. 8 (citing *Baum*, 903 F.3d at 582-583).

intend their interaction to be construed as sexual. Justice Ternus improperly equated Plaintiff's potential physiological response to spooning someone with sexual intent. This was evidence of bias against Plaintiff on the basis of his sex which caused Justice Ternus to overlook the clear inconsistencies in Complainant 3's uncertain account of whether Plaintiff's clothed penis even made contact with her a second time, after she said she was uncomfortable. Per Complainant 3 "it was kind of on me again, if not, like, his leg or something. Um, I wasn't sure if it was his leg or the erection again." Complainant 3 also stated that she could have been paranoid due to smoking marijuana. Justice Ternus considered none of this, focusing only on the "evidence" of Plaintiff's physiology. Complainant 3 was clear that when she first told him she was uncomfortable he was "receptive to that."

184.    Despite the conflicting evidence, Justice Ternus found that Plaintiff was responsible for "nonconsensual sexual contact" with Complainant 3. Per Justice Ternus, Plaintiff was responsible because he did not "assert that he asked [Complainant 3] for her consent to the sexual contact that occurred or that [Complainant 3] otherwise affirmatively consented to being touched in a sexual manner." Putting aside that Plaintiff stated that he did not intentionally touch Complainant 3 with a fully-clothed, erect penis while they were spooning on his bed, Grinnell's definition of affirmative consent states that:

> If at any time it is reasonably apparent that either party is hesitant, confused or unsure, **both parties** should stop, decide whether to continue, and obtain mutual verbal consent before continuing such activity. (emphasis supplied)

185.    Per Complainant 3's own statements, when she felt uncomfortable spooning with Plaintiff after consenting to lay down with him on his bed, she told Plaintiff that she was uncomfortable and he was receptive to that. Per Plaintiff, the two immediately sat up after she expressed discomfort. This conduct complies with the definition of consent set forth in the Sexual

Misconduct Policy, as set forth above. There was insufficient evidence that further contact occurred after Complainant 3 expressed her discomfort as Complainant 3 changed her version of events in her follow-up interview and could not even be sure whether she felt Plaintiff's penis or his leg.

### G.   The Fabricated "Pattern of Prohibited Conduct"

186.   Grinnell's Sexual Misconduct Policy does not define what behavior constitutes a "pattern of prohibited conduct." Nor is a "pattern of prohibited conduct" a separately "chargeable" violation of the Sexual Misconduct Policy. Instead, Grinnell administrators unofficially define a pattern as more than one complaint, causing them to improperly consolidate unrelated allegations for investigation and adjudication. Thus, as occurred here, even when a respondent is found "not responsible" for one or more charges, Justice Ternus can still rely on a purported or imagined "pattern" to recommend a harsher sanction. The allegations—even if unfounded—are considered in recommending sanctions.

187.   Justice Ternus treated pattern evidence as a separately chargeable offense, and found that "[t]he evidence of substantially similar conduct by [Plaintiff] in the *three complaints* at issue showed—by a preponderance of the evidence—a predatory pattern of prohibited conduct by [Plaintiff]." Ternus Op. at 28. While the Adjudicator called the pattern she saw, or believed she saw, "predatory," she did not explain why. Justice Ternus found that Plaintiff "had a practice of engaging in rather harmless or innocuous physical contact with a woman (sometimes gaining their trust and sympathy by sharing accounts of [Plaintiff's] personal troubles) and then escalating that contact into sexual activity." The evidence gathered by the investigator demonstrated as follows:

- In the case of Complainant 1, Plaintiff and Complainant 1 were long-time friends. By Complainant 1's own account, she gave Plaintiff reasonable, objective indications that she was interested in engaging in sexual activity with him. In the case of Complainant 1, there was no indication that Plaintiff

attempted to escalate contact into sexual activity. Rather, Complainant 1 said that, earlier in the evening, when she told Plaintiff she was not interested in kissing he stopped. She later went up to his room, put on a t-shirt to go to bed, engaged in sexual activity with their friend, performed oral sex on Plaintiff and then had sexual intercourse with him which she "wanted to at the time and she okayed it." Justice Ternus found Plaintiff *not responsible* for nonconsensual sexual intercourse but improperly found him responsible for nonconsensual sexual contact, without evidence of same, and with which Plaintiff had not been charged. Upon information and belief, Justice Ternus found Plaintiff responsible for this unwarranted violation in order to utilize Complainant 1's allegations in support of a "pattern." Complainant 1 should have been excluded from this analysis.

- Complainant 2 was an acquaintance of Plaintiff's. The night that they engaged in sexual intercourse was the first time they had any sexual contact. Complainant 2 had a lengthy conversation with Plaintiff on the loggia but this was quite some time prior to when she and Plaintiff engaged in sexual activity. The allegations do not fit Justice Ternus' narrative of trust-building and escalation of sexual activity for these reasons. Moreover, there was no allegation made by Complainant 2 that Plaintiff attempted to gain her sympathy by discussing his personal problems in order to sleep over in her dorm room.

- Complainant 3 agreed to lay down with Plaintiff to watch television. She did not allege that any discussion was had concerning Plaintiff's personal issues. There was no escalation of activity. When Complainant 3 said she was uncomfortable the two sat up. Complainant 3 was unsure whether bodily contact occurred between her and Plaintiff a second time.

The facts simply did not constitute a "pattern" of predatory behavior. Justice Ternus, despite the finding and the labelling of some behavior as predatory, did not explain what constituted the predatory nature of the behavior. Here implicit gender bias appears to have prompted, influenced or driven the Adjudicator to label the behavior as "predatory."

188.    Justice Ternus next concluded that there was a pattern because "in two of the cases" Plaintiff "preyed on women who were intoxicated and approaching incapacitation if not incapacitated." Ternus Op. at p. 28. Yet, by all accounts, Complainants 1 and 2 were not approaching incapacitation—each complainant was able to walk, talk and hold a conversation. Complainant 2 spoke with Plaintiff at length before their encounter and was able to remember the

subject matter of the conversation. There was, further, no evidence that Plaintiff's conduct was "predatory." Justice Ternus offered no explanation of why she characterized some particular behavior as "preying." Unless, of course, a perceived male person asking a perceived female on a date, having earlier had sexual fantasies about the female, is automatically, by the very nature of what it is properly called "predatory." On both occasions, Plaintiff had also been drinking and, in the case of Complainant 2, had also taken Xanax and smoked marijuana. In the case of Complainant 1, she asked to stay with Plaintiff for a number of days, partially disrobed and got into bed, admittedly appeared to Plaintiff to have consented to the sexual activities that occurred, and stayed over at Plaintiff's house on the night after the alleged incident. Complainant 2 invited Plaintiff up to her room and to sleep over after spending the evening together socializing and talking.

189.    The presumptions made by Justice Ternus in concluding that a pattern of predatory behavior was at play in Plaintiff's interactions was not only not supported by evidence, it was plainly contradicted by the evidence. This suggests bias in the decision-making process.[28] Justice Ternus' reference to Plaintiff as "he" in her opinion, her statements about female sexual passivity and presumptions about male anatomy/physiology undermining credibility demonstrate that Justice Ternus was motivated by sex bias.[29] While Plaintiff elected to proceed as "non-binary" for purposes of the Title IX proceedings, he was treated as a male respondent.

---

[28] "[W]here the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d 46, 57 (2d Cir. 2016).

[29] *Marymount U.*, 297 F. Supp. 3d at 584. *See Grinnell*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 22-28.

190.    Justice Ternus considered the pattern she imagined and found it a basis for recommending that Plaintiff be expelled as a student of the College in a report that was not shared with Plaintiff.

## VIII.    Grinnell's Gender-Biased Pattern of Decision Making

191.    Grinnell has had a number of cases in which female students were accused of sexual misconduct and, in each case, the College and/or Justice Ternus treated the female accused more favorably or more leniently than male respondents in similar circumstances:

- Grinnell informally resolved two, separate complaints against a female student accused of nonconsensual sexual intercourse by issuing no contact orders. In contrast, the College has given no leniency to male students accused of a pattern of sexual misconduct, including Plaintiff.

- Justice Ternus found a female student responsible for nonconsensual sexual intercourse. The complainant requested that the College place a notation on the respondent's transcript. Justice Ternus refused this request because it would impede the respondent's ability to complete her educational goals, gain employment and become a responsible member of the community. The College issued only a campus ban as a sanction, after the adjudication process. Here, Plaintiff was immediately banned from campus—before the adjudication process—and a permanent notation has been placed on his transcript.

- Between January 1, 2014-June 30, 2018, the only cases that Grinnell informally resolved and subsequently reopened for a formal resolution process involved male respondents.[30]

Upon information and belief, there are cases other than those cited *supra* ¶ 191, in which Justice Ternus and/or Grinnell treated female respondents more favorably than male respondents in circumstances similar to Plaintiff's. Records concerning outcomes in Grinnell's Title IX proceedings and the gender/gender identities of the parties involved are not publicly available and are in the exclusive possession of the College.

---

[30] *See Doe v. Grinnell College*, No. 4:17-cv-00079-RGE-SBJ, Doc. No. 129-3, at ¶¶ 88-96; Doc. No. 136, at ¶¶ 88-96. *See also Doe v. Grinnell College*, SJ Opinion, July 9, 2019, Doc. No. 151, at pp. 26-27.

192.    Justice Ternus has also exhibited gender-biased assumptions when adjudicating at least one other case involving a male respondent which was the subject of prior litigation in this Court. In *Doe v. Grinnell*, 4:17-cv-00079,[31] a case which also involved a purported "pattern" of behavior, Justice Ternus:

- presumed that because the female complainant was sexually inexperienced and "naïve" she did not know how to tell the male respondent to stop the sexual activity. The male student in this case also lacked sexual experience but this was not taken into consideration. In fact, Angela Voos, the Title IX Coordinator at the time, presumed that the male student was more experienced than the female student.

- With respect to the same complainant, Justice Ternus found it credible that she would have engaged in a second, sexual encounter with the male respondent—which he denied—because she was young, inexperienced and wanted to make friends.

- Like Plaintiff's case, here, in *Doe v. Grinnell*, Justice Ternus also misconstrued an apology text sent by the male student as an admission of wrongdoing.

- In *Doe v. Grinnell*, Justice Ternus found the second, female complainant to be more credible than the male respondent even though the second complainant declined to participate in the adjudication process. Here, Justice Ternus found Complainant 3 to be more credible even though she declined to participate and, similar to the complainant in *Doe v. Grinnell* her transcribed statements about what happened were inconsistent.

193.    The gender bias described above remained unchecked by the procedures employed by Grinnell in sexual misconduct cases because Moschenross, responsible for sanctioning in Plaintiff's case, and Conner, responsible for deciding Plaintiff's appeal, deferred to what they believed to be Justice Ternus' expertise and failed to question her findings and recommendations which were, on their face, clearly open to question.

---

[31] *See* Docket #129-1 at pp. 31-34. *Grinnell*, 4:17-cv-00079, SJ Opinion, July 9, 2019, Doc. No. 151, at pp. 22-28.

194.     While Justice Ternus is a well-respected jurist, she had no experience with Title IX and limited or no experience with sexual assault cases, prior to being hired by Grinnell to serve as a sole adjudicator. Grinnell made no efforts to research her background or experience in these specific areas prior to hiring Justice Ternus. Because of her reputation, Moschenross and Conner deferred to Justice Ternus in every respect.

## IX.     The Decision to Dismiss Plaintiff and Permanently Mark His Transcript

195.     On June 12, 2018, Moschenross,[32] who was then the Dean of Students, issued three identical outcome letters to Plaintiff. With respect to Complainant 3, Moschenross ***incorrectly stated that Plaintiff was found responsible for nonconsensual sexual intercourse and that he had engaged in nonconsensual sexual intercourse*** with Complainant 3. Complainant 3 alleged only that she felt Plaintiff's penis through his clothes while they were spooning, which Justice Ternus erroneously deemed to be "nonconsensual sexual contact." There was no allegation that intercourse occurred. This error has not been corrected and exhibits a lack of care on Moschenross' part. To the extent that this information was copied from Justice Ternus' separate recommendation document it exhibits a lack of care on Justice Ternus' part.

196.     Even though each Complainant had made different allegations, and Plaintiff was found ***not responsible*** for violating the Sexual Misconduct Policy with respect to Complainant 1, Moschenross elected to rely on Justice Ternus' misconstrued pattern of behavior (discussed *supra* Paragraphs 186-190)—relying on all three complaints—to expel Plaintiff from the College. Notably, Justice Ternus' recommendation, which had not been provided to Plaintiff, had included the options of ***suspension*** or dismissal.

---

[32] Shortly after deciding Plaintiff's case, Moschenross took over Conner's position as Associate Vice President of Student Affairs. Conner left Grinnell for a position at Wake Forest College.

197.    Justice Ternus' recommendation, as quoted by Moschenross in the outcome letters, was rife with mischaracterization and errors, including:

- That the complainants considered Plaintiff to be a "risk to the safety of women on campus." In fact, Complainant 3—who was not interviewed by Justice Ternus—stated that she still had friendly feelings towards Plaintiff, was not sure if he had violated any policy, and that he had not acted with malicious intent. In the case of the male respondent in *Doe v. Grinnell*, Justice Ternus made a similar finding even though she had not interviewed one of the two complainants.

- That Plaintiff "did not express in any way during the course of this proceeding any understanding that their actions were harmful to the women involved." Putting aside, in the case of Complainant 1, that is incomprehensible how Plaintiff could have harmed someone with whom he had consensual sexual intercourse and that Complainant 3 did not express feelings of harm, Plaintiff, in fact, expressed remorse over the complainants' perceived harm. In his mitigation statement—which Moschenross apparently did not provide to Justice Ternus—Plaintiff expressed concern for the well-being of the three complainants, stated that he was undergoing regular counseling, and that he had been clean and sober since the week prior to learning about the Title IX complaints.

- That Plaintiff "exhibit[ed] a serious lack of understanding of Grinnell's Sexual Misconduct Policy and the standard of conduct required by that policy" even though Plaintiff reliably and consistently stated that he obtained consent from Complainant 1, Complainant 2 for oral sex and sexual intercourse and that, with respect to Complainant 3, he immediately sat up in bed when she said she was uncomfortable. Complainant 1 should not have been included in this narrative because Justice Ternus found that Plaintiff was not responsible for nonconsensual sexual intercourse with Complainant 1. Justice Ternus deemed Plaintiff a predator because she found him "not believable" yet it was the three complainants that changed their stories with each iteration.

198.    Moschenross' copying and pasting into each letter is an exemplar of her blind deference to Justice Ternus' written opinion even though, as Dean of Students, she had the authority to choose to suspend Plaintiff or deviate from Ternus' recommended outcome in the case of serious mitigating circumstances. *See* Sexual Misconduct Policy at p. 52.

199.    The outcome letters also provided Plaintiff with incorrect information regarding what would occur in the event he appealed, referencing the Student Conduct Board process and the potential for a new "hearing." *Compare* Sexual Misconduct Policy at pp. 54-55. Notably, in cases not involving sexual misconduct respondents were entitled to a hearing, and had a right of cross-examination.

## X.    Conner Denies Plaintiff's Appeal

200.    On June 12, 2018, Plaintiff submitted an appeal on the grounds that "the adjudicator made substantial errors in the processing of evidence, substantially affecting the fairness of the decision." In the appeal, Plaintiff, without any attorney assistance, pointed out the *consistencies* in his statements that were overlooked by Justice Ternus in evaluating credibility and facts which contradicted Justice Ternus' evaluation of the evidence. Though Plaintiff believed that Complainant 2 gave false testimony, he did not include this in his appeal because he did not think it constituted grounds for an appeal under the Sexual Misconduct Policy.

201.    Conner, as Associate Vice President of Student Affairs, was responsible for deciding Plaintiff's appeal on one of two grounds: i) new evidence and ii) procedural error(s) that had a material impact on the outcome. Sexual Misconduct Policy at p. 54. Per the Sexual Misconduct Policy, Conner was to be impartial and was solely responsible for evaluating, and deciding, the appeal. Conner had the authority to affirm the original findings, alter the findings and/or alter the sanctions. *Id.* at p. 55.

202.    Conner was not an impartial appeal officer. As expressed to the *Huffington Post*, she believed that all sexual misconduct cases began with dismissal as an outcome. The outcome was not predetermined as such. It is that dismissal is the preferred outcome for such an accusation unless and until the actual evidence suggests some lesser sanction. This shows a built-in implicit

bias which the law precludes. Conner also participated in meetings with Dissenting Voices and worked on changing the Sexual Misconduct Policy, to, in part, satisfy the group's demands. Conner also worked on the revision of the Sexual Misconduct Policy which removed the right of cross-examination, and to a hearing, from the sexual misconduct process.

203. Upon information and belief, as she had in other cases such as *Doe v. Grinnell*,[33] Conner invited Justice Ternus to review Plaintiff's appeal and to offer her comments to same. This infected the process with the same gender bias that was present in the adjudication process and also violated the Sexual Misconduct Policy. Upon information and belief, Conner relied on at least some of Justice Ternus' comments when drafting the appeal outcome letter in Plaintiff's case, if not copying and pasting Ternus' comments verbatim. It is, accordingly, no surprise that Conner denied Plaintiff's appeal.

204. Upon information and belief, Conner also relied on Grinnell's Title IX counsel to draft her response to Plaintiff's appeal. Apparently, the process permits more professional legal assistance to the prosecution of allegations of sexual misconduct than it permits to respondents accused of sexual misconduct.

205. On or about June 22, 2018, Conner denied Plaintiff's appeal. As expected, Conner deferred to Justice Ternus' decision, found no error, and stated that granting Plaintiff's appeal would amount to replacing Plaintiff's judgment with Justice Ternus' judgment, without any explanation of how or why the appeal was lacking in merit.

## COUNT I
### Violations of Title IX of the Education Amendments of 1972
### Erroneous Outcome/Selective Enforcement

206. Plaintiff repeats and realleges each and every allegation set forth above, in

---

[33] Docket #129-1, at pp. 27-29. *Grinnell*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 17-18.

Paragraphs 1-205, as if fully set forth herein.

207.     Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

208.     Title IX applies to an entire school or institution if any part of that school receives federal funds. Grinnell receives federal funds, including Pell Grants, grants from the National Science Foundation, and other research grants.

209.     Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.   34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[34]

210.     The "prompt and equitable" procedures that a school must implement include, at a minimum: "[n]otice . . . of the procedure, including where complaints may be filed; [a]pplication of the procedure to complaints alleging harassment; . . . [a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; . . . [and] [d]esignated and reasonably prompt timeframes for the major stages of the complaint process." *See* 2001 Guidance at p. 20.

---

[34] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) (the "2001 Guidance") at 19-20, 21 & nn. 98-101.

211.   The OCR's 2017 Guidance further requires that:

a)   interim measures must be fairly assessed, making every effort to avoid depriving any student of his or her education;

b)   training materials that apply sex stereotypes or generalization be avoided to ensure a fair and impartial investigation;

c)   decision-making techniques or approaches that apply sex stereotypes or generalizations be avoided to ensure an objective and impartial investigation; and

d)   those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation.

212.   Title IX may be violated by a school's imposition of discipline where gender is a motivating factor in the decision to discipline.

213.   Challenges to the outcome of college disciplinary proceedings can fall into two categories: (1) "erroneous outcome" cases, in which the claim is that the plaintiff is innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which the claim is that, regardless of the plaintiff's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the respondent's gender.

214.   To succeed on an erroneous outcome claim under Title IX, a plaintiff must demonstrate: (i) that there are sufficient facts to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding; and (ii) a particularized causal connection between the flawed outcome and gender bias. *See Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994).

215.   Gender bias may be shown through the statements of members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that tend to show the influence of gender. *Yusuf,* 35 F. 3d at 715. For instance, "where the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion

in favor of the other side" it may be inferred that the evaluator has been influenced by bias. *Doe v. Columbia U.*, 831 F.3d at 57.

216.    Outdated and discriminatory views of sexuality and gender on the part of a key decisionmaker in a Title IX proceeding will also show that the proceeding was infected with gender bias. *Marymount*, 297 F. Supp. 3d at 586. *See also Grinnell*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 22-28.

217.    Articulable doubt in the accuracy of the outcome of a disciplinary proceeding can be established in a number of ways including: pointing to procedural flaws in the investigatory and adjudicative processes; noting inconsistencies or errors in the adjudicator's oral or written findings; or challenging the overall sufficiency and reliability of the evidence. *Marymount U.*, 297 F. Supp. 3d at 584. *See Yusuf*, 35 F. 3d at 715.

218.    An erroneous outcome occurred in this case because Plaintiff, who was innocent, was subjected to a blatantly flawed process and proceedings and erroneously found responsible for violating Grinnell's Sexual Misconduct Policy, and gender was a motivating factor behind this erroneous outcome.

219.    Beginning in Fall 2014 and up until the time that Plaintiff's Title IX proceedings were underway, Grinnell was under tremendous pressure to respond to criticism from campus activist group Dissenting Voices, to correct its failings and take a more aggressive stance towards male students accused of sexual misconduct.

220.    Dissenting Voices regularly criticized the administration for creating a hostile environment for female students and held protests across campus during high profile events, ensuring that students and parents alike were aware that, according to Dissenting Voices, Grinnell

had a sexual assault problem and, in particular, a problem with serial rapists. *See supra* Paragraphs 28-57.

221.    Grinnell administrators—including the appeal officer in Plaintiff's case—met with members of Dissenting Voices and revised the College's sexual misconduct policy and procedures so that the accused were no longer afforded a hearing or the right of cross-examination.

222.    When notified that the OCR was investigating the College, in response to well-publicized complaints prompted by Dissenting Voices, Grinnell responded by emphasizing these policy changes, noting that they were made in response to student activism.

223.    In October 2015, Grinnell entered into a financial settlement with the female, OCR complainants which, upon information and belief, amounted to millions of dollars.

224.    The OCR investigation did not conclude until nearly two years later in September 2017.

225.    Dissenting Voices continued to criticize the administration. On January 25, 2018, a few weeks before the Title IX complaints were filed against Plaintiff by a group of friends, Dissenting Voices claimed that "a countless number of serial rapists" were being permitted to graduate from Grinnell "while their peers affected by violence are on medical leave."

226.    In response to Dissenting Voices' demands, Grinnell adopted a trauma-informed approach to sexual misconduct proceedings. More specifically, Grinnell adopted what it referred to as "evidence-based guidance" which portrayed women as at greater risk for victimization and men as toxic and privileged by a "patriarchal dividend" that left them "unaware and complicit" in sexual violence against women. *See supra* ¶¶ 74-83.

227.    Grinnell trained its personnel, including Justice Ternus, to adopt a trauma-informed approach in sexual misconduct proceedings. Grinnell also provided adjudicator training to Justice Ternus which utilized sex stereotypes.

228.    Since doing away with the hearing model in sexual misconduct cases, Grinnell has also engaged in a gender-biased pattern of decision-making in sexual misconduct cases as female respondents have been treated more favorably, and more leniently, than male respondents. *See supra* ¶¶ 191-194.

229.    Justice Ternus has also exhibited gender-biased decision-making in cases other than Plaintiff's. In one case involving a female respondent, Justice Ternus refrained from recommending that the student's transcript be permanently marked, though she had been found responsible for nonconsensual sexual intercourse.

230.    In cases other than Plaintiff's, Justice Ternus has also attributed stereotypical traits to female complainants and male respondents, attributing traits like naïveté and passivity to the female complainant and sexual experience and aggressiveness to the male respondent. *See Grinnell*, 4:17-cv-00079, Order, July 9, 2019, Doc. No. 151, at pp. 22-28.

231.    In Plaintiff's case, Justice Ternus made the following statements that were indicative of gender bias:

- Plaintiff, who was found ***not responsible*** for non-consensual sexual intercourse with Complainant 1, "knowingly took advantage of [Complainant 1's] impaired state" even though Plaintiff had also been drinking and Justice Ternus found that "there is very little indication that [Complainant 1] exhibited any signs that she was incapacitated or approaching incapacitation."

- Because Plaintiff kissed Complainant 2 when they got into bed, he was dishonest about not intending to have sex with her.

- That, in agreeing to go to the party with Complainant 2, Plaintiff was trying to "assuage H.A.'s fears for Complainant 2's safety." H.A. expressed no such fears.

66

- Because Complainant 2 was intoxicated it was unlikely that she was sexually aggressive, or forward.

- Complainant 3—who was not interviewed by Justice Ternus was "very confident in her recollection of what happened."

- Plaintiff's erection was "inconsistent with Plaintiff's denial of any sexual interest in [Complainant 3]."

- Plaintiff was not credible because if Plaintiff "was aroused enough to have an erection, it is unlikely that they would have touched or rubbed their penis to or against [Complainant 3] without being aware of doing so." Notably, the two were laying down in a spooning position, fully clothed.

232.    That Justice Ternus also "charged" Plaintiff with nonconsensual sexual contact, without authorization or evidence to do so, and separately "charged" Plaintiff with engaging in a pattern of predatory behavior—not grounded in evidence, which included all three complainants—is suggestive of gender bias. Plaintiff was found not responsible for the charge of nonconsensual sexual intercourse with respect to Complainant 1 and Complainant 3's allegations, involving fully clothed spooning, were entirely different than Complainant 2's allegations. There was simply no evidence to support the purported pattern.

233.    That the allegations lodged against Plaintiff with respect to Complainants 1, 2 and 3 were contradicted by the complainants' own statements, yet Justice Ternus found the complainants to be more credible in each instance, is also indicative of gender bias.

234.    The flawed manner in which the "investigation" and adjudication of the allegations against Plaintiff were conducted also casts doubt on the accuracy of the outcome. Grinnell failed to conduct a fair, adequate, reliable and impartial investigation and adjudication of the complaints against Plaintiff because, without limitation:

a.    The complainants reported their allegations together and were admittedly close friends. This was not questioned at any stage of the proceedings.

b.    When he first met with Asberry and Moschenross, they told Plaintiff that

67

Complainant 3 had alleged nonconsensual sexual intercourse with respect to the spooning incident—this was untrue. Plaintiff was not provided with any specifics of the allegations against him at that time.

c.  Asberry and Moschenross immediately banned Plaintiff from campus even though no adjudication had taken place and no findings had been made with respect to the allegations.

d.  Even though Plaintiff identified as nonbinary, both the investigator and Justice Ternus referred to Plaintiff as "he." Justice Ternus treated Plaintiff as a male respondent.

e.  Asberry and Moschenross told Plaintiff the investigation and adjudication would take 60 days. It took four months.

f.  The investigator failed to conduct an impartial investigation because he asked the complainants leading questions. In the case of Complainant 3, this caused her to conclude that the alleged spooning incident was not consensual when she first reported that she was unsure.

g.  The investigator and/or the Title IX Coordinator, incorrectly determined that all three investigations should be produced as one report, as "pattern evidence" when no pattern existed.

h.  The cases were consolidated even though the evidence related to each incident was not relevant and probative in reaching a determination in the other incidents.

i.  The complainants' prejudicial, unfounded statements concerning Plaintiff's character and hearsay statements were not redacted from the investigation report. These statements were then considered by Justice Ternus and cited in her opinion.

j.  Plaintiff was only allowed to propose questions to be asked by the investigator of the complainants *after* the investigation had concluded. He was not directly notified of this right by either Moschenross, who sent Plaintiff the preliminary investigation report, or the investigator.

k.  Plaintiff had no right to a hearing or right to cross-examine witnesses, even though students accused of far less serious misconduct had the right to hearing and cross-examination.

l.  Justice Ternus was not allowed to meet with any witnesses.

m.  Justice Ternus did not meet with the investigator as part of the adjudication process.

n.  Justice Ternus misapplied the definition of affirmative consent.

o. Justice Ternus credited Complainant 3 as more credible than Plaintiff, even though Justice Ternus did not meet with Complainant 3—she relied solely on her written statements to investigators (which were inconsistent).[35]

p. Justice Ternus misconstrued the definition of nonconsensual sexual contact as "initiating" sexual activity, and then found Plaintiff responsible for nonconsensual sexual contact with Complainant 1, even though he was not charged with this violation and there was no evidence to support this charge.

q. Justice Ternus "charged" Plaintiff with a pattern of predatory behavior even though this is not listed as a separate policy violation in the Sexual Misconduct Policy.

r. Justice Ternus misquoted Plaintiff's statements concerning his sexual activities with Complainant 2.

s. There was no preponderance of the evidence against Plaintiff with respect to either Complainant 2 or Complainant 3 because each of these complainants contradicted their accounts of what happened.

t. Moschenross did not provide Plaintiff's mitigation letter to Justice Ternus.

u. Moschenross exercised no independent judgment with respect to sanctioning Plaintiff and, instead, copied and pasted Justice Ternus' findings into the three outcome letters.

v. Moschenross' outcome letter concerning Complainant 3 incorrectly found Plaintiff responsible for nonconsensual sexual intercourse. The charge, concerning the spooning incident, was nonconsensual sexual contact.

w. Moschenross issued a much more severe sanction than was warranted.

x. Upon information and belief, Conner permitted Justice Ternus to review and comment on Plaintiff's appeal.

y. Upon information and belief, Conner also relied on Title IX counsel.

z. Conner was not impartial and exercised no independent judgment when denying Plaintiff's appeal—despite a number of glaring errors in the findings and Justice Ternus' failure to weigh the evidence properly.

---

[35] *See Rhodes College*, Docket #33, at p. 8 (citing *Baum*, 903 F.3d at 582-583).

235.    Grinnell has also engaged in selective enforcement. Female respondents accused of similar misconduct, including engaging in patterns of sexual misconduct, are given far less severe sanctions than male respondents:

- Grinnell informally resolved two, separate complaints against a female student accused of nonconsensual sexual intercourse by issuing no contact orders. Leniency was given to the female student. In contrast, the College has given no leniency to male students accused of patterns of sexual misconduct, including Plaintiff.

- Justice Ternus found a female student responsible for nonconsensual sexual intercourse. The complainant requested that the College place a notation on the respondent's transcript. Justice Ternus refused this request because it would impede the female respondent's ability to complete her educational goals, gain employment and become a responsible member of the community. The College issued only a campus ban as a sanction, after the adjudication process. Here, Plaintiff was immediately banned from campus—prior to adjudication—and a permanent notation has been placed on his transcript. There was no consideration of how the sanction would impact of his future. On the contrary, Justice Ternus' attitude towards Plaintiff was punitive.

- Between January 1, 2014 and June 30, 2018, the only cases that Grinnell informally resolved and then reopened for a subsequent, formal resolution process involved male respondents.

236.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual misconduct and punished severely for it.

237.    As a direct and proximate result of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

238.    As a result of Grinnell's violation of Title IX, which resulted in an erroneous and unduly severe and unwarranted sanction which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing Grinnell to (i) reverse the outcome

and findings regarding Complainants 1 and 2; (ii) reverse the outcome and finding with respect to the improper charge of nonconsensual sexual contact with respect to Complainant 3; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints.

239.    As a result of the foregoing, Plaintiff is also entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II
## State Law-Breach of Contract

240.    Plaintiff repeats and realleges each and every allegation set forth above, in Paragraphs 1-205, as if fully set forth herein.

241.    Under Iowa law, Grinnell's Sexual Misconduct Policy created a contractual relationship between Grinnell and its students. *See, e.g. T.E. v. Linn-Mar Community School Dist.*, No. LACV 35077, 2000 WL 34514000 (Iowa Dist. Ct. Aug. 30, 2000); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443 (1984).

242.    Grinnell breached the Sexual Misconduct Policy by:

    i.   Engaging in sex discrimination and/or gender identity discrimination against Plaintiff. *See* Sexual Misconduct Policy, at p. 3.

    ii.  Failing to "approach the assessment of each report with an earnest intent to understand the perspective and experience of each individual involved in order to ensure fair and impartial evaluation and resolution." *Id.* at p. 29. Grinnell treated Plaintiff without concern for his stated mental health and substance abuse issues, and Justice Ternus approached these issues in a punitive manner, wrongly accusing Plaintiff of using them as an excuse.

    iii. Failing to implement "reasonable and appropriate" interim measures by banning Plaintiff from campus before his case had been adjudicated. *Id.* at p. 38.

iv.   Failing to provide written notice to Plaintiff as to the reasons for the delay in conducting the investigation. *Id.* at p. 41.

v.   Notifying Plaintiff that he was alleged to have engaged in nonconsensual sexual intercourse with Complainant 3, which was the wrong "charge." *Id.* at p. 44.

vi.   Failing to provide a fair and reliable gathering of facts by the investigator, who led certain of the complainants to conclude that consent was not given despite their prior, contradictory statements. *Id.* at p. 44.

vii.   Failing to assess the relevance, form and reliability of the "pattern" alleged by the Complainants—which was contradicted by their own narratives of what allegedly occurred—before including that information in the investigation report. *Id.* at p. 46.

viii.   Consolidating the complaints for investigation and resolution when there was no reason to conclude that the evidence related to each incident would be relevant or probative in reaching a determination on the other incident. Upon information and belief, Dean of Students Moschenross did not consult with the Title IX office, or make the decision to consolidate the reports as required by the Sexual Misconduct Policy. *Id.* at p. 47.

ix.   Electing not to redact information that was "irrelevant, more prejudicial than probative or immaterial" from the investigation report. *Id.* at p. 47.

x.   Misapplying the preponderance of the evidence standard. *Id.* at p. 51.

xi.   Failing to follow adjudication procedures, as Justice Ternus did not meet with a member of the investigation team. *Id.* at p. 49.

xii.   Failing to provide Justice Ternus with a copy of Plaintiff's mitigation statement. *Id.* at p. 51.

xiii.   Failing to deviate from the typical range of sanctions when there was compelling justification to do so. *Id.* at p. 52.

xiv.   Finding Plaintiff responsible for misconduct with which he was not charged (non-consensual sexual contact for Complainant 1 and nonconsensual sexual intercourse for Complainant 3). *Id.* at p. 50.

xv.   Permitting, upon information and belief, Justice Ternus and others to review Plaintiff's appeal.

243.    Plaintiff suffered substantial economic losses as a result of the direct, proximate, and foreseeable consequence of the foregoing breaches.

244.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT III
### State Law -Breach of the Implied Covenant of Good Faith and Fair Dealing

245.    Plaintiff repeats and realleges each and every allegation above, set forth in Paragraphs 1-205, as if it fully set forth herein.

246.    Under Iowa law it is generally recognized that there is an implied covenant of good faith and fair dealing in a contract. *Harvey v. Care Initiatives, Inc.*, 634 N.W.2d 681, 684 n. 4 (Iowa 2001).

247.    Grinnell breached that covenant when Moschenross and Conner acted in deference to Justice Ternus and failed to exercise independent judgment in determining Plaintiff's sanction and appeal. Moschenross and Conner were each designated as the sole arbiters of the sanction and appeal, respectively, under the Sexual Misconduct Policy.

248.    Grinnell also breached that covenant when, upon information and belief, Conner permitted Justice Ternus to weigh in on Plaintiff's appeal. Justice Ternus is not cited as an appellate officer in the Sexual Misconduct Policy.

249.    Upon information and belief, Grinnell administrators diverged from Grinnell's Sexual Misconduct policy and procedures, employing unwritten procedures and allowing administrators who were not expressly provided decision-making authority to make decisions in Plaintiff's case.

250.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT IV
**Wrongful Discipline: Lack of Fundamental Fairness in Disciplinary Proceedings**

251.    Plaintiff John Doe repeats and realleges each and every allegation above, set forth in Paragraphs 1-205, as if fully set forth herein.

252.    Iowa state courts, and the United States Court of Appeals for the Eight Circuit, recognize that private school students facing disciplinary actions, up to and including expulsion, are entitled to a disciplinary process that: (i) adheres to the school's established standards, <u>and</u> (ii) is not arbitrary, unreasonable, or conducted in bad faith. *See Harvey v. Palmer Coll. of Chiropractic*, 363 N.W.2d 443, 444 (Iowa Ct. App. 1984) ("'The requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities.' . . . It is clear . . . that a private university may not expel a student arbitrarily, unreasonably, or in bad faith." (citations omitted)); *see also Warren v. Drake Univ.*, 886 F.2d 200, 202 (8th Cir. 1989) (citing *Harvey*).

253.    In the instant case, Grinnell's disciplinary process neither conformed to its established procedures, nor satisfied principles of fundamental fairness and due process because, without limitation:

   a.   The complainants reported their allegations together and were admittedly close friends. This was not questioned at any stage of the proceedings.

   b.   When he first met with Asberry and Moschenross, they told Plaintiff that Complainant 3 had alleged nonconsensual sexual intercourse with respect to the spooning incident—this was untrue. Plaintiff was not provided with any specifics of the allegations against him at that time.

   c.   Asberry and Moschenross immediately banned Plaintiff from campus even though no adjudication had taken place and no findings had been made with respect to the allegations.

   d.   Even though Plaintiff identified as nonbinary, both the investigator and Justice Ternus referred to Plaintiff as "he." Justice Ternus treated Plaintiff as a male respondent.

74

e.  Asberry and Moschenross told Plaintiff the investigation and adjudication would take 60 days. It took four months.

f.  The investigator failed to conduct an impartial investigation because he asked the complainants leading questions. In the case of Complainant 3, this caused her to conclude that the alleged spooning incident was not consensual when she first reported that she was not sure.

g.  The investigator and/or the Title IX Coordinator, incorrectly determined that all three investigations should be produced as one report, as "pattern evidence" when no pattern existed.

h.  The cases were consolidated even though the evidence related to each incident was not relevant and probative in reaching a determination in the other incidents.

i.  The complainants' prejudicial, unfounded statements concerning Plaintiff's character and hearsay statements were not redacted from the investigation report. These statements were then considered by Justice Ternus and cited in her opinion.

j.  Plaintiff was only allowed to propose questions to be asked by the investigator of the complainants after the investigation had concluded. He was not directly notified of this right by either Moschenross, who sent Plaintiff the preliminary investigation report, or the investigator.

k.  Plaintiff had no right to a hearing or right to cross-examine witnesses, even though students accused of far less serious misconduct had the right to hearing and cross-examination.

l.  Justice Ternus was not allowed to meet with any witnesses.

m.  Justice Ternus did not meet with the investigator as part of the adjudication process.

n.  Justice Ternus misapplied the definition of affirmative consent.

o.  Justice Ternus credited Complainant 3 as more credible than Plaintiff, even though Justice Ternus did not meet with Complainant 3—she relied solely on her written statements to investigators (which were inconsistent).[36]

p.  Justice Ternus misconstrued the definition of nonconsensual sexual contact as "initiating" sexual activity, and then found Plaintiff responsible for nonconsensual sexual contact with Complainant 1, even though he was not charged with this violation and there was no evidence to support this charge.

---

[36] *See Rhodes College*, Docket #33, at p. 8 (citing *Baum*, 903 F.3d at 582-583).

q.  Justice Ternus "charged" Plaintiff with a pattern of predatory behavior even though this is not listed as a separate policy violation in the Sexual Misconduct Policy.

r.  Justice Ternus misquoted Plaintiff's statements concerning his sexual activities with Complainant 2.

s.  There was no preponderance of the evidence against Plaintiff with respect to either Complainant 2 or Complainant 3 because each of these complainants contradicted their accounts of what happened.

t.  Moschenross did not provide Plaintiff's mitigation letter to Justice Ternus.

u.  Moschenross exercised no independent judgment with respect to sanctioning Plaintiff and, instead, copied and pasted Justice Ternus' findings into the three outcome letters.

v.  Moschenross' outcome letter concerning Complainant 3 incorrectly found Plaintiff responsible for nonconsensual sexual intercourse. The charge, concerning the spooning incident, was nonconsensual sexual contact.

w.  Moschenross issued a much more severe sanction than was warranted.

x.  Upon information and belief, Conner permitted Justice Ternus to review and comment on Plaintiff's appeal.

y.  Upon information and belief, Conner also relied on Title IX counsel.

z.  Conner was not impartial and exercised no independent judgment when denying Plaintiff's appeal—despite a number of glaring errors in the findings and Justice Ternus' failure to weigh the evidence properly.

254.  Grinnell's overwhelming failure to conduct a thorough, fair, and impartial investigation and adjudication of the claims against Plaintiff resulted in findings and sanctions that were arbitrary, unreasonable, imposed in bad faith, not in compliance with Grinnell's published policies, and ultimately deprived Plaintiff of due process to which he was entitled both by common law and by Grinnell's own express promises.

255.  Plaintiff has an undeniably strong interest in his disciplinary and educational files, and the timely conferral of his undergraduate degree, of which he was only a few credits shy at the time he was dismissed from Grinnell.

256.    Grinnell's arbitrary, unreasonable, unfair and inappropriate actions caused Plaintiff to sustain substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

257.    As result of the foregoing, an injunction should issue directing Grinnell (i) reverse the outcome and findings regarding Complainants 1 and 2; (ii) reverse the outcome and finding with respect to the improper charge of nonconsensual sexual contact with respect to Complainant 3; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints.

258.    As a result of the foregoing, Plaintiff is also entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendant Grinnell College as follows:

(i)     On the first count, for violations of Title IX of the Education Amendments of 1972, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Grinnell to (i) reverse the outcome and findings regarding Complainants 1 and 2; (ii) reverse the outcome and finding with respect to the improper charge of nonconsensual sexual contact with respect to Complainant 3; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints;

(ii)     On the second count, for state law breach of contract, damages in an amount to be determined at trial, plus prejudgment interest;

(iii)    On the third count, for state law breach of the implied covenant of good faith and fair dealing, damages in an amount to be determined at trial, plus prejudgment interest;

(iv)     On the fourth count, for wrongful discipline/lack of fundamental fairness in disciplinary proceedings, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction directing Grinnell (i) reverse the outcome and findings regarding Complainants 1 and 2; (ii) reverse the outcome and finding with respect to the improper charge of nonconsensual sexual contact with respect to Complainant 3; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints;

(v)      Equitable relief in the form of an order directing Grinnell to (i) reverse the outcome and findings regarding Complainants 1 and 2; (ii) reverse the outcome and finding with respect to the improper charge of nonconsensual sexual contact with respect to Complainant 3; (iii) expunge Plaintiff's disciplinary record; (iv) remove any record of the finding and sanctions from Plaintiff's education records and any other records kept at the College, including but not limited to public safety records, records kept by the development office, and any other departments maintaining such records; and (v) destroy any records concerning the complaints.

(vi)     Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: February 19, 2020

BABICH GOLDMAN, P.C.

/s/ David H. Goldman
David H. Goldman
Amy K. Davis
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: adavis@babichgoldman.com

-and-

NESENOFF & MILTENBERG, LLP

/s/ Andrew T. Miltenberg
Andrew T. Miltenberg (*pro hac vice* admission pending)
Kara L. Gorycki *(pro hac vice* admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: kgorycki@nmllplaw.com
Email: amiltenberg@nmllplaw.com

***Attorneys for Plaintiff***