IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PETER P. MOE,<br><br>          Plaintiff,<br><br>v.<br><br>GRINNELL COLLEGE,<br><br>          Defendants. | No. 4:20-cv-00058-RGE-SBJ<br><br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S RESISTANCE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## <u>TABLE OF CONTENTS</u>

Introduction ........................................................................................................... 1

Background ............................................................................................................. 2

Argument ................................................................................................................ 7

I.    There are Genuine Disputes of Material Fact Which Preclude Summary Judgment on Plaintiff's Title IX Claim ................................................... 7

A.    The College's Refusal to Follow OCR's 2017 Title IX Guidance ............. 7

B.    A Reasonable Jury Could Conclude that Justice Ternus' Findings Were Motivated by Sex Bias .................................................................. 11

    1.    There Were Numerous Procedural Irregularities in the Adjudication Process ................................................................... 13

    2.    Justice Ternus' Improper and Unsubstantiated Findings With Respect to Complainant 1 Evidence Sex Bias ...................... 14

    3.    Justice Ternus' Determinations with Respect to Complainant 2 Evidence Sex Bias ................................................ 19

        a.    Complainant 2 Told Justice Ternus That Plaintiff Committed A "Moral Transgression" ................................ 19

        b.    Justice Ternus Minimized Complaint 2's Inconsistent Statements ..................................................... 20

        c.    There Was No Evidence that Complainant 2 Was Overly Intoxicated ........................................................... 22

        d.    Sex Stereotypes Governed Justice Ternus' Credibility Determinations ................................................. 24

4.     Justice Ternus' Determinations with Respect to Complaint 3 Evidences Sex Bias ........................................................................25

5.     Justice Ternus' Recommended Outcomes Misstated the Record ........................................................................................27

C.     Justice Ternus Treated Female Respondents More Favorably .................29

D.     The Individual Responsible for Imposing Sanctions Expressed Sex-Biased Views ........................................................................29

E.     The Appeal Officer in Plaintiff's Case Was Not Impartial.......................35

F.     The College's Trauma-Informed Approach is Not Sex-Neutral...............37

II.     There are Genuine Disputes of Material Fact Which Preclude Summary Judgment on Plaintiff's Breach of Contract Claim................................................39

III.     There is a Genuine Dispute of Material Fact with Respect to Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing .....................42

IV.     The Court Should Deny Summary Judgment with Respect Plaintiff's Wrongful Discipline Claim................................................................44

Conclusion .................................................................................................................45

## **INTRODUCTION**

Plaintiff Peter P. Moe ("Plaintiff") respectfully submits this brief in resistance to Defendant Grinnell College's ("Defendant" or the "College") motion for summary judgment. The Court should deny Defendant's motion and allow each and every claim asserted by Plaintiff to proceed to trial. As detailed below, there is a genuine dispute of material fact with respect to Plaintiff's claims for: i) violations of Title IX of the Education Amendments of 1972 (Count I) ii) breach of contract (Count II); iii) breach of the implied covenant of good faith and fair dealing (Count III); and iv) wrongful discipline (Count IV).

*First*, Summary judgment is precluded on Plaintiff's Title IX claim because the record evidence shows that a reasonable jury could conclude that Plaintiff's sex was a motivating factor in the determination that he was responsible for violating the College's Title IX Policy,[1] the decision to expel him and the denial of his appeal. In fact, Plaintiff's Title IX proceeding was an utter catastrophe from start to finish, with so many procedural irregularities and errors as to raise the question whether the individuals involved cared about Plaintiff's rights at all.

Plaintiff's Title IX proceeding was infected with an express anti-male bias of then Dean of Students Sarah Moschenross ("Ms. Moschenross"), who was involved in every aspect of Plaintiff's case. The College's adjudicator, Justice Marsha Ternus ("Justice Ternus"), made findings and recommendations against the substantial weight of the evidence. She ignored clear evidence, namely the complainants' own statements, that Plaintiff had consent for the sexual interactions in question. Her findings reflected stereotypical assumptions about the sexual interest and behavior of men and women. Justice Ternus' communications with Ms. Moschenross reflected a desire to

---

[1] Plaintiff will herein refer to the *Grinnell College Policy, Procedures and Guide to Preventing, Reporting, and Responding to Sexual Misconduct and Other Forms of Interpersonal Violence*, last revised in September 2017, as the "Title IX Policy."

punish Plaintiff based on her subjective feelings and own sense of justice rather than the evidence, which Ms. Moschenross obliged. Andrea Conner ("Ms. Conner"), who decided Plaintiff's appeal, was deeply involved in a conduct case that gave rise to the United States' Department of Education's Office for Civil Rights' ("OCR") investigation of the College. She was also Ms. Moschenross' friend and supervisor. She rejected Plaintiff's appeal while schooling him on the erroneous presumption that the College was prohibited from questioning Justice Ternus' judgment.

*Second*, outlined below are ten ways in which the College materially breached the Title IX Policy, precluding summary judgment on Plaintiff's breach of contract claim.

*Third*, Plaintiff would have justifiably expected that, if he were accused of sexual misconduct, the College would act fairly and reasonably, and follow the Title IX Policy. Detailed below are fifteen instances in which the College deviated from the Title IX Policy and employed unwritten rules that impacted the fairness of the proceedings, precluding summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing.

*Fourth*, Plaintiff's separate claim for wrongful discipline is properly before the Court and there is evidence in the record which raises a genuine dispute as to whether the College acted arbitrarily, unreasonably and in bad faith when it expelled Plaintiff.

## **BACKGROUND**[2]

In December 2017, Plaintiff and his best friend and fellow Grinnell College student, Complainant 1, decided to mix friendship with physical intimacy after they spent the night drinking at a party. Complainant 1 slept over Plaintiff's house for several days afterward and everything appeared to be fine. SAF ¶ 1-8. Within days of her sexual encounter with Plaintiff, Complainant 1

---

[2] All facts relevant to Plaintiff's resistance can be found in Plaintiff's Statement of Additional Facts in Resistance to Defendant's Motion for Summary Judgment, which will be cited herein as "SAF." Plaintiff's document appendix will be cited herein as "P-APP." Citation's to Defendant's appendix will be cited herein as "DAPP:"

made a Title IX report **unrelated to** Plaintiff, alleging she was sexually assaulted by someone else. SAF ¶¶ 22-25. After winter break, Complainant 1 returned to campus and was angered when she heard that Plaintiff had been speaking to their friends about their sexual encounter. SAF ¶ 172(i). Complainant 1 then spoke with her friends about bringing a Title IX case against Plaintiff. SAF ¶¶ 27-28, 37, 51, 201, 251.

When the College's acting Title IX Coordinator, Bailey Asberry ("Ms. Asberry") met with Complainant 1 about the unrelated Title IX report, Complainant 1 mentioned that she had a "tangentially related" problem with Plaintiff[3] concerning "blurred lines of consent." SAF ¶¶ 28-30. Complainant 1 told Ms. Asberry that her friends also had problems with Plaintiff. SAF ¶ 32. On February 20, 2018, without any concern for Plaintiff's privacy rights under FERPA, Ms. Asberry met with Complainants 1-3 and Student A as a group to discuss their allegations against Plaintiff. SAF ¶¶ 35-39. At that meeting, Complainant 1 and 2 decided that they wanted to pursue formal conduct against Plaintiff. P-APP 745. Student A subsequently decided **not to pursue** a Title IX case against Plaintiff because she believed her activities with Plaintiff were consensual. SAF ¶¶ 48-51, 55. On February 27, 2018, Ms. Asberry met jointly with Complainants 2 and 3. SAF ¶¶ 54-59.

On February 28, 2018, Plaintiff was banned from campus before he was even aware of the allegations against him. SAF ¶¶ 78-85. In the interim ban letter, Ms. Moschenross, then Dean of Students, advised Plaintiff that he should use his time away from campus to "be reflective." P-APP 755. The decision to ban Plaintiff from campus was based on a faulty "threat assessment"

---

[3] Complainants 1-3 and Student A referred to Plaintiff as "they" or "them" when making the report to Ms. Asberry, resulting in Plaintiff being identified as nonbinary for purposes of the Title IX proceeding. P-APP 744-46; P-APP 1372. For this reason, in certain documents contained in the record Plaintiff is referred to using nonbinary pronouns. Plaintiff was identified as nonbinary but presented as male and was treated as male by Justice Ternus and Ms. Moschenross. ECF No. 1, Compl. ¶¶ 5, 100; SAF ¶¶ 294-96. Plaintiff is comfortable using male pronouns and has been doing so for purposes of this litigation. P-APP 1164.1-1164. 2, at 99:22-102:22.

that presumed Plaintiff was guilty of the alleged sexual misconduct. SAF ¶¶ 60-77. Complainant 3's report was considered as part of the threat assessment even though there was confusion about her allegations. SAF ¶¶ 86-101. Student A's report was also considered. SAF ¶¶ 48-51, 55. The reports made by Complainants 1-3 became the basis of a formal investigation against Plaintiff. SAF ¶¶ 68-71. Ms. Moschenross issued a Notice of Investigation to Plaintiff, which contained incorrect information and lacked sufficient detail. SAF ¶¶ 95-100, 105-112.

The Title IX investigation and adjudication were riddled with errors and procedural irregularities. SAF ¶¶ 113-171, 216-314. During the Title IX investigation, Complainant 1 told the investigator that she was "told" what happened with Plaintiff was not consensual. SAF ¶ 172(e). Neither the investigator, Husch Blackwell attorney Demetrius Peterson ("Mr. Peterson"), nor Justice Ternus asked her about this statement. SAF ¶ 133; CONNER0006.[4] Complainant 1's account of what happened demonstrated that she consented to sexual activity with Plaintiff. SAF ¶ 172, 174, 271-90. At Complainant 1's adjudication meeting, Justice Ternus permitted her to discuss Complainant 2. SAF ¶ 256. Justice Ternus told Complainant 1 that she could request Plaintiff's expulsion as part of the "smorgasbord" of available sanctions. SAF ¶ 259. Justice Ternus found Plaintiff not responsible for nonconsensual sexual intercourse with respect to Complainant 1 but added the "lesser included offense" of nonconsensual sexual contact to her case opinion because she "felt" Plaintiff violated the Title IX Policy. SAF ¶ 296. Plaintiff was not charged with, and was never questioned about, nonconsensual sexual contact with Complainant 1. Nor was there any evidence to support Justice Ternus' new finding. SAF ¶¶ 264-314. Justice Ternus included Complainant 1 in a pattern in which she found Plaintiff preyed on women who were "approaching incapacitation if not incapacitated." Justice Ternus herself found that Complainant 1 was ***not***

---

[4] CONNER0006-0008 are audio files of the adjudication meetings. They will be provided to the Court on a flash drive.

4

approaching incapacitation or incapacitated. SAF ¶ 397.

Complainant 2 told Justice Ternus, "I know it wasn't full on rape" but "some kind of moral transgression." SAF ¶ 252. She reported Plaintiff, about a sexual encounter that occurred one year prior, only after her friends came to her and asked her to make a Title IX report. *Id.* Complainant 2's statements during the investigation were mired with inconsistencies which Mr. Peterson went to great lengths to try and clear up. SAF ¶¶ 128-32. In contrast, Mr. Peterson did not follow-up with Plaintiff about a crucial conversation that Complainant 2's witness, H.A., claimed to have had with Plaintiff. SAF ¶¶ 128-32, 341-46. Justice Ternus found Plaintiff responsible for nonconsensual sexual intercourse with respect to Complainant 2. SAF ¶ 315. Her findings were not supported by the evidence and included stereotypical assumptions about male sexual behavior, including that Plaintiff's decision to go up to Complainant 2's dorm room, and a kiss on the cheek, belied Plaintiff's assertion that he did not intend to have sex with Complainant 2. SAF ¶¶ 317-61. Justice Ternus included Complainant 2 in a pattern of predatory behavior that did not exist. SAF ¶¶ 394-424.

Complainant 3 reported to the investigator that her view of Plaintiff changed after she heard from the "other girls that are involved in this investigation." P-APP 350. She added that she did not believe that Plaintiff acted with "malicious intent." *Id.* She continued to have a "positive interpretation" of Plaintiff and "wish the best" for him. *Id.* Plaintiff was ultimately charged with nonconsensual sexual contact with regard to Complainant 3, who alleged that Plaintiff pressed up against her with an erection while they were laying on his bed, fully clothed, watching TV. SAF ¶¶ 202, 362. Complainant 3 first alleged that she felt the erection two times, but then changed her story and said that on the second occasion it could have been Plaintiff's leg. SAF ¶¶ 365-69. Justice Ternus did not meet with Complainant 3 but found her to be more credible than Plaintiff. SAF ¶

5

363. In doing so, she misread Plaintiff's statements and, again, made stereotypical assumptions about Plaintiff's sexual intentions with relation to his level of physiological arousal. SAF ¶¶ 362-93. Justice Ternus also included Complainant 3 in the nonexistent pattern of predatory behavior. SAF ¶¶ 412-24. Justice Ternus' report recommending sanctions contained a number of errors and misstatements. SAF ¶¶ 425-49. Nearly six months after she adjudicated Plaintiff's case, Justice Ternus found a female student not responsible for nonconsensual sexual intercourse under quite similar circumstances, and, unlike Plaintiff's case, there was substantial evidence that the complainant was incapacitated. SAF ¶¶ 542-44.

Ms. Moschenross determined that Plaintiff should be expelled. SAF ¶ 450. She made a number of sex-biased statements on social media. SAF ¶¶ 450-66. When deciding Plaintiff's sanction, Ms. Moschenross considered unproven allegations against Plaintiff about which he had no knowledge. SAF ¶¶ 478-93; P-APP 1382-83. The outcome letters issued by Ms. Moschenross, which are part of Plaintiff's permanent conduct record, contained a number of errors, including that Plaintiff was found responsible for nonconsensual sexual intercourse with Complainant 3. SAF ¶¶ 1, 467-77.

The appeal officer, Andrea Conner ("Ms. Conner"), was Ms. Moschenross' good friend and supervisor. SAF ¶¶ 501-503. Ms. Conner was deeply involved in a sexual misconduct case which was the subject of an article published in the *Huffington Post* in March 2015, and which resulted in the OCR's investigation of the College. P-APP 57, 62. The complainant involved in the case, a female student, was forced into mediation with the male student she accused of sexual assault, in violation of the OCR's applicable Title IX guidance. P-APP 57; SAF ¶¶ 500-514. Ms. Conner denied Plaintiff's appeal even though it met the jurisdictional criteria set forth in the Title IX Policy. SAF ¶¶ 515-539.

## ARGUMENT

**I.     There are Genuine Disputes of Material Fact Which Preclude Summary Judgment on Plaintiff's Title IX Claim[5]**

A number of federal courts, including the Eighth Circuit, have recently adopted a simpler approach to Title IX sex discrimination cases involving college disciplinary proceedings, simply asking the direct question of whether a college or university has disciplined a plaintiff on the basis of sex—that is, because he is male. *See Doe v. University of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020) (citing *Doe v. Purdue Univ.*, 928 F. 3d 652, 667-68 (7th Cir. 2019)); *Doe v. American Univ.*, 2020 WL 5593909, at * 7 (D.D.C. Sept. 18, 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020). To survive summary judgment, a plaintiff is required to set forth sufficient evidence to allow a reasonable jury to find that the College disciplined him on the basis of sex, or that there is a "genuine dispute of material fact whether being male was a motivating factor" in the College's decision to expel him. *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020). Here, a reasonable jury could find that the College disciplined Plaintiff on the basis of sex and, accordingly, Defendant's motion for summary judgment should be denied.

### A.   The College's Refusal to Follow OCR's 2017 Title IX Guidance

The College failed to provide Plaintiff with rights to which he was entitled under federal Title IX guidance issued nearly ***six months prior*** to the College's commencement of the Title IX investigation against him. SAF ¶ 107. Instead, in the wake of the OCR investigation—which

---

[5] Defendant asserts that, because Plaintiff has not addressed certain theories in his response to Defendant's Interrogatory 19 that he has abandoned those theories. Defendant's contention interrogatory asks Plaintiff to "explain why you believe you experienced discrimination on the basis of sex by identifying… evidence that you believe demonstrates sex bias ***in the disciplinary proceeding*** described in your complaint." DAPP 751 (emphasis added). Plaintiff responded directly to that question. FRCP 33 permits a party to respond to contention interrogatories as late as the pretrial conference phase of litigation. Defendant identifies only two "theories" in the Complaint that Plaintiff has purportedly abandoned. Moving Br. at 23. Dissenting Voices and the impact of the College's strict adherence to Obama-era Title IX guidance are discussed *infra* at Point I.A.

concerned allegations that the College mishandled the Title IX complaints of female students by issuing lenient sanctions to male students—as well as threatened litigation by Gloria Allred and a number of female students (which resulted in a settlement), the College elected ***not to*** provide additional due process rights to the accused and to continue following Obama-era guidance. SAF ¶¶ 506-514; P-APP 146, 166, 192-95. *See American Univ.*, 2020 WL 559309, at * 9 (university's adoption of "survivor-friendly" model and reassurance that it would not follow DeVos's new guidance was relevant to sex discrimination claim). Three individuals involved in Plaintiff's Title IX proceeding, Ms. Asberry, Ms. Moschenross and Ms. Conner played a role in the OCR investigation. SAF ¶¶ 507-514. Justice Rowsley Ternus was notified about the filing of the female students' OCR complaints with OCR and the College's "bold approach" to responding. P-APP 1032.

In February 2017, the College published a "Title IX Statement on DeVos" which stated "We do not know the direction (and many ***fear*** the direction) that Betsy DeVos, Secretary of Education, will take regarding Title IX. P-APP 188. The College's Title IX Advisory Committee met to discuss the "Uncharted Waters" presented by the Trump Administration's approach to Title IX. P-APP 925; P-APP 1205-1206, at 106:8-111:22. Notes taken at the meeting show that one agenda item was the loss of federal funding. P-APP 1392-93. Yet the College elected ***not to comply*** with the 2017 Guidance. The threat of the loss of federal funding apparently meant little to the College if it would be forced to better protect the rights of the accused. Indeed, a report published in August 2017 revealed the view that the Title IX Office was under pressure to take an aggressive stance against the accused or else face an angry student body. SAF ¶ 546(h).

On September 7, 2017, then Secretary DeVos vowed to replace the "failed system" of campus sexual assault enforcement, to ensure fairness for both accusers and the accused. DeVos

stated that "one person denied due process is one too many." P-APP 204. Significantly, DeVos proclaimed that the 2011 Dear Colleague Letter failed students. P-APP 208. As stated by DeVos, "any school that uses a system *biased toward finding a student responsible for sexual misconduct … commits discrimination*." P-APP 208 (emphasis added).

On September 22, 2017, the OCR rescinded the 2011 Dear Colleague Letter and related guidance. P-APP 146, 166; 214-16. The OCR noted that the 2011 Dear Colleague Letter placed "improper pressure upon universities" which resulted in the establishment of procedures for resolving sexual misconduct allegations which "'lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation*.'" *Id.* (citation omitted) (emphasis added). P-APP 215. On the same day, the OCR issued a significant guidance document "September 2017 Q&A on Campus Sexual Misconduct" (the "2017 Guidance"). P-APP 196-202.

Prior to the issuance of the 2017 Guidance, the College viewed Obama-era guidance, such as the rescinded 2011 Dear Colleague Letter, as *mandatory*. P-APP 1169.1-.2, at 21:14-28:14; P-APP 1034 ("In keeping with evolving federal guidance and law, additional changes were made during a second-round policy review this fall."). In contrast, the College flouted Trump-era guidance. P-APP 753. On September 29, 2017, the student newspaper published an article which stated "Grinnell College affirmed that it will continue to operate under the Obama-era guidance." P-APP 193. Angela Voos ("Ms. Voos"), the named Title IX Coordinator at the time, was quoted as saying "[The Trump] administration is focusing a lot on the adjudicative process, to make sure that due process is being served" and "most of this guidance is about choices. It's permitting some scaling back — we're not going to scale back." *Id.*; P-APP 1201, at 10:15-25; SAF ¶ 17.

On November 9, 2017, campus activist group Dissenting Voices took part in a national

vigil for survivors of sexual assault, held on the College's campus, in response to the rescission of the Dear Colleague Letter. P-APP 1177, at 88:7-89:8.

The Title IX Policy applied in Plaintiff's case, in February 2018, was last revised in September 2017. P-APP 1. Each individual involved in Plaintiff's Title IX proceeding had a role in revising the Title IX Policy applied in Plaintiff's case. P-APP 1209, at 9:5-17; P-APP 1169, at 20:16-21:10; P-APP 1176-77, at 84:5-89:8; P-APP 1279, at 28:2-29:18; P-APP 1126; SAF ¶¶ 229-30. The only process revision made to the Title IX Policy in response to the 2017 Guidance was to remove the 60-day timeline for completing investigations, which benefitted the College. P-APP 1176-77, at 85:14-87:5. The College failed to provide him with the following rights set forth in the 2017 Guidance:

    a. Colleges were prohibited from relying on fixed rules or assumptions that favor complainants over respondents when implementing interim measures. P-APP 198. The Title IX Policy did not comply with this guidance. SAF ¶¶ 60-61, 78-81, 554, 559.[6]

    b. Respondents in college disciplinary proceedings must receive written notice of the allegations constituting a potential violation of the school's sexual misconduct policy, including: i) the identities of the parties; ii) the specific section of the code of conduct allegedly violated; iii) the precise conduct allegedly constituting the potential violation; iv) and the date and location of the alleged incident. P-APP 199. "Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for *meaningful participation*." P-APP 199 (emphasis added). The College did not comply with the 2017 Guidance in Plaintiff's Title IX proceeding. SAF ¶¶ 105-112, 114-115.[7]

    c. Schools could apply the clear and convincing evidence standard in sexual misconduct proceedings. P-APP 200. The College elected not to apply this standard. SAF ¶¶ 219-20.

---

[6] Defendant contends that the interim measures in its policy "at most favors victims over respondents." Moving Br. at 9. According to the 2017 Guidance, this violated Title IX.

[7] Defendant glosses over, but does not deny, the numerous and repeated failures to provide Plaintiff with adequate notice of the charges against him. Moving Br. at 11. Ms. Moschenross was responsible for issuing the Notice of Investigation and an interim ban letter, both of which contained incorrect charges and were far from detailed. SAF ¶¶ 92, 105-112. It is clear that Ms. Moschenross did not take care to ensure that Plaintiff had enough details so that he could meaningfully participate in his interviews. As discussed *infra* Point I.D., Ms. Moschenross has expressed anti-male sentiments, and, in September 2017, posted an article that was critical of the changes proposed by DeVos. *See* SAF ¶¶ 450-466.

d. A trained investigator must analyze and document available evidence to support a reliable decision. P-APP 199. This did not occur. SAF ¶¶ 113-71.

e. A person free from actual or reasonably perceived conflicts of interest and biases for or against any party was required to lead the investigation. P-APP 199. Mr. Peterson exhibited bias. SAF ¶¶ 120-24, 128-37, 140-46, 158-61, 217, 421 and 446.

f. The 2017 Guidance cautioned schools "to avoid conflicts of interest and biases in the adjudicatory process." P-APP 200. "Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially." *Id.* The College did not heed this caution or comply with the requirements of the 2017 Guidance in Plaintiff's Title IX proceeding. SAF ¶¶ 242, 245, 249-250, 253, 256, 259, 264-307, 310-311, 315-449, 540-544.[8] *See infra* Point I.B.

g. Those issuing sanctions must consider the impact of separating a student from his or her education and the sanction should be proportionate to the violation. P-APP 201. There was no consideration of the impact of separating Plaintiff from the College and the sanction imposed was disproportionate because there was no preponderance of evidence that Plaintiff violated the Title IX Policy. SAF ¶¶ 251-449, 467-493.

The College's failure to provide Plaintiff with rights to which he was entitled under the 2017 Guidance raises a genuine dispute of material fact as to whether Defendant violated Title IX, and discriminated against Plaintiff on the basis of his sex, in his Title IX disciplinary proceeding.

## B. A Reasonable Jury Could Conclude that Justice Ternus' Findings Were Motivated by Sex Bias

Defendant incorrectly argues that Plaintiff "faces an uphill battle" in proving sex discrimination with respect to Justice Ternus because a factfinder's conclusions in a Title IX disciplinary proceeding are entitled to a presumption of impartiality. Moving Br. at 13. Courts ***do not apply*** this presumption when evaluating Title IX sex discrimination claims. *See, e.g.*, *Grinnell College*, 473 F. Supp. 3d at 931 (while universities have flexibility in executing their disciplinary

---

[8] When the 2017 Guidance was issued, the College was already embroiled in litigation with a male student who alleged that the College violated Title IX by discriminating against him on the basis of his sex. Justice Ternus served as adjudicator. *See* Case Docket, *Doe v. Grinnell College*, 4:17-cv-00079. *See also Doe v. Grinnell College*, 473 F. Supp. 3d 909, 930 (S.D. Iowa 2019). Clearly the College took threatened litigation by female students who claimed that the College failed to protect them far more seriously than actual litigation by male students who claimed the College's Title IX process discriminated against them.

policies they must also comply with Title IX).[9] *Doe v. Trustees of Boston College*, 892 F. 3d 67, 84 (1st Cir. 2018), relied on this presumption—which typically concerns acts taken by public university employees—when evaluating fundamental fairness for purposes of the plaintiff's breach of contract claim. *Id.* Similarly, the Eighth Circuit has employed this presumption in the context of due process claims against public universities. *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir. 2000). *Doe v. University of St. Thomas*, evaluated whether a university breached its common law duty not to expel students in an arbitrary manner. 972 F.3d 1014, 1018-1019 (8th Cir. 2020). Assuming *arguendo* that such a presumption did apply here, as fully set forth below, the record evidence shows that a reasonable juror could find that Justice Ternus was not impartial because she discriminated against Plaintiff on the basis of his sex.

The adjudication process in Plaintiff's Title IX proceeding, and resulting determinations of responsibility, were rife with sex bias. The degree to which Justice Ternus failed to engage with exculpatory evidence (including the complainants' own statements); her reliance on record evidence that ***did not exist*** to find that Plaintiff lacked credibility; her mischaracterizations of Plaintiff's testimony; her stated desire to find Plaintiff responsible for a "lesser included offense" with respect to Complainant 1 (even though there was no supporting evidence); and her stereotypical assumptions about the sexual behavior of both men and women flatly contradict any assertion by Defendant that Justice Ternus "carefully evaluated" the evidence in Plaintiff's case. SAF ¶¶ 240-449; Moving Br. at 15-22. The errors in this case are so egregious as to have resulted in "findings so devoid of substantive content as to be unworthy of credence." *Rossley*, 979 F.3d at

---

[9] The College also incorrectly asserts that the cat's paw theory of liability is at issue in this action. Moving Br. at 13. It is not. Plaintiff incorporates by reference the arguments made in the Brief in Support of Plaintiff's Resistance to Defendant's Partial Motion for Judgment on the Pleadings. ECF No. 31-1. Plaintiff also refers the Court to the record evidence in this case since Defendant's motion was made prior to the completion of discovery. SAF ¶¶ 216-47, 264-68, 294-314, 315, 362, 425, 450-539. Plaintiff also refers the Court to the Eighth Circuit's *Rossley* decision, decided after Plaintiff's resistance was submitted, which examined the investigation, disciplinary hearing and appeals process in determining whether Drake University violated Title IX. 979 F.3d 1192-94.

1193.[10] *See Univ. of Arkansas-Fayetteville*, 974 F.3d at 864; *American Univ.*, 2020 WL 5593909, at *7-8; *Lee v. Univ. of N. Mexico*, 449 F. Supp. 3d 1071, 1144-45 (D.N.M. 2020); *Grinnell College*, 473 F. Supp. 3d at 927-31.

### 1.   <u>There Were Numerous Procedural Irregularities in the Adjudication Process</u>

There were a number of procedural irregularities in the adjudication process that did not conform with the Title IX Policy:

a. Justice Ternus did not have all of Plaintiff's statements from the Title IX investigation and, therefore, did not review them prior to Plaintiff's adjudication meeting, as required by the Title IX Policy. SAF ¶¶ 232-238. Ten days after Plaintiff's adjudication meeting, Justice Ternus realized that she did not have one of Plaintiff's statements. SAF ¶¶ 234, 236. There is no evidence that Justice Ternus ever saw, or requested, a second statement of Plaintiff's that was missing from the final investigation report. SAF ¶ 235. The final investigation report formed the basis for adjudication. SAF ¶ 216.

b. Justice Ternus did not meet with Mr. Peterson. SAF ¶¶ 240, 242.

c. Justice Ternus emailed Ms. Moschenross[11] during Complainant 1's adjudication meeting[12] to determine whether Complainant 1 could talk about what happened to Complainant 2. Justice Ternus permitted Complainant 1 to share information about her friend, Complainant 2. SAF ¶256.

d. Justice Ternus informed Ms. Moschenross of her determinations of responsibility in Plaintiff's case prior to sending Ms. Moschenross her case opinion. SAF ¶¶ 264-68.

e. Justice Ternus asked Ms. Moschenross how to make her recommendations for sanctions. SAF ¶¶ 268-269.

f. Justice Ternus did not know what the exact charges were against Plaintiff. SAF ¶¶ 162-66, 296.

g. With respect to Complainant 1, Justice Ternus found Plaintiff not responsible for nonconsensual sexual intercourse (with which he was charged). She found him

---

[10] *Rossley* is distinguishable from the present case. As the Court stated in *Doe v. Grinnell College*, in *Rossley* the Court "found the plaintiff provided... no actual evidence—to support his arguments that the defendant university viewed the evidence in his sexual misconduct proceeding through a gender-biased lens." 473 F. Supp. 3d at 930-31 (also distinguishing *Doe v. Univ. of Denver*). As detailed herein, like the plaintiff in *Grinnell College*, there are, among other things, specific omissions in the determinations of responsibility in Plaintiff's case that could lead a jury to conclude the determination was motivated by gender bias.

[11] Ms. Moschenross' sex bias is addressed below, at Point I.D.

[12] This is noted in the audio of Complainant 1's adjudication meeting. SAF ¶ 256. It does not appear that this email was produced in discovery.

responsible for nonconsensual sexual contact, with which ***he was not charged***. She communicated with Ms. Moschenross about this error. Though she was advised to edit her case opinion, Justice Ternus did not remove the improper finding. SAF ¶¶ 294-96, 303-309.[13]

h.  Justice Ternus testified that she felt that she could make a finding about conduct with which Plaintiff had not been charged because the policy allowed her to consider "other charges, other instances of prohibited conduct, whether adjudicated or not." SAF ¶ 301. The Title IX Policy expressly refers to the consideration of "previous conduct ***violations***" in determining sanctions. SAF ¶ 302.

i.  Under the Title IX Policy, Justice Ternus had the discretion to hold another adjudication meeting with Plaintiff to discuss the purported nonconsensual sexual contact with Complainant 1. She did not do so. Ms. Moschenross did not suggest this to her. SAF ¶¶ 310-314.

j.  After she was told to edit her case opinion, Justice Ternus added a new section to her revised opinion concerning a pattern of predatory behavior which included Complainant 1. SAF ¶¶ 392-424. A pattern of predatory behavior is not a separate charge under the Policy. SAF ¶ 393.

k.  It appears that Justice Ternus read Complainant 1' impact statement even though she found Plaintiff ***not responsible*** with respect to Complainant 1. Impact statements were only to be read in cases where Justice Ternus found students ***responsible*** as charged. SAF ¶¶ 434-37. At Complainant 1's adjudication meeting, Justice Ternus told Complainant 1 that there was a "smorgasbord" of sanctions she could choose from, including getting Plaintiff expelled. SAF ¶ 259.

Justice Ternus' failure to adhere to the Title IX Policy in Plaintiff's case coupled with her desire to hold Plaintiff responsible with respect to Complainant 1 despite a lack of evidence, could lead a reasonable juror to conclude that Plaintiff's gender was a motivating factor in Justice Ternus' determinations of responsibility in Plaintiff's case. *See, e.g.*, *Doe v. Oberlin College*, 963 F.3d 580, 586-87 (6th Cir. 2020) (citing *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019).

### 2.  Justice Ternus' Improper and Unsubstantiated Findings With Respect to Complainant 1 Evidence Sex Bias

Defendant claims to be "baffled" that Complainant 1 is included in Plaintiff's sex

---

[13] In her correspondence with Ms. Moschenross, Justice Ternus likened Plaintiff's Title IX proceeding to a criminal case in which she played both prosecutor and jury, even though Plaintiff had none of the attendant protections afforded to criminal defendants, including the right to confront his accusers. SAF ¶¶ 296-300.

discrimination claim. Moving Br. at 15; SAF ¶ 296. Had Justice Ternus' correct decision that Plaintiff was ***not responsible*** for the charged conduct been the end of her inquiry then Complainant 1 need not have been included in this lawsuit. However, the manner in which Justice Ternus handled Complainant 1's case, using it to bolster her false theory that Plaintiff was a sexual predator, lends credence to Plaintiff's claim that the determinations made in his case were the result of sex bias. *See* SAF ¶¶ 264-314, 392-424.

Justice Ternus' belief that Plaintiff engaged in nonconsensual sexual contact with Complainant 1, was against the substantial weight of the evidence. *See Univ. of Arkansas-Fayetteville*, 974 F.3d at 864; *Grinnell College*, 473 F. Supp. 3d at 927; SAF ¶¶ 264-314. Per the Title IX Policy, "[c]onsent is demonstrated through mutually understandable words and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity." P-APP 19. "When evaluating consent, the College will consider the objectively apparent indications of consent (or lack of consent) from a reasonableness perspective." P-APP 20. When determining whether or not someone has given consent, Justice Ternus considers their ***internal feelings*** about the sexual encounter. SAF ¶ 276.

Justice Ternus found that Plaintiff engaged in nonconsensual sexual contact with Complainant 1 because he "initiated" sexual activity without Complainant 1's consent. SAF ¶¶ 277, 306. This was based on Justice Ternus' finding that Complainant 1 "curled into a ball" when she was first in bed with Plaintiff. SAF ¶ 278. Complainant 1 said that she ***did not*** shrink into a ball on the night in question. SAF ¶¶ 285-86. At her adjudication meeting, Complainant 1 stated that "in the moment I looked like I wanted what was happening." SAF ¶ 262. Complainant 1's transcribed statements in the investigation report showed that she: i) "okayed" Plaintiff's initiation of sexual contact; ii) she kissed Plaintiff; iii) she and Plaintiff had a mutual understanding of sexual

contact being okay; iv) she had oral sex with Plaintiff and "can't help the noises that my body makes"; and she "seemed enthused." SAF ¶¶ 275-293. These statements **matched Plaintiff's** account to the Title IX investigator that Complainant 1 was embracing and kissing him and responding affirmatively and enthusiastically to his questions or propositions. SAF ¶ 292.

At her deposition, Justice Ternus could not specify the nonconsensual sexual contact that occurred. SAF ¶ 279. Justice Ternus further stated that Complainant 1's testimony was that her body language should have made Plaintiff aware that she did not consent. SAF ¶ 290. At Complainant 1's adjudication meeting, when Justice Ternus asked Complainant 1 what body language she used that would have indicated to Plaintiff that she did not want to engage in sexual activity Complainant 1 said **she didn't know and had no idea** what would have "clued him up." SAF ¶ 411. At his adjudication meeting, Justice Ternus only asked Plaintiff whether Complainant 1 consented to sexual intercourse. SAF ¶ 293.

Justice Ternus included Complainant 1 in the pattern of predatory behavior that she falsely attributed to Plaintiff. SAF ¶¶ 394-424. Justice Ternus found that Plaintiff "preyed on women who were intoxicated **and** approaching incapacitation if not incapacitated." SAF ¶ 394 (emphasis added). But Justice Ternus found, as written in her case opinion, that there was **very little indication** that Complainant 1 "exhibited **any** signs that she was incapacitated or approaching incapacitation." SAF ¶ 399 (emphasis added).

When asked how Plaintiff "preyed" on Complainant 1, Justice Ternus went back to Complainant 1's "body language" which, as discussed *supra*, was not supported by the evidence. SAF ¶¶ 409-411. Justice Ternus claimed that Plaintiff "exploited" situations but acknowledged that Plaintiff was not charged with exploitation under the Title IX Policy. SAF ¶¶ 401-404. There was no allegation that Plaintiff served Complainant 1 alcohol. SAF ¶ 404. Justice Ternus failed to

credit Plaintiff's statement that he felt pressured to have sex with Complainant 1, though she admitted that someone who feels pressure to have sex with someone cannot at the same time prey upon them. SAF ¶¶ 6, 407-408.

Justice Ternus also erroneously included Complainant 1 in a "pattern" in which Plaintiff gained trust while talking about his personal troubles and escalating rather harmless or innocuous physical contact into sexual activity without first obtaining consent. SAF ¶ 412. Complainant 1 did not express that Plaintiff shared his personal troubles with her on the night in question. SAF ¶ 413. While Complainant 1 told the Title IX investigator that Plaintiff had a "history" of "edging [his] way in to get more and more sexual contact without ever explicitly asking if it was okay," she also stated that she and Plaintiff had a "***mutual understanding*** of sexual contact being okay" and pointed to instances where Plaintiff asked for consent.[14] SAF ¶¶ 283-84, 415 (emphasis added).[15]

Justice Ternus testified that she found that Plaintiff was not credible[16] with respect to

---

[14] Complainant 1's own account that Plaintiff had previously asked for consent prior to engaging in sexual contact, such as kissing Complainant 1's neck, supported Plaintiff's statements that he had asked for consent prior to engaging in sexual intercourse with Complainant 1. SAF ¶ 6. Defendant overlooked this fact when attempting to justify Justice Ternus' finding that Plaintiff was not credible. Moving Br. at 15. The fact that Plaintiff's testimony was not "corroborated" by Complainant 1 is not surprising given the "he said she said" context and should not have counted against Plaintiff. *See American Univ.*, 2020 WL 5593909 at *7-8.

[15] Defendant omits this testimony from its argument that Justice Ternus' "belief" that there was a pattern was a valid determination. Moving Br. at 15. Defendant's assertion that ***one*** witness (Complainant 1) corroborated that Plaintiff had a history of escalating sexual situations belies any argument that there was a ***pattern***. *Id.* It is also unclear why Plaintiff should be held responsible as a sexual predator for speaking with his best friend about his life's troubles and any resulting agreement on her part to engage in sexual activity so as not to ***feel*** like a jerk. *See* DAPP 93. This assumes that Plaintiff is a mind reader and that women cannot make their own decisions about the choices they make when deciding to engage in sexual contact with friends. *See Grinnell College*, 473 F. Supp. 3d at 927. There was no methodical "setting up" of situations either. Plaintiff watched TV with Complainant 3 on one occasion. Complainant 3 told the Title IX investigator that she did not feel pressured into sexual activity after receiving Plaintiff's text messages. P-APP 360. *Cf.* Moving Br. at 22. Plaintiff had sex with Complainant 2 on one occasion. *See* SAF ¶¶ 412-24.

[16] Though credibility was at issue in Plaintiff's Title IX proceeding, he did not have a right to cross-examine his accusers. SAF ¶¶ 241, 245. While the Title IX Policy gave Plaintiff the right to ask questions through the Title IX investigator, Mr. Peterson did not afford Plaintiff this opportunity. SAF ¶¶ 125-27. *See Univ. of Sciences*, 961 F.3d at 215 ("the basic elements of federal procedural fairness in a Title IX sexual misconduct proceeding include…when credibility determinations are at issue, the opportunity for cross-examination of witnesses").

Complainant 1 because he "lost his credibility" with respect to Complainant 2. SAF ¶ 409. As discussed *infra*, Justice Ternus' credibility assessment in Complainant 2's case misstated the evidence and failed to grapple with the significant inconsistencies in Complainant 2's account.[17]

At bottom, Justice Ternus found that Plaintiff—as opposed to Complainant 1—was to blame for Complainant 1's "poor decision"[18] to engage in various sexual activities with her friends at a party even though—according to Complainant 1's testimony—she ***outwardly appeared*** to consent. P-APP 832; SAF ¶¶ 172-74, 271-93, 410-11. Justice Ternus apparently determined that Plaintiff should be punished for Complainant 1's feelings of regret despite her objectively apparent indications of consent.

The manner in which Justice Ternus evaluated the evidence in Complainant 1's case and her perception that Plaintiff "preyed" on Complainant 1—despite an astounding lack of evidence to support these findings—could lead a reasonable jury to conclude that Justice Ternus deemed Plaintiff to be a sexual predator because he is male. *See Oberlin College*, 963 F.3d at *588 (hearing panel's "inexplicable" decision supported inference of sex bias); *American Univ*, 2020 WL 5593909, at *7-8 (failure to question credibility or grapple with inconsistencies in complainant's account was plausible evidence of gender bias); *Grinnell College*, 473 F. Supp. 3d at 927-28 (same); *Doe v. Quinnipiac Univ.*, 404 F. Supp. 3d 643, 662 (D. Conn. 2019) (failure to credit

---

[17] Defendant dismisses Justice Ternus' failure to conduct an independent credibility assessment with respect to Complainant 1 as merely following the College's "sex-neutral" policy, which permitted consolidation of the Title IX complaints. Moving Br. at 16. This ignores that a "sex-neutral" policy can be applied in a manner that is sex-biased. *See Norris v. Univ. Colo., Boulder*, 362 F. Supp. 3d 1001, 1012 (D. Colo. 2019). The College further ignores that no determination was made in Plaintiff's case as to whether Complainant 1's report was "relevant" or "probative" of Complainant 2's report or vice versa. SAF ¶ 151. The consideration of evidence from other cases is also very different than failing to conduct a credibility assessment with respect to each complaint.

[18] Defendant misses the mark in regard to Plaintiff's argument, here. Moving Br. at 16-17. As explained above, Justice Ternus' finding about Complainant 1's level of intoxication contradicted her finding that Plaintiff preyed on Complainant 1. Justice Ternus found that Complainant 1 had the ability to make informed rational judgments and, accordingly, there could be no finding that Plaintiff took advantage of Complainant 1. P-APP 832. Whether or not Plaintiff was intoxicated is irrelevant to this analysis.

male's statements of fear while crediting female's statement was reflective of gender stereotyping).

### 3. Justice Ternus' Determinations with Respect to Complainant 2 Evidence Sex Bias

Justice Ternus found Plaintiff responsible for engaging in nonconsensual sexual intercourse with Complainant 2. SAF ¶ 115. A reasonable jury could conclude that Justice Ternus' determinations with respect to Complainant 2 were grounded in sex bias. Complainant 2's testimony presented "a raft of potential problems" which Justice Ternus minimized. *American Univ.*, 2020 WL 5593909, at *7; *Grinnell College*, 473 F. Supp. 3d at 928. Justice Ternus' credibility determinations with respect to Plaintiff—who made consistent statements—were based on a complete misreading of the evidence. *American Univ.*, 2020 WL 5593909, at *7. Justice Ternus also credited the testimony of Complainant 2's female witness, H.A. on an issue about which Plaintiff was never questioned. *Id.* at *8. Justice Ternus' findings were also against the substantial weight of the evidence. *See Univ. of Arkansas-Fayetteville*, 974 F.3d at 864; *Grinnell College*, 473 F. Supp. 3d at 927.

#### a. Complainant 2 Told Justice Ternus That Plaintiff Committed A "Moral Transgression"

Complainant 2 was friends with Complainants 1 and 3. At her adjudication meeting, she told Justice Ternus that "the other parties in the case" came to her and asked for her help in bringing a case against Plaintiff. SAF ¶ 251. Complainant 2 told Justice Ternus "it wasn't full on rape" that occurred but a "***moral transgression***." Complainant 2 further stated that she did not know if what occurred was sexual assault and she was not sure if it violated the Title IX Policy but she felt a duty to report it after her friends came to her. SAF ¶¶ 251-252.[19] This was not addressed in Justice

---

[19] Similarly, Complainant 1 told the Title IX Investigator that she "was told" what happened was not consensual. SAF ¶ 133. "Student A," who decided not to pursue a complaint against Plaintiff was also friends with Complainants 1-3. She told Ms. Asberry, if she hadn't spoken to her friends about Plaintiff, she would not have labeled her interaction with Plaintiff as nonconsensual. SAF ¶ 51. Complainant 3 also reported that her view of things changed after she

Ternus' case opinion. P-APP 810-12.

At Complainant 2's adjudication meeting, Justice Ternus said to Complainant 2 "let me explore how drunk you were that night just for purposes of considering whether you were even capable of giving consent because he claims that you did." SAF ¶ 253. Justice Ternus later told Complainant 2 that she could submit an impact statement which described the "effect ***this sexual assault*** had on" her. SAF ¶ 255.

### b.  Justice Ternus Minimized Complainant 2's Inconsistent Statements

Complainant 2's account of what happened ***did not match*** the account of her witness, female student H.A. For example, Complainant 2 reported that when she met up with Plaintiff she was too drunk to stand and H.A. asked Plaintiff to take her home. SAF ¶ 175.[20] H.A. reported that Complainant 2 was walking and talking fine and that she did not ask Plaintiff to take Complainant 2 home. SAF ¶¶ 182-83. Complainant 2 said that on the day after her encounter with Plaintiff, she told H.A., said "that's not okay." SAF ¶ 175.[21] H.A. reported only that Complainant 2 told her that she hooked up with Plaintiff and she wasn't sure how she felt about it. SAF ¶ 185. According to H.A., Complainant 2 never said that Plaintiff engaged in any actions without Complainant 2's consent. SAF ¶ 186. H.A. was not aware of any problem until Complainant 2 told her she was filing a complaint against Plaintiff, a year later. SAF ¶ 185.

Complainant 2 also changed her account of what happened with Plaintiff, at first saying that she crawled into bed with Plaintiff and, all of a sudden, he was having sex with her. SAF ¶ 175. When confronted with Plaintiff's statement that he performed oral sex on her, Complainant

---

spoke with her friends. SAF ¶ 200-201. Justice Ternus questioned neither Complainant 1 nor Complainant 2 about what they discussed. CONNER0006, 0008. Complainant 3 did not meet with Justice Ternus. SAF ¶ 363.

[20] Complainant 2 provided yet another version of what H.A. said, and where they were, during her adjudication meeting. SAF ¶ 317(c).

[21] Complainant 2 made a similar statement about H.A. during her adjudication meeting. CONNER 0008, at 15:49-17:10. The Title IX Policy did not permit Justice Ternus to meet with H.A. P-APP 45.

2 said "*if I said yes*, then I was just trying to go to sleep."[22] SAF ¶192 (emphasis added). Complainant 2 also said it was "possible" that she gave Plaintiff directions during their sexual encounter. SAF ¶ 193. In her first interview, Complainant 2 failed to report that she and Plaintiff talked on the "loggia" before walking back to her room. SAF ¶ 190. In her follow-up interview she confirmed Plaintiff's account that they "hung out" there. *Id.* During her follow-up interview, Complainant 2 said that she first crawled into bed and Plaintiff followed her. SAF ¶ 191.

Plaintiff gave a consistent account about his sexual activities with Complainant 2. Plaintiff provided consistent, graphic details to the Title IX investigator and Justice Ternus about the manner in which he and Complainant 2 engaged in sex and how she acted in a sexually forward manner. SAF ¶¶ 176-181; 321-29. Plaintiff's statement that Complainant 2 was forward with him was supported by H.A.'s statement that Complainant 2 becomes more "extroverted" when drinking. SAF ¶ 350.

Plaintiff and Complainant 2 differed in their accounts of whether they socialized after the night in which they engaged in sexual activity. Plaintiff provided details about the occasions on which they subsequently got together. SAF ¶¶ 442-48. No one questioned Complainant 2 about the discrepancy. *Id.*

In her case opinion, Justice Ternus minimized the significant, material inconsistencies in Complainant 2's account, finding her account to be "more likely" than Plaintiff's because it was "most consistent" with H.A.'s. SAF ¶¶ 317-320. H.A. was not with Plaintiff and Complainant 2 at the party they attended, when they were talking on the loggia or when Plaintiff walked Complainant 2 home. P-APP 592-93. Justice Ternus did not meet with H.A. as part of the adjudication process. SAF ¶ 243.

---

[22] Justice Ternus applied the trauma-informed approach, that the College trained her to use, to explain away the inconsistencies in Complainant 2's testimony. SAF ¶¶ 328-35.

### c.   **There Was No Evidence That Complainant 2 Was Overly Intoxicated**

Justice Ternus' findings regarding Complainant 2's level of intoxication during her encounter with Plaintiff were not supported by the evidence:

In her case opinion, Justice Ternus found that Plaintiff attempted to "assuage H.A.'s fears for Complainant 2's safety" by telling H.A. that he was sober and would go to the party with Complainant 2. SAF ¶ 342. Plaintiff was ***never asked*** whether this conversation occurred or whether he discussed his level of sobriety with H.A. SAF ¶¶ 344, 346.[23] When asked about ***Complainant 2's*** statement that H.A. entrusted Plaintiff with getting Complainant 2 home safely, Plaintiff said "that's not how I remember it" because "the last time [we were] with H.A. was … before we went to the party." SAF ¶ 346. In her interview, H.A. expressed no concerns for Complainant 2's safety. P-APP 590-91.

Justice Ternus also found that H.A. believed that Complainant 2 was "too drunk to leave her dorm room." SAF ¶ 349. H.A. actually stated that she "thought she should have stayed in her room to go to bed and I told her that." SAF ¶ 349. When asked by the investigator "[w]hat was she doing besides being loud and more extroverted that gave you the opinion she should have stayed in her room?" H.A. answered "I'm not really sure, I, I don't remember." SAF ¶ 350.

Justice Ternus did not "reach the issue of capacity to consent" but stated that there was "substantial evidence that [Complainant 2] was not capable of giving knowing, voluntary and affirmative consent to sexual activity." SAF ¶ 336. This finding was based on H.A.'s statement.

---

[23] Indeed, the Title IX investigator did not follow up with Plaintiff after speaking with H.A. though he made sure to touch base with Complainant 2 in order to address the "discrepancies" between the accounts given by H.A. and Complainant 2. SAF ¶¶128-32. Defendant misunderstands Plaintiff's point. Moving Br. at 11-12. The Title IX investigator failed to question Plaintiff about a key issue raised by H.A.—whether Plaintiff and H.A. discussed Complainant 2's level of intoxication. The investigator interviewed Plaintiff after speaking with H.A. but did not bring it up. This was a fundamental failure to collect crucial evidence from Plaintiff on a matter that impacted Justice Ternus' determination and, not as Defendant contends, favoritism or asking the complainants "softball" questions." Moving Br. at 12.

SAF ¶¶ 341-51. Justice Ternus found that Plaintiff's description of Complainant 2 as "tipsy" was "implausible." SAF ¶ 351.[24] Justice Ternus' disdain for Plaintiff was demonstrated by her statement that Plaintiff "euphemistically" described preying on women as "tipsy sexual encounter[s]." SAF ¶ 443. Plaintiff did not use the word "tipsy" as part of any blanket statement regarding his sexual encounters. In the first instance, he told the Title IX investigator that he did not view Complainant 2 as "extremely intoxicated" and that they were both tipsy.[25] SAF ¶ 166. Plaintiff further stated that nothing in his subsequent social interactions with Complainant 2 indicated that their activity was anything other than "a tipsy sexual encounter."[26] SAF ¶ 444.

Per Complainant 2's own testimony: i) while with Plaintiff at a party she was able to climb through a window to get to the loggia; ii) she remembered what she and Plaintiff talked about on the loggia; iii) she remembered telling Plaintiff he could sleep over; and iv) she commented on Plaintiff's level of sobriety. SAF ¶ 352. There were no statements that Plaintiff had to carry Complainant 2 up to her room, that she was vomiting, or that she was unconscious. SAF ¶¶ 353-356. Complainant 2 changed her own clothes before getting into bed. SAF ¶ 356. At most, Complainant 2 "wanted to go to sleep" or was "drifting off to sleep" but was fully aware that she

---

[24] At her deposition, Justice Ternus testified that Plaintiff's statement that "he didn't believe that [Complainant 2] had any drinks before the jungle juice" was so inconsistent with H.A.'s statement as to be unbelievable. Moving Br. at 14. Again, Defendant was never asked whether he had a conversation with H.A. about how much Complainant 2 had to drink. If as, H.A. stated, Complainant 2 was walking and talking fine then Plaintiff would have had no indication that she was intoxicated. SAF ¶¶ 341-50. Plaintiff was asked what Complainant 2's physical state was like "*at the party*," to which Plaintiff responded, "I don't believe she had any drinks before the jungle juice." Plaintiff added, "I wasn't with her for the earlier part of the evening, but I don't recall her having any other drinks." P-APP 579. There was no testimony that Plaintiff observed Complainant 2 drinking before the party. P-APP 588-94.

[25] Plaintiff consumed marijuana, Xanax and alcohol on the night in question. SAF ¶ 176.

[26] Notably, the College has had a problem with its students engaging in tipsy sexual encounters for a number of years. During the 2017-2018 school year, the College waged a "Sober sex campaign," in response to a number of student surveys, one of which demonstrated that 24.2% of students thought that the typical Grinnell student preferred to be intoxicated if they were going to have sexual contact with someone else." SAF ¶¶ 570-77. In August 2017, a report was produced at the request of the Title IX Office concerning the experiences of participants in the College's formal resolution process for Title IX proceedings. SAF ¶¶ 545-546. One student commented that the Title IX Policy needed to be clarified because "it's very widely spread at new student orientation that if your intoxicated it's assault." The student further noted that an unclear expression of policy can hurt students in very real ways. SAF ¶ 546.

was in bed with Plaintiff, that he performed oral sex on her and that they had sexual intercourse. SAF ¶ 175, 192-93, 361.[27] There was, accordingly, **no evidence** to support Justice Ternus' finding that Complainant 2 was in a "diminished physical state." SAF ¶¶ 336-357.

### d.  Sex Stereotypes Governed Justice Ternus' Credibility Determinations

Justice Ternus' credibility determinations were grounded in a complete misreading of the evidence and stereotypical assumptions about Plaintiff and Complainant 2:

- She found that Plaintiff was not credible because he made "inconsistent" statements regarding who initiated oral sex. Every statement Plaintiff made about performing oral sex on Complainant 2, to the investigator and at his adjudication, was **consistent** – including the two statements cited in Justice Ternus' opinion. SAF ¶¶ 328-335;

- She found that Plaintiff lacked credibility about regarding his sexual intentions. Justice Ternus pointed to the fact that Plaintiff **kissed Complainant 2 on the cheek** after she got into bed with him.[28] SAF ¶¶ 321-327. At her deposition, Justice Ternus testified "why did you have to be in the room – to say good night?" SAF ¶ 324. Justice Ternus disbelieved Plaintiff simply because he went up to Complainant 2's room, even though he stated that he was planning on "staying with her for a little bit and talking while she was, while we were…tired, kind of winding down." SAF ¶ 322. A reasonable jury could conclude that Justice Ternus employed the stereotypical assumptions that, because Plaintiff is male, he went up to Complainant 2's room because he intended to have sex with her. SAF ¶¶ 321-327. *See Grinnell College*, 473 F. Supp. 3d at 927.[29]

- She found that it was unlikely that Complainant 2 "would become sexually aggressive with someone in whom she had expressed no romantic interest either before, or after, February 17, 2017." SAF ¶ 357. Given the utter lack of evidence, discussed *supra*, regarding Complainant 2's "diminished physical state," and Plaintiff's precise description of how Complainant 2 was "forward" or "aggressive"

---

[27] This evidence also demonstrates that Justice Ternus was incorrect in concluding that Complainant 2 was part of a pattern in which Plaintiff "preyed on women who were intoxicated and approaching incapacitation if not incapacitated." SAF ¶¶ 394-96.

[28] Defendant attempts to make more of this than it was by saying Plaintiff "entered her room and kissed her." Like Justice Ternus, Defendant assumes that a man would only enter a woman's dorm room if he has sexual intentions and that a man can never be interested in the various stages of intimacy that precede sexual intercourse. Moving Br. at 14.

[29] Defendant is correct that Justice Ternus testified at her deposition that Complainant 2 was part of a pattern in which Plaintiff escalated sexual contact because Plaintiff "came in, and then asked to stay overnight. And then it turned into sexual activity." *See* Moving Br. at 22. Per Plaintiff's consistent account, which Justice Ternus chose to disbelieve, the sexual contact between he and Complainant 2 escalated when **she started kissing him** after he kissed her on the cheek. SAF ¶¶194-95. Complainant 2 and Plaintiff were mere acquaintances and there was, accordingly, no build up of trust or intimacy between them. SAF ¶¶ 175-76.

when she got into bed (SAF ¶¶ 176, 194-95)—which matched H.A.'s description that Complainant 2 was more "extroverted" when drinking (SAF¶ 350)—a reasonable juror could conclude that Justice Ternus employed the stereotypical assumption that a woman must be romantically interested in a man in order to feel sexual ardor.[30] *See Grinnell College*, 473 F. Supp. 3d at 927.

### 4. Justice Ternus' Determinations with Respect to Complainant 3 Evidences Sex Bias

Justice Ternus found Plaintiff responsible for nonconsensual sexual contact with Complainant 3.[31] SAF ¶ 362. This determination was based on the allegation that, ***ten months prior***, Plaintiff had an erection while spooning Complainant 3 on his bed while they watched TV and that he pressed it against Complainant 3 two times. SAF ¶ 362. Justice Ternus testified that the kind of sexual contact alleged by Complainant 3 would not warrant dismissal from the College. SAF ¶ 391.

Justice Ternus did not have an adjudication meeting with Complainant 3 yet she found her more credible than Plaintiff because she was "very confident" in her recollection. SAF ¶ 380. It is certainly peculiar that Justice Ternus could assess Complainant 3's demeanor without hearing or seeing her. *See Purdue*, 928 F.3d at 669 (crediting complainant's account without hearing directly from her gave rise to inference of sex bias).[32] Complainant 3's statements to the investigator were inconsistent. At first, Complainant 3 said that she was laying down with Plaintiff, she felt his erection, sat up, expressed discomfort and Plaintiff was "receptive" and said "okay." SAF ¶ 364.

---

[30] Justice Ternus gave conflicting testimony on this issue at her deposition. P-APP 1271, at 155:10-157:17. This raises credibility issues that should be determined by the jury at trial. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003) ("In ruling on a motion for summary judgment a court must not weigh evidence or make credibility determinations.")

[31] While Defendant disputes this fact, Moving Br. at 9, the record evidence shows that Complainant 3 should not have been part of Plaintiff's Title IX proceeding. No one knew what she had actually accused Plaintiff of so they improperly charged him with nonconsensual sexual intercourse with respect to Complainant 3 until they had time and the opportunity to find a potential violation. SAF ¶¶44-46, 93-101. Ms. Moschenross was involved in the decision to send all three complaints to a formal resolution process. SAF ¶ 70. She banned Plaintiff from campus before she even knew what all the charges were. SAF ¶ 96.

[32] Contrary to Defendant's assertion, Plaintiff is not suggesting that Justice Ternus should have drawn an adverse inference against Complainant 3. Moving Br. at 18.

In her follow-up interview, she said "I *think* that there was an erection and I felt it and addressed it." SAF ¶ 365. This was in agreement with Complainant 3's summary of her Facebook messages (she could not produce the actual messages) in which she wrote Plaintiff "hit me up, we watched TV and *I set boundary*." SAF ¶ 371 (emphasis added). Complainant 3 said in her follow-up interview that the second time Plaintiff allegedly pressed against her, she was not sure if it was "*his leg* or something." SAF ¶ 369.[33]

With respect to Plaintiff's testimony, Justice Ternus found that Plaintiff "equivocated" about whether Complainant 3 told him she wanted to sit up because she was uncomfortable. SAF ¶ 379.[34] This was an inaccurate reading of the evidence. During his interview with Mr. Peterson, Plaintiff was asked if Complainant 3 "indicate[d] that she didn't want to *or* that she was uncomfortable laying down in that fashion?" SAF ¶ 377. Plaintiff answered "Yes, and we immediately changed to sitting up." SAF ¶ 377. Mr. Peterson then specifically asked "[d]id she say anything about being uncomfortable?" to which Plaintiff responded "[n]ot that I can remember, no." SAF ¶ 378.

Justice Ternus found it unlikely that Plaintiff "would have been unaware of any sexual touching that occurred." SAF ¶ 381. Plaintiff *denied* that any sexual touching occurred and did not remember having an erection while laying down with Complainant 3. SAF ¶ 383. He said he had no sexual intention when doing so. *Id.* When asked about the erection in his follow-up interview Plaintiff stated "I do not recall that." He added "I mean, it's – I guess it's possible[35] – but I wasn't

---

[33] Defendant conveniently omits this portion of Complainant 3's account from its assertion that Justice was correct in referring to Complainant 3 as confident. Moving Br. at 19.

[34] Defendant misread Justice Ternus' opinion as stating that Plaintiff equivocated about "whether the improper conduct with Complainant 3 had occurred." Moving Br. at 19.

[35] This type of statement, that it was "possible," is the same type of statement that Complainant 2 made during her interview, where she said it was possible that she gave Plaintiff directions during sexual intercourse. SAF ¶ 193. Justice Ternus did not hone in on this statement as any form of acknowledgment that Complainant 2 consented to sexual intercourse. That she counted the same type of statement against Plaintiff could lead a reasonable jury to

aware of it, definitely." SAF ¶ 384. At his adjudication, Plaintiff said that he did not remember having an erection on the night in question (by this time nearly *one year* prior) and he was surprised Complainant 3 had filed a complaint. SAF ¶ 387. Plaintiff's account of what happened did not include a second instance of spooning after he and Complainant 3 sat up in his bed. SAF ¶ 370.

Similar to the assumptions she made about male sexual behavior in the case of Complainant 2, Justice Ternus found that because Plaintiff acknowledged that he *may have had* an erection his denial of having sexual interest in Complainant 3 was inconsistent. SAF ¶ 385. This negates the very real possibility that a male may physiologically respond to close physical contact with a female while never intending to have sex with her or even having any sexual "interest."[36] Assuming that Plaintiff wanted to have sex with Complainant 3—as opposed to simply spooning with her—because his body responded to physical closeness is an archaic view of male sexuality *See Grinnell College*, 473 F. Supp. 3d at 927. Justice Ternus also recounted Plaintiff as saying that he could have accidentally touched Complainant 3 with an erect penis, deeming it "not credible." SAF ¶ 386. He made no such statement. SAF ¶ 387.

### 5.  <u>Justice Ternus' Recommended Outcomes Misstated the Record</u>

Justice Ternus' followed Ms. Moschenross' advice and issued one set of recommendations for sanctions. SAF ¶¶ 268-269. In order to include her faulty pattern evidence in her report, Justice Ternus' relied on the portions of the Title IX Policy concerning "Complainant Agency and Autonomy" and the role of the Title IX investigator. SAF ¶ 426-429. Justice Ternus recommended dismissal or suspension based upon her finding of responsibility with respect to Complainant 2. P-

---

conclude that Justice Ternus' determination of responsibility was motivated by sex bias. *See American Univ.*, 2020 WL 5593909 at * 7.

[36] Indeed, Defendant refers to this as a "biological response" in its brief, meaning that it was not conscious. Moving Br. at 20. *Haley v. Virginia Com. Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996), is inapposite. Plaintiff is not pointing to the mere words used by Justice Ternus to describe sexual arousal, but to the assumptions she made in connecting arousal to sexual intent or interest.

APP 835-37. Justice Ternus' recommendations contained the following errors:

    a.  She erroneously stated that the "complainants" considered Plaintiff to be "a risk to the safety of women on Grinnell's campus." P-APP 836. Neither Complainant 2 nor Complainant 3 expressed this sentiment. SAF ¶¶ 431-432. Complainant 3 told Mr. Peterson that she did not think Plaintiff acted with "malicious intent," she still had a "positive interpretation" of Plaintiff and "wish[ed] the best for him." SAF ¶ 431. Complainant 1 expressed in an impact statement that she wanted Plaintiff removed from campus. P-APP 869. This was not surprising given that Justice Ternus told Complainant 1 that she could request Plaintiff's expulsion. SAF ¶ 259. Justice Ternus was not permitted to review Complainant 1's impact statement because she found Plaintiff **not responsible** for nonconsensual sexual intercourse with Complainant 1. SAF ¶¶ 431-437. Justice Ternus said it was possible that she read it. SAF ¶ 437.

    b.  She stated that Plaintiff did not express any understanding that his actions were harmful to the women involved. P-APP 836. An impartial adjudicator would not expect a Title IX respondent, who is defending himself against charges, to acknowledge that harm occurred no less apologize for it. Regardless, Plaintiff told Justice Ternus he was "deeply sorry" and "I know if these complaints were filed there's a reason for that." SAF ¶¶ 438-440.[37] Before Complainant 1 filed a Title IX complaint, Plaintiff sent a text message to her in which he acknowledged hurting people and said he was working on himself. SAF ¶¶ 12-14; CONNER0007, at 42:05-44:53.

    c.  She found that Plaintiff used his own drinking as an excuse. SAF ¶441. However, after Justice Ternus asked him what impact consuming alcohol had on him during his encounter with Complainant 1, Plaintiff stated that he retained his memory of the events that occurred. SAF ¶ 442.

The totality of the circumstances detailed above, including the (i) procedural irregularities in Plaintiff's adjudication process; (ii) findings and credibility assessments that were either contradicted by or against the substantial weight of the evidence; and (iii) Justice Ternus' stereotypical assumptions about the sexual behavior of men and women, could lead a reasonable jury to conclude that Plaintiff's gender was a motivating factor in determining that Plaintiff was responsible for violating the Title IX Policy.

---

[37] Defendant falsely asserts that Plaintiff's impact statement, which he erroneously submitted to the appeal officer, "failed to note any remorse or concern for the Complainants." Moving Br. at 21. The first sentence states, "I would like to start off by saying that although I did not intend to cause any harm to the three women who have filed complaints against me, I am aware that my actions did cause serious distress and I am sorry. I know that I have had problems with relationships, sex, and substances, and I am actively working to address those problems. I also know **that this does not change anything about the distress my actions have caused**. Determining my level of responsibility in those actions, however, is the job of the investigation and adjudication process and will not be attempted here." P-APP 887. Plaintiff's impact statement was not considered. SAF ¶ 500.

### C.  **Justice Ternus Treated Female Respondents More Favorably**

Less than six months after she found Plaintiff responsible for nonconsensual sexual intercourse with Complainant 2, Justice Ternus adjudicated a similar case against a female respondent and found her ***not responsible*** for nonconsensual sexual intercourse. SAF ¶¶ 542-44. The respondent had been accused of plying an already intoxicated student with alcohol. Though there was some evidence of the complainant's ***incapacitation*** during the sexual encounter, Justice Ternus found that the complainant outwardly appeared to consent. *Id.* Justice Ternus found that the female respondent was credible and stated in her opinion that a violation of the Title IX Policy required more than impaired judgment. *Cf.* P-APP 810-17, 832-33.

In 2015, Justice Ternus found a female respondent responsible for nonconsensual sexual intercourse but went against the complainant's wishes that the respondent's transcript be marked because the respondent mistakenly thought she had consent. SAF ¶ 540. Justice Ternus did not think that sexually assaulting someone who was asleep posed a danger to the public or the respondent's future intimate partners. *Id.* Justice Ternus believed that the respondent was remorseful and did not believe she should be impeded in achieving her future goals. *Id.*[38]

Justice Ternus' decisions in cases involving female respondents raise a genuine dispute of material fact as to whether Justice Ternus found Plaintiff responsible for violating the Title IX Policy because he is male. *See Grinnell College*, 473 F. Supp. 3d at 929-930.

### D.  **The Individual Responsible for Imposing Sanctions Expressed Sex-Biased Views**

Ms. Moschenross was responsible for determining the sanction in Plaintiff's case. SAF ¶ 450. Ms. Moschenross was involved in every aspect of Plaintiff's Title IX proceeding. SAF ¶¶ 70-

---

[38] Ms. Conner, who served as the appeal officer in Plaintiff's case, was responsible for issuing the sanction in this case. She barred the respondent from campus only until the complainant graduated and did not mark her transcript. SAF ¶ 541. Ms. Conner advised that the finding would be kept in her College conduct file. *Id.*

71, 85-86, 89, 92, 96, 106-107, 230, 234, 236-39, 256, 264-65, 425, 450-93. She: i) banned Plaintiff from campus based on a "threat assessment" which showed that Plaintiff was not a threat (SAF ¶¶ 60-104);[39] ii) issued a notice of investigation which contained the wrong charge and then failed to amend the notice (SAF ¶¶ 105-112); iii) decided that the complaints against Plaintiff should be consolidated (though Ms. Asberry also took credit) (SAF ¶¶ 151-56); iv) failed to provide Plaintiff with the opportunity to meet prior to adjudication as required by the Title IX Policy (SAF ¶¶ 222-225);[40] and v) advised Justice Ternus about the charges against Plaintiff, missing evidence, Justice Ternus' determinations of responsibility, and the manner in which her sanction recommendations should be drafted (SAF ¶¶ 264, 268, 294-96, 304-14).

Ms. Moschenross was subjected to sex discrimination in the workplace early in her career, when a male colleague received higher wages. SAF ¶ 460. Ms. Moschenross has expressed the following views on social media:

a. In April 2017, she tweeted at the *Washington Post*, in regard to Bernie Sanders:

> *Yes because what we've been lacking is another old white man that helped keep us from breaking down new barriers*. No thanks.

SAF ¶ 451; P-APP 184 (emphasis added). Defendant minimizes this explicitly anti-male statement as "disappointment in the lack of diversity among presidential candidates," but the article that Ms. Moschenross responded to was about rebuilding the Democrat party – a new President had just taken office. *See* Moving

---

[39] Ms. Asberry worked in consultation with Ms. Moschenross on Plaintiff's case. *See* SAF ¶¶ 16-21, 60-104, 107, 222. Defendant argues that the threat assessment concluded that there was a "risk that Plaintiff preyed upon intoxicated women." Moving Br. at 10. That is not how the document was filled out at the time nor did Plaintiff "grossly mischaracterize" the threat assessment. SAF ¶ 60-77. *See* Moving Br. at 9-10. It is, further, troubling that such analysis was undertaken, and Plaintiff banned from campus, with no evidence other than a report made in a group meeting attended by Ms. Asberry, Complainants 1-3 and Student A (who elected not to proceed). The women were all friends. SAF ¶¶ 32-59, 83-84. Ms. Asberry submitted a declaration with Defendant's motion in which she asserts that she did not communicate with the complainants as a group after they requested to proceed with formal discipline. The record evidence shows that Complainants 1 and 2 requested formal discipline on February 20, 2018 and that Ms. Asberry communicated with the group, and met with Complainants 2 and 3 jointly, on February 27, 2018. SAF ¶¶ 52-59.

[40] Prior to the adjudication meetings, Ms. Asberry sent Complainants 1-3 an email detailing the adjudication process and attaching resources. SAF ¶ 227; P-APP 801-804. This information was not sent to Plaintiff. SAF ¶ 227. Defendant dismisses this **procedural inequity** as merely providing complainant-specific support in student discipline. But information about how the adjudication process is handled by the College is not complainant-specific. *See* Moving Br. at 12. *See Norris*, 362 F. Supp. 3d 1012.

Br. at 6; P-APP 184. Defendant further asserts that such a statement has "no tie" to Plaintiff's discipline and merely recognizes the "cultural concept of male privilege." Moving Br. at 7. Whatever the topic it does not change that it is an express statement of anti-male bias.

b. On September 20, 2017, after then-Secretary DeVos issued a statement about protecting the due process rights of the accused, Ms. Moschenross posted an article on her social media account *Sexual Assault Needs to Be Taken Seriously.* The caption in her post stated "[i]n recent weeks, decades of federal civil rights law and research on campus sexual activity have been called into question." SAF ¶¶ 461-63. The article attacked the view that the trauma-informed approach "encourages college students to view consensual late-night, alcohol fueled encounters that might produce disjointed memories and some regret as something more sinister." SAF ¶ 463. The article posted by Ms. Moschenross stated that "[s]uch a statement blames victims and excuses the actions of perpetrators" and "[a]lcohol does not cause rape but is strategically used to facilitate sexual assault by exploiting and enhancing vulnerability, lowering inhibitions and ensuring others excuse their actions." *Id.* When asked at her deposition whether she thinks that "sexual and relationship violence is an issue of gender dynamics," Ms. Moschenross answered "I don't know." SAF ¶ 456.

c. On April 3, 2018, Ms. Moschenross tweeted at *Inside Higher Education*, that university presidents "feel dissonance about Title IX…. Missing from the explanation: *70% of respondents are men*." SAF ¶ 457 (emphasis added). Ms. Moschenross testified that she was taking a "critical eye to the lack of representation of the data," and because there's "not a lot of diversity among college and university leadership" it did not surprise her that they (*i.e., men*) expressed "being uncomfortable with navigating college and university responsibilities under Title IX." *Id.* ¶¶ 458-59. Though Ms. Moschenross expressly referenced men in her post she denied that it related to the dissonance experienced by men. P-APP 1228-29, at 101-104.

These posts raise a genuine dispute as to whether Ms. Moschenross' sex bias permeated every aspect of Plaintiff's Title IX proceeding and whether her decision making was compromised by her disdain for white men (like Plaintiff) and, particularly those who engaged in sexual encounters with women while drinking. *See Grinnell College*, 473 F. Supp. 3d 927; *Doe v. Washington & Lee Univ.*, 2015 WL 4647996, at *3 (W.D. Va. 2015). While Defendant argues that the Court would engage in "speculation or conjecture" if it concluded that a "decisionmaker with feminist or diversity-forward views inherently harbors anti-male bias" that decision is for the jury to make

after weighing the evidence and assessing Ms. Moschenross' credibility. *See Kenney*, 347 F.3d at 1044. Ms. Moschenross' statement about "old white men" keeping women down crosses the line, particularly since she was charged with making life-altering decisions in Title IX cases involving male students.

Ms. Moschenross had no authority to reverse Justice Ternus' findings of responsibility, only to determine the sanction. P-APP 52. Her decision to expel Plaintiff was "influenced by the adjudicator." SAF ¶ 471. Ms. Moschenross copied and pasted Justice Ternus' recommendations for sanctions into each of the three outcome letters she issued, including in the case of Complainant 1, even though Plaintiff was found ***not responsible*** in her case. SAF ¶ 472. Ms. Moschenross also included the sanction of dismissal in Complainant 1's outcome letter. *Id.* She included this information in Complainant 1's letter because Complainant 1 "knew there were other complaints." SAF ¶¶ 474-477. She did not think this violated Plaintiff's right to privacy under FERPA. *Id.* ¶ 475. Ms. Moschenross' outcome letter in the case of Complainant 3 incorrectly stated that Plaintiff was found responsible for nonconsensual sexual intercourse.[41] The outcome letter for Complainant 3 also incorrectly stated that the typical outcome would be suspension or dismissal. SAF ¶¶ 467-469. These letters are part of Plaintiff's permanent conduct record. SAF ¶ 1.

When determining Plaintiff's sanctions, Ms. Moschenross reviewed Justice Ternus' final case opinion and recommended outcomes. SAF ¶ 481. She did not recall noticing any errors in the opinion. SAF ¶ 482. She did not remember if she reviewed Plaintiff's statements to the investigator to determine whether Justice Ternus was correct in finding that Plaintiff was inconsistent in his account of performing oral sex on Complainant 2. SAF ¶ 492. However, Ms. Moschenross agreed

---

[41] While Ms. Moschenross' self-serving declaration notes this as a "clerical error," she does not say that she ever corrected the error in Plaintiff's record. The letter, at the very least, reflects the carelessness with which she approached Plaintiff's proceeding. DAPP 164-165. She does not explain the second error in Complainant 3's outcome letter.

that the statements cited in Justice Ternus' opinion were *consistent* rather than inconsistent. SAF ¶492. Although Ms. Moschenross agreed that Justice Ternus found that there was little evidence that Complainant 1 was either approaching incapacitation or incapacitated, Ms. Moschenross denied it was error for Justice Ternus to include Complainant 1 in a predatory pattern of behavior since Justice Ternus was "contextualizing." SAF ¶¶ 490-91. She did not verify whether Justice Ternus was accurate in finding that Plaintiff expressed no understanding of the harmful nature of his actions. SAF ¶ 493.

More troubling was Ms. Moschenross' "holistic" approach to determining sanctions in which she considered "information that [she] knew about, other conduct history." SAF ¶ 480. In determining sanctions, Ms. Moschenross considered *allegation*s made against Title IX respondents, including those of which a respondent was not even aware. SAF ¶ 483. She also considered allegations against respondents for which they were neither charged nor found responsible. *Id.* ¶ 484-85. She did this in Plaintiff's case. SAF ¶ 483. Ms. Moschenross deemed unproven allegations to be "aggravating circumstances," but could not explain how they fit into that category. SAF ¶ 489.[42] Ms. Moschenross believes that a student who read the Title IX Policy would know that she was considering unproven allegations against them. SAF ¶ 486. The Title IX Policy solely refers to "previous conduct violations" as a factor for consideration in determining sanctions. P-APP 52-53. Plaintiff had no previous conduct violations. SAF ¶ 484. It is, further, *impossible* that a student would know that, as she did in Plaintiff's case, Ms. Moschenross was considering reports about which the student had *no knowledge*. P-APP 1382-84.

Ms. Moschenross' declaration references—but does not identify—a "Complainant 5."

---

[42] Notably, Ms. Moschenross did not reference any aggravating circumstances in the outcome letters. It is, therefore, questionable whether she actually considered any additional factors at the time in which she determined Plaintiff's sanction.

Plaintiff anticipates that Defendant will reveal this information on reply when he has no opportunity to respond. After reviewing Defendant's discovery in this action, Plaintiff can only speculate that "Complainant 5" is student, "J.L." P-APP 1340-53; P-APP 1382-84. J.L. was not a complainant. A member of the campus activist group Dissenting Voices, told Plaintiff and his roommate that J.L. sexually assaulted someone and urged Plaintiff to tell others. Plaintiff told one of his friends who took action against J.L. P-APP 1383. As a result, J.L. became upset with Plaintiff. *Id.* Plaintiff and J.L. met and talked about the situation in December 2017 and were on amicable terms after that. P-APP 1347-53, 1383-84.

J. L. initially sought advice from Ms. Moschenross but later informed her that things had worked out. P-APP 1340-45. There is no evidence that J.L. pursued any institutional action against Plaintiff. Ms. Asberry testified that notes she took at a meeting with J.L., which Defendant produced in this litigation, ***were*** not part of Plaintiff's Title IX record. P-APP 1196, at 167:14-168:10. Ms. Moschenross ***never spoke*** with Plaintiff about J.L.'s concerns. P-APP 1383. It would be utterly ridiculous for her to consider this information when sanctioning Plaintiff.

Student A, whom Defendant misclassifies as "Complainant 4," was part of the group meeting with Ms. Asberry in which sexual misconduct allegations were made. She decided ***not to proceed*** with a complaint against Plaintiff because, as relayed to Ms. Asberry, she decided that the activity at issue was consensual. SAF ¶¶ 48-51. Plaintiff not charged with any form of sexual misconduct with respect to Student A. P-APP 762. Nor was he even aware that she met with Ms. Asberry. P-APP 1382. Ms. Moschenross should not have considered Student A when determining sanctions.

Ms. Moschenross' involvement in nearly every aspect of Plaintiff's Title IX proceeding, the manner in which she approached sanctioning, and her anti-male views could lead a reasonable

juror to conclude that the decision to expel Plaintiff was motivated by sex bias.

### E.  The Appeal Officer in Plaintiff's Case Was Not Impartial

Plaintiff appealed the outcome of his Title IX proceeding. SAF ¶ 500. The Title IX Policy defines the appeal officer in student Title IX cases as an "impartial decision-maker." SAF ¶ 495. Ms. Conner handled Plaintiff's appeal, which she denied. SAF ¶¶ 500, 522

Ms. Conner led social justice workshops on campus, some of which addressed privilege and oppression. She believes that "male privilege" exists in our society. SAF ¶ 504. Ms. Conner was good friends with, supervised and evaluated Ms. Moschenross. SAF ¶ 502-503. Ms. Conner denied every appeal submitted to her, including during the time in which Ms. Moschenross served as Dean of Students and was responsible for sanctions in Title IX cases. SAF ¶¶ 501-503, 514.

Ms. Conner was quoted in a *Huffington Post* article, published in March 2015, which heavily criticized the College's failure to protect female students who made Title IX complaints. P-APP 62. Ms. Conner was deeply involved in a case that was featured in the article and which became part of the OCR investigation. SAF ¶¶ 510-11. Ms. Conner testified that a number of female students pressured the College to issue harsher sanctions. SAF ¶ 509. The article quoted Ms. Conner as affirming that, in cases where a student is found responsible for sexual misconduct, "the college's first consideration as a sanction is always dismissal." SAF ¶ 507.

The OCR investigation included a complaint that the College issued lenient sanctions to male students. SAF ¶ 512. Ms. Conner was the Dean of Students during the timeframe that was the subject of the OCR complaints. SAF ¶ 514. The OCR complainants, who were represented by Gloria Allred, threatened litigation against the College but the matter was settled. SAF ¶ 513. The OCR concluded its investigation in July 2017. *Id.*

There were two grounds for appeal in the Title IX Policy: 1) new evidence; and 2)

procedural errors that had a material impact on the outcome. SAF ¶ 495. Plaintiff submitted an appeal on the ground that Justice Ternus made "substantial errors in her processing of evidence, substantially affecting the fairness of the decision." SAF ¶ 515. Per the adjudication *procedures* set forth in the Title IX policy, the adjudicator was required to fairly adjudicate the matter, and was responsible for "finding the facts in the case" and determining responsibility by a preponderance of the evidence. SAF ¶ 516. Because Plaintiff's appeal asserted that Justice Ternus made incorrect findings of fact which impacted the fairness of the proceeding, it met the second ground for appeal. SAF ¶¶ 515-521. Plaintiff's appeal provided Ms. Conner with citations to the record, including his *consistent* statements about performing oral sex on Complainant 2, which demonstrated that Justice Ternus made errors in her factual findings. *Id.* Plaintiff also pointed to Justice Ternus' failure to examine the inconsistencies in Complainant 2's account and take into account the timeline during which Complainant 2 consumed alcohol. SAF ¶¶ 518-519. Plaintiff also pointed out in his appeal that Justice Ternus misinterpreted his statements concerning his understanding of harm caused to the complainants. SAF ¶ 521.

Ms. Conner dismissed Plaintiff's appeal as mere disagreement with Justice Ternus' "analysis and/or interpretation," and, with an air of condescension, informed Plaintiff that "Justice Ternus (a trained adjudicator and formed Iowa Supreme Court Chief Justice) was fully within her right to make a credibility determination, and the policy forbids us to simply substitute your judgment for hers." SAF ¶¶ 523-24. Ms. Conner further informed Plaintiff that based on her "review of the record, there is no evidence of a procedural error." SAF ¶ 525.[43] Ms. Conner did not review the record. SAF ¶ 528. Ms. Conner gave inconsistent testimony about whether she read Justice Ternus' case opinion. SAF ¶¶ 529-31, 533. Ms. Conner could have evaluated whether

---

[43] Her letter to Plaintiff also included a boilerplate list of "safeguards" employed to ensure fairness in Plaintiff's Title IX proceeding though she made no effort to determine whether those safeguards had been in place. SAF ¶ 526-27.

Justice Ternus misread Plaintiff's statements but chose not to. SAF ¶¶ 532, 536. She did not review the final investigation report. SAF ¶ 534. When asked "[w]hat if the evidence that Justice Ternus relied upon in issuing her opinion actually stated different things than in her opinion? Ms. Conner answered "you're overstating…how consequential this evidence was that was misinterpreted or misread." SAF ¶ 539. But the errors pointed out by Plaintiff in his appeal were key issues on which the outcome of his case turned. SAF ¶¶ 317-61, 438-48.

Given Ms. Conner's involvement with the OCR complaints, her deference to Justice Ternus in the face of clear errors and the condescension and carelessness with which Ms. Conner addressed Plaintiff's appeal, a reasonable juror could conclude that the denial of Plaintiff's appeal was motivated by sex bias.

### F.  The College's Trauma-Informed Approach is Not Sex-Neutral

Despite Defendant's assertions to the contrary, the College's trauma-informed approach is not sex-neutral. *See* Moving Br. at 4-5. While Ms. Asberry may have described her approach in a sex-neutral manner, the credibility of her testimony is an issue for the jury. *Kenney*, 347 F.3d at 1044. Per the Title IX Office's own reporting for fiscal years 2017 and 2018, the College "follow[ed]…evidence-based guidance" in "pursuing the related goals of promoting sexual respect and reducing the incidence of sexual misconduct." SAF ¶¶ 547-52. First on the list was the American College Health Association's ("ACHA") "Addressing Sexual and Relationship Violence: A Trauma-Informed Approach" (the "ACHA Report"). Jen Jacobsen ("Ms. Jacobsen"), the Assistant Dean of Students, whom Ms. Moschenross supervised and who also served as a Deputy Title IX Coordinator, was on the task force that developed the ACHA Report. SAF ¶¶ 547-51, 567.

The ACHA Report frames sexual and relationship violence "as an issue of gender

dynamics." SAF ¶ 549(c). According to the report "[f]ar too many men have done little more in the area of preventing sexual and relationship violence than to make a personal decision ***not to be a rapist or violent***." *Id.* ¶ 549(d) (emphasis added).[44] The Report further noted that "[i]t is essential to recognize that a male…who does not recognize the structural dimensions of masculinity and who takes for granted his structural privileges will likely perceive women's empowerment as an actual loss and have a real sense of victimization." *Id.* ¶ 549(g). The Report advised the reader to "***Target Men*** in Prevention of Sexual and Relationship Violence" and "[u]nderstand the 'patriarchal dividend' that may have left many men unaware and ***complicit***." *Id.* ¶ 549(h) (emphasis added).

Ms. Asberry testified that the College used the ACHA Report to think "about how environments shape us and our experiences." SAF ¶ 556.[45] Ms. Asberry said that the College was using the report in thinking about "where students are in the stages of change and thinking about these issues and where they are in their understanding and willingness to engage with the work." SAF ¶ 557. In other words, the College was focusing on how its male students could be deprogrammed from their default setting of being violent rapists.

In April 2017, the Title IX Deputies, including Ms. Asberry, met with Jackson Katz, who gave a presentation on campus called "Man Enough," about how men are socialized differently than women." SAF ¶¶ 560-61. In April 2018, Ms. Jacobsen and Ms. Asberry emailed the College's Title IX Advisory Committee, including Ms. Moschenross, a copy of the ACHA Report. SAF ¶ 569. Per the email, "we're asking you to engage with the toolkit and identify areas (policies, communication, physical spaces) where we want to have more conversation about how to have a

---

[44] Notably, the FY2018 Annual Title IX Report listed "Protective Measures" including the use of the interim ban as part of the College's goal of responding in a "trauma-informed" way. SAF ¶ 559.
[45] Ms. Asberry described the trauma-informed approach as "approaching work with individuals to consider the lived experiences and trauma that a person has likely experienced throughout their life." P-APP 1170-71, at 37:5-39:8.

trauma-informed approach on our campus." SAF ¶ 569. Ms. Moschenross attempted to distance herself from the ACHA Report, describing the ACHA task force as work that Ms. Jacobsen conducted outside the College, the specifics of which they did not necessarily discuss. SAF ¶ 569.

During the 2018-2019 academic year, Trent Claypool, who was on the task force that drafted the ACHA Report trained Title IX and Student Affairs in regard to implementing a "trauma-informed response" to incidents on campus. SAF ¶ 562.

## II.     There Are Genuine Disputes of Material Fact Which Preclude Summary Judgment on Plaintiff's Breach of Contract Claim

A reasonable jury could conclude that the College breached the Title IX Policy, that those breaches were material and caused injury to Plaintiff. *See Grinnell College*, 473 F. Supp. 3d at 933-935. The relationship between university and student is contractual in nature. *Corso v. Creighton Univ.*, 731 F. 2d 529, 531 (8th Cir. 1984); *Harvey v. Palmer College of Chiropractic*, 363 N.W.2d 443,446 (Iowa Ct. App. 1984). Here, the College's Title IX Policy is "the primary source of the terms governing the parties' contractual relationship." *Corso*, 731 F.2d at 531. *See T.E. v. Linn-Mar Comm'y Sch. Dist.*, 2000 WL 34514000, at *3-4 (Iowa Dist. Ct. Aug. 30, 2000). The College breached the Title IX Policy in the following ways:

   i.   ***The College gave Plaintiff an error-riddled Notice of Investigation.*** The Notice of Investigation provided to Plaintiff did not meet the requirements of the Title IX Policy because it did not provide a "brief description of the alleged conduct" with respect to each Complainant. P-APP 44. The Notice of Investigation stated the wrong charge with respect to Complainant 3 and the wrong date range for the Title IX complaints. SAF ¶¶ 105-112. The Notice of Investigation expressly stated it "there are additional or amended charges you will be notified with an updated letter." SAF ¶ 108. The Notice was never amended. SAF ¶ 111. Defendant argues that Plaintiff was sufficiently notified of the charges because—after the investigation was completed—Justice Ternus stated the charges at Plaintiff's adjudication meeting. Moving Br. at 25. This does not change that the Title IX Policy required sufficient details to be given at the beginning of the investigation, prior to any interview with the Title IX investigator, so that Plaintiff could address the charges against him.

   ii.  ***The College failed to implement reasonable and appropriate interim measures***. SAF

¶ 40. Plaintiff was banned from campus before he was able to provide his account of what happened. SAF ¶¶ 84-85. At the time of the ban, Ms. Moschenross and Ms. Asberry were confused as to what Complainant 3 had even alleged. SAF ¶¶ 49-51. The "threat assessment" conducted by Ms. Asberry found that: Plaintiff had not threatened further acts of sexual misconduct or violence; all complainants felt physically safe; and there was no evidence of interference with any Complainant's education or work activities. SAF ¶¶ 60-77. Notably, the "threat assessment" presumed that a respondent had engaged in the sexual misconduct alleged. SAF ¶¶ 61. Ms. Asberry's threat assessment also included the allegations of Student A, who had decided not to proceed with a Title IX complaint because she realized her friends had influenced her perception of what had occurred. SAF ¶¶ 49-51, 90-91. Defendant's arguments that the interim ban was appropriate raise questions of fact that cannot be resolved on summary judgment. *See* Moving Br. at 25. As a result of being banned from campus, Plaintiff had trouble with his classes and even had to drop one of them. SAF ¶¶ 102-104.

iii.   ***The College failed to conduct an equitable, thorough and impartial investigation with a fair and reliable gathering of the facts***. P-APP 44. The Title IX investigator: 1) failed to interview relevant witnesses (SAF ¶¶ 120, 122, 139-146); 2) did not collect all relevant evidence (SAF ¶¶ 121, 123); 3) failed to ask Plaintiff about a key issue in Complainant 2's case—whether he and H.A. discussed Complainant 2's sobriety—but made sure to follow up with Complainant 2 about inconsistencies between her account and H.A.'s (SAF ¶¶ 128-132); 4) failed to follow up with Complainant 2 about social interactions she had with Plaintiff after their sexual encounter (SAF ¶¶ 445-46); 5) rather than following up with Complainant 1 about her statement that she was "told" what happened was nonconsensual, Mr. Peterson effectively told Complainant 1 that she had not consented to sexual activity with Plaintiff (SAF ¶ 133); 6) told Complainant 2 to give her witness a "heads up" that he would be contacting her (SAF ¶ 136); 7) failed to question Plaintiff about his text message to Complainant 1 (SAF ¶¶ 420-21); 8) included Complainant 3's email summary of her messages with Plaintiff in the investigation report after she deleted the actual messages (SAF ¶ 124); 9) included unsubstantiated, irrelevant and prejudicial information in the investigation report (SAF ¶¶ 148-149, 157-161); 10) failed to specify the charges against Plaintiff for each Complainant (SAF ¶¶ 163-66); 11) failed to include two of Plaintiff's transcribed statements and certain of Plaintiff's comments in the investigation report—one statement was never provided to Justice Ternus[46] (SAF ¶¶ 167-169); and 12) organized the final investigation report so that the Complainants' statements preceded Plaintiff's, including follow-up interviews (SAF ¶ 217).

The final investigation report was the basis for adjudication. SAF ¶ 216. The numerous deficiencies and failures in the investigation process outlined above could certainly have had a material impact on the outcome of Plaintiff's case. For example, Mr.

---

[46] Defendant is, accordingly, incorrect that the deficiencies in the investigation report were fully remedied. Moving Br. at 26-27.

Peterson failed to collect a text message between Complainant 2 and H.A.[47] Complainant 2 alleged that she discussed her encounter with Plaintiff the day after it happened and H.A. said "that's not okay." SAF ¶ 175(h). H.A. did not mention this. SAF ¶¶ 184-86. Complainant 2 told Mr. Peterson that in the text H.A. said "I can't believe that happened." P-APP 570-71. Complainant 2's failure to provide the text message indicates that it could have discredited her account. In the statement that was never provided to Justice Ternus, Plaintiff discussed his perception of Complainant 1's level of intoxication, expressed concern for the Complainants' wellbeing, and demonstrated his responsiveness to Complainant 1's wishes with respect to kissing earlier in the evening. P-APP 1354-58. The fact that Mr. Peterson never questioned Plaintiff about having a conversation with H.A. about Complainant 2's level of intoxication (or his level of sobriety) certainly had an impact as this was a key issue in Justice Ternus' findings. SAF ¶¶ 336-61. That Mr. Peterson asked leading questions to the Complainants to confirm a lack of consent also led to the gathering of unreliable evidence. SAF ¶¶ 133-135. The inclusion of prejudicial information in the investigation report also influenced Justice Ternus' findings. *See* P-APP 811, 815, 824.

iv.   ***Plaintiff was denied the opportunity to ask Complainants 1-3 questions through the investigator***. P-APP 45; SAF ¶ 125-127. Defendant argues that the obligation was on Plaintiff to raise questions after he reviewed the preliminary investigation report (Moving Br. at 27), but ignores that the Title IX Policy provided Plaintiff the right to ask questions through the investigator while the investigation was being conducted (P-APP 45). An earlier draft of the Title IX Policy shows that questioning was initially limited to after the review of the preliminary investigation report, but the College added the language about questioning witnesses to the investigation process section of the Title IX Policy before it was published in September 2017. P-APP 1070, 1116. Mr. Peterson testified that there was no way for the parties to ask each other questions through the investigator. SAF ¶ 126. Plaintiff had no right of cross-examination during the adjudication process. SAF ¶¶ 241, 298.

v.   ***Plaintiff was not provided with an opportunity to meet with Ms. Moschenross prior to the adjudication***. P-APP 49. The scheduling email sent to Plaintiff did not offer an opportunity to meet and discuss the adjudication process or ask questions, as required by the Title IX Policy. SAF ¶ 225. *Cf.* P-APP 801-804.

vi.   ***Justice Ternus did not have the required meeting with the Title IX investigator***. SAF ¶ 242. Given the number of flaws in the Title IX investigation, a meeting between Justice Ternus and Mr. Peterson certainly could have clarified some issues and ensured that there was a full record for Justice Ternus to review. Perhaps the statement that Justice Ternus never received would have even been supplied. That Justice Ternus testified that she had no questions for Mr. Peterson is irrelevant. *See* Moving Br. 28. The Title IX Policy mandated a meeting with the investigator. SAF ¶ 240; P-APP 50-51. Moreover, Justice Ternus expressed confusion about the charges against Plaintiff

---

[47] Defendant nonsensically argues that it could not ask for the text message because it did not have subpoena power. Moving Br. at 26. The College did not need subpoena power to ask a Title IX complainant for information she agreed to provide.

well after his adjudication meeting. SAF ¶¶ 294-96. This led Justice Ternus to find Plaintiff responsible for nonconsensual sexual contact with respect to Complainant 1. SAF ¶ 306. Plaintiff was not questioned about this issue. SAF ¶¶ 287, 293, 304-314.

vii. ***Justice Ternus did not review all of the evidence prior to her meeting with Plaintiff.*** SAF ¶¶ 232-39. In addition, as discussed *supra*, Justice Ternus never had all of the evidence.

viii. ***Justice Ternus misapplied the preponderance of the evidence standard***. P-APP 51. *See supra* Point I.B. Justice Ternus' failure to properly weigh the evidence resulted in the erroneous determinations that caused Plaintiff's dismissal from the College.

ix. ***Justice Ternus and Ms. Moschenross failed to deviate from the typical range of sanctions when there was compelling reason to do so***. P-APP 52. At the time of Plaintiff's adjudication, he was sober, in a healthy, monogamous relationship and addressing his relationship and addiction issues with a therapist. SAF ¶¶ 422, 424. This was not considered by either Justice Ternus or Ms. Moschenross. P-APP 836, 870-884.

x. ***Ms. Moschenross issued Outcome Letters which contained incorrect information***. P-APP 53. The outcome letter issued with respect to Complainant 3 improperly stated that Plaintiff was found responsible for nonconsensual sexual intercourse. The correct charge was nonconsensual sexual contact. SAF ¶ 468. The outcome letter also incorrectly stated that the typical outcome would be suspension or dismissal. SAF ¶ 469. Though Plaintiff was found not responsible with respect to Complainant 1, Ms. Moschenross included in the outcome letter the sanction imposed with respect to Complainant 2, as well as Justice Ternus' recommendations. SAF ¶¶ 472-475. These letters are part of Plaintiff's permanent conduct record. P-APP 53.[48]

The breaches outlined above preclude summary judgment on Plaintiff's breach of contract claim against the College.

### III.    There is a Genuine Dispute of Material Fact with Respect to Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing

The parties are in agreement that there is an implied covenant of good faith and fair dealing in every contract. *See* Moving Br. at 29; *Grinnell College*, 473 F. Supp. 3d at 933. "A covenant of good faith and fair dealing is breached when a party to a contract acts in a manner that is offensive to community standards of decency, fairness and reasonable." *Deghedy v. Viztek, Inc.*, 2014 WL

---

[48] Plaintiff no longer asserts a breach of contract claim on the grounds alleged at Paragraph 242 (ii), (iv), (vii), (viii), (xii), and (xv) of the Complaint.

12378802 at * 11 (S.D. Iowa Aug. 4, 2014). Good faith performance of a contract "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *MYA Logistics, LLC. v. Phoenix Newton LLC*, 2019 WL 5106773, at *6 (S.D. Iowa Mar. 27, 2019).[49] Plaintiff had the justified expectation that if he was accused of violating the College's Title IX Policy that the procedures employed in assessing, investigating and adjudicating the allegations against him would be fair and reasonable, and that the College would follow the procedures outlined in the Title IX Policy. Instead, Defendant deviated from the Title IX Policy and employed unwritten rules that impacted the fairness of the proceedings: 1) Ms. Asberry acted as the Title IX Coordinator even though her role was Title IX Deputy (SAF ¶¶ 15-21); 2) atypically, Ms. Asberry met, and communicated with Complainants 1-3 and Student A as a group, ignoring the influence that each student could have on the other (SAF ¶¶ 32-59); 3) Ms. Asberry had an overly friendly relationship with Complainant 1 (*See, e.g.* ¶ 433); 4) Ms. Asberry sent emails to Complainants 1-3, but not Plaintiff, outlining the adjudication process (P-APP 801-804); 5) the College followed the unwritten rule that when there is more than one complaint all complaints are formally resolved (SAF ¶ 69); 6) Complainant 3's report was put into formal resolution even though there was uncertainty as to what she had alleged (SAF ¶¶ 96-101); 7) there was no request to expedite the investigation even though a campus ban had been issued (SAF ¶¶ 116-17); 8) no effort was made to secure the testimony of Plaintiff's witness, C.M., though the College could have pursued sanctions (SAF ¶¶ 138-146); 9) Justice Ternus advised Ms. Moschenross of her decision in Plaintiff's case before she finished writing her case opinion (SAF ¶¶ 264-68); 10) Ms. Moschenross advised Justice Ternus to consolidate her recommendation for sanctions (SAF ¶ 268); 11) Ms. Moschenross allowed Justice Ternus to include her findings about

---

[49] Plaintiff no longer asserts a claim for breach of the covenant of good faith and fair dealing on the grounds set forth in Paragraphs 247-248 of the Complaint.

nonconsensual sexual contact in the final case opinion because Justice Ternus was "contextualizing" (SAF ¶ 308); 12) Ms. Moschenross permitted Justice Ternus to add a new section to her case opinion concerning pattern evidence (SAF ¶¶ 392-93, 478-479); 13) Ms. Moschenross did not advise Justice Ternus to hold a second adjudication meeting with Plaintiff in order to address the issue of nonconsensual sexual contact (SAF ¶ 312); 14) Ms. Moschenross and Justice Ternus permitted Complainant 1 to speak about Complainant 2 during Complainant 1's adjudication meeting (SAF ¶ 256); 15) in determining sanctions, Ms. Moschenross relied on the unproven (and withdrawn) reports of Student A and J.L.—about which Plaintiff had no notice— when determining that Plaintiff should be dismissed from the College (P-APP 1382-84); and 16) Ms. Conner had a conflict of interest as the appeal officer because she was good friends with, supervised and evaluated Ms. Moschenross (SAF ¶¶ 500-503). The College also breached the covenant of good faith and fair dealing because, as discussed *supra*, the College breached the Title IX Policy and discriminated against Plaintiff on the basis of his sex when determining the outcome of the Title IX complaints. *See Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 196 (D.R.I. 2016).

From these facts a reasonable jury could conclude that the College breached the covenant of good faith and fair dealing that was implied in the Title IX Policy.

## IV. The Court Should Deny Summary Judgment with Respect to Plaintiff's Wrongful Discipline Claim

Defendant's motion for summary judgment should be denied as to Plaintiff's claim for "Wrongful Discipline: Lack of Fundamental Fairness in Disciplinary Proceedings" (Count IV) because: i) claims for wrongful discipline are recognized under Iowa law; and ii) Plaintiff's Title IX proceeding was devoid of fundamental fairness.

Plaintiff incorporates by reference his brief in resistance to Defendant's Motion to Certify, (ECF No. 58-1), which addresses the reasons why his wrongful discipline claim should proceed

as a mater of law. *See id.* at pp. 3-7. As stated in *Harvey*, 363 N.W.2d at 444, the requirements imposed by the common law on private universities parallel those imposed by the due process clause on public universities. A private university "may not expel a student arbitrarily, unreasonably, or in bad faith." *Id.* While Defendant makes a great effort to distinguish the procedures at issue in *Harvey* from the disciplinary proceeding at issue here there is one common factor—in neither case were the procedures followed. *See supra* Point II. In addition, there is a wealth of evidence supporting Plaintiff's claim that the College expelled him arbitrarily, unreasonably and in bad faith. *See* SAF ¶¶ 19-21, 36-39, 49-101, 108-11, 114, 116-17, 118-47, 156, 157-66, 168-70, 217, 225, 227, 228-239, 241-243, 246, 249-250, 253, 255, 256, 259, 264-265, 268-69, 270-73, 276-302, 305-544, 547-569. *See also* Points II-III. The College promised its students fundamental fairness in its disciplinary proceedings and, in Plaintiff's case it breached that promise.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's summary judgment motion in its entirety along with such other and further relief as the Court deems just and proper.

Dated: March 26, 2021

Respectfully Submitted,

/s/ Kara L. Gorycki
    Kara L. Gorycki (admitted *pro hac vice*)
Andrew T. Miltenberg (admitted *pro hac vice*)
NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone: (212) 736-4500
Email: KGorycki@nmllplaw.com
Email: AMiltenberg@nmllplaw.com

-and-

45

/s / David H. Goldman____
David H. Goldman
Amy K. Davis
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: adavis@babichgoldman.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 26, 2021, I served the foregoing document on the following counsel of record for Defendant Grinnell College via the Court's ECF system:

Frank B. Harty, Esq.
Nyemaster Goode P.C.
700 Walnut Street, Suite 1600
Des Moines, IA 50309-3899
(515)283-3100
fharty@nyemaster.com

Frances M. Haas, Esq.
Nyemaster Goode P.C.
625 First Street SE, Suite 400
Cedar Rapids, IA 52401-2030
(319)286-7000
fmhaas@nyemaster.com

<u>/s/ Kara L. Gorycki</u>