IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| PETER P. MOE,<br><br>Plaintiff,<br><br>v.<br><br>GRINNELL COLLEGE,<br><br>Defendant. | **No. 4:20-cv-00058-RGE-SBJ**<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I.   INTRODUCTION

Plaintiff Peter P. Moe[1] filed suit against Defendant Grinnell College after Grinnell College expelled him for violating its sexual misconduct policy. Moe alleges Grinnell College discriminated against him on the basis of sex in violation of Title IX of the Education Amendment of 1972. He also alleges various state law claims. Grinnell College moves for summary judgment on all of Moe's claims. Moe resists. Because genuine issues of material fact are present as to Moe's Title IX and breach of contract claims, the Court denies Grinnell College's motion for summary judgment on those claims. The Court grants Grinnell College's motion as to the other state law claims.

## II.   BACKGROUND

In presenting the facts relevant to Grinnell College's motion for summary judgment, the Court first sets forth Grinnell College's sexual misconduct policy. Next the Court recounts the

---

[1] Moe uses the pseudonym "Peter P. Moe" rather than John Doe to avoid confusion with the case *John Doe v. Grinnell College*, No. 4:17-cv-00079-RGE-SBJ. *See* Compl. n.1, ECF No. 1; *see also* Order Granting Pl.'s Mot. Proceed Under Pseudonym, ECF No. 14. In the Complaint, Moe refers to himself with the pronouns "he" and "him." ECF No. 1 *passim*; *see also* Moe Dep. 27:14–15, ECF No. 53-7 at 9. The Court follows suit.

sexual misconduct allegations against Moe and the resulting disciplinary investigation, adjudication, and appeal. The following facts are either uncontested or, if contested, viewed in the light most favorable to Moe, the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.      Grinnell College's Sexual Misconduct Policy

Grinnell College's Policy, Procedures and Guide to Preventing, Reporting, and Responding to Sexual Misconduct and Other Forms of Interpersonal Violence (the Policy) governs sexual assault investigations and discipline at Grinnell College. *See* Pl.'s App. Supp. Resist. Def.'s Mot. Summ. J. P-APP 000001–56, ECF No. 77-3 (Policy). At the beginning of each fall semester Grinnell College provides the Policy to students. Compl. ¶ 84, ECF No. 1. The September 2017 version of the Policy was in effect when the events at issue occurred. *See id.* ¶ 86; *see also* ECF No. 77-3 at P-APP 000001. The Policy is intended to "[p]rovide the Grinnell College community with a clear set of behavioral standards and clear definitions of [p]rohibited [c]onduct." ECF No. 77-3 at P-APP 000002. The Policy explains how a "College community member" can report a Policy violation and provides information about "how a report against a student . . . will be investigated, evaluated, and adjudicated by [Grinnell C]ollege." *Id.*

> Grinnell's Policy "prohibits . . . sexual assault," which it defines as
>
> having or attempting to have sexual intercourse or sexual contact with another individual without consent. This includes sexual intercourse or sexual contact achieved by the use or threat of force or coercion, where an individual does not consent to the sexual act, or where an individual is incapacitated. Sexual assault includes the following acts: . . .
>
> Having or attempting to have sexual intercourse with another individual without consent. Sexual intercourse includes vaginal or anal penetration, however slight, with a body part or object, or oral copulation by mouth-to-genital contact. . . .
>
> Having or attempting to have sexual contact with another individual without consent. Sexual contact includes kissing, touching the intimate parts of another, causing the other to touch one's intimate parts, causing the other to touch their own

intimate parts, or disrobing or exposure of another without permission. Intimate parts may include the breasts, groin, genitals, buttocks, mouth[,] or any other part of the body that is touched in a sexual manner. Non-consensual Sexual Contact can occur whether individuals are clothed or unclothed.

*Id.* at P-APP 000004, 16–17. "The [P]olicy is based on affirmative consent." *Id.* at P-APP 000019.

Consent to engage in sexual activity must be given knowingly, voluntarily, and affirmatively. Consent to engage in sexual activity must exist from the beginning to end of each instance of sexual activity and for each form of sexual contact. Consent is demonstrated through mutually understandable words and/or clear, unambiguous actions that indicate a willingness to engage freely in sexual activity. Consent is active, not passive.

*Id.*

Under the Policy, any individual who is affected by prohibited conduct may file a Title IX report. *See id.* at P-APP 000023. The Title IX Coordinator works with the Title IX response team, including the Deputy Title IX Coordinators, to respond to Title IX allegations. *See id.* at P-APP 000009, 34. After a complainant files a report against a student-respondent,[2] a member of the Title IX response team conducts an initial assessment. *See id.* at P-APP 000034–35. The initial assessment "consider[s] the nature of the report, the [c]omplainant's expressed preference for resolution, and the appropriate course of action, which may include Informal or Formal Resolution." *Id.* at P-APP 000035. "Informal Resolution does not involve disciplinary action against a [r]espondent." *Id.* Formal Resolution "involves an investigation to determine if there has been a policy violation," an adjudication, and may result in "sanctions through conduct (corrective) action." *See id.* at P-APP 000041. "The College seeks to resolve all reports of [p]rohibited [c]onduct within 60 calendar days of the initial report or the Notice of Investigation." *Id.* If "the investigation and resolution exceed this time frame for good cause, the College will notify all

---

[2] The Policy has different procedures for student-respondents, staff member-respondents, and faculty member-respondents. ECF No. 77-3 at P-APP 000034–35. The Court uses "respondent" to refer to student-respondents.

parties of the need for additional time and best efforts will be made to complete the process in a timely manner while balancing principles of thoroughness and fairness with promptness." *Id.*

After Grinnell College initiates an investigation as part of a Formal Resolution, the Dean of Students issues a written Notice of Investigation to the complainant and the respondent. *Id.* at P-APP 000044. "The Notice will include the names of the parties, a brief description of the alleged conduct, and the potential policy violations." *Id.* The Title IX Coordinator then appoints a "trained investigator to conduct a prompt, equitable, thorough, and impartial investigation" of the alleged Policy violations. *Id.* "It is the responsibility of . . . [Grinnell] College, not the parties, to gather relevant evidence." *Id.* The investigator is responsible for interviewing the parties separately; "interviewing potential witnesses; collecting relevant documentation and physical evidence;" and "preparing a written report documenting the complete investigation." *Id.* at P-APP 000045. Grinnell College "expects all members of the Grinnell community to cooperate fully with the investigation and disciplinary procedures." *Id.* "[A]ny student . . . who refuses to cooperate in an investigation may be subject to sanction. Refusal to cooperate includes . . . failing to acknowledge requests from College officials for information. . . ." *Id.*

After the investigation, the investigator writes a preliminary investigation report, which, in part, "identif[ies] the potential [P]olicy violations." *Id.* at P-APP 000047. The complainant and respondent review the preliminary investigation report and "may provide comments, propose questions for the investigator[] to ask the other party, or identify additional witnesses or source[s] of information." *Id.* The investigator then prepares the final investigation report. *Id.* The final investigation report "provides a statement of the policy violation(s) that are alleged to have taken place and a summary of the facts underlying the allegations." *Id.* at P-APP 000048.

The final investigation report forms the basis for the adjudication. *Id.* Grinnell College utilizes a third party adjudicator. *See id.*; Pl.'s Statement Additional Material Facts Supp. Resist.

Def.'s Mot. Summ. J. ¶ 164, ECF No. 77-1. "The adjudicator bears the ultimate responsibility of determining, by a preponderance of the evidence, whether the [r]espondent is responsible for committing [p]rohibited [c]onduct in violation of [the] [P]olicy." ECF No. 77-3 at P-APP 000048. After the adjudicator receives the final investigation report, the adjudicator "will" meet with a member of the investigation team and ask any questions to fully understand the case. *Id.* at P-APP 000050. The adjudicator also conducts private adjudication meetings with each party. *See id.* at P-APP 000049–51.

> The Dean of Students will send each party an explanation of the process; provide the parties with the date, time, and place of the meeting; and the name of the adjudicator. The Dean of Students will also provide an opportunity to the parties to ask questions about the process and meet before the adjudication meeting occurs.

*Id.* at APP 000048–49. Prior to the adjudication meetings, "[t]he adjudicator is required to review all pertinent information regarding the incident, including written statements, the investigation report, documents, . . . and/or oral information from the [c]omplainant(s), [r]espondent(s), and witnesses." *Id.* at P-APP 000050. Although the adjudication meetings are private, each party "will be provided with the opportunity to listen to the adjudicator's meeting with the other party." *Id.* at P-APP 000049, 51.

At the adjudication meeting, the respondent may respond to the allegations, present a Mitigation Statement, and answer the adjudicator's questions. *Id.* at P-APP 000051. After listening to the opposing party's adjudication meeting, the complainant and the respondent may raise questions or comments to the adjudicator. *Id.* Then the adjudicator deliberates privately and writes a case opinion. *Id.* The case opinion details the adjudicator's findings of fact by a preponderance of the evidence and the adjudicator's rationale. *Id.*

If the adjudicator finds a respondent responsible for the charged violations, the adjudicator recommends an appropriate educational outcome or sanction to the Dean of

Students. *Id.* at P-APP 000052. The Dean of Students is not bound by the adjudicator's recommended sanction and may broaden or lessen any range of recommended sanctions "in the case of serious mitigating circumstances, contextual or historical aggravating circumstances, or egregiously offensive behavior." *Id.*

> A student who is found responsible for Non-consensual Sexual Intercourse will typically receive educational outcomes (sanctions) of suspension or dismissal, including a ban from campus. A student who is found responsible for Non-consensual Sexual Contact (where no intercourse has occurred) will typically receive education outcomes (sanctions) ranging from conduct warning to dismissal.

*Id.* The Dean of Students provides the complainant and respondent with written notice of the adjudicator's findings and the sanctions imposed. *Id.* at P-APP 000053.

The complainant and the respondent have the right to appeal the outcome of the adjudication. *Id.* at P-APP 000054. Parties may appeal on two grounds, either "[n]ew evidence that was not available at the time of the investigation is presented that could be outcome-determinative; and/or . . . [p]rocedural error(s) that had a material impact on the outcome." *Id.* The appeal request includes "a plain, concise, and complete written statement expounding the grounds for the appeal." *Id.* The appeal request will either be accepted or denied. *Id.* "Appeals will be evaluated by an impartial decision-maker." *Id.* The Appeals Officer is Grinnell College's Associate Vice President of Student Affairs. *Id.*

If the appeal is accepted, each party is given the opportunity to respond to the other party's appeal in writing. *Id.* The appealing party bears the burden of proof because the original decision is "presumed to have been decided reasonably and appropriately." *Id.* at P-APP 000054–55. "The Appeals Officer can affirm the original findings, alter the findings, and/or alter the educational outcomes. . . ." *Id.* at P-APP 000055. "Appeal decisions are final." *Id.*

### B.       Proceedings Against Moe

In February 2018, Complainant 1,[3] a female student at Grinnell College, filed a Tile IX complaint against Moe, a male student at Grinnell College. *See* ECF No. 1 ¶ 95. Complainant 1 alleged Moe engaged in sexual misconduct with her and may have done so with other students. *See* Pl.'s Sealed App. Part Two Supp. Resist. Def.'s Mot. Summ. J. P-APP 000740, ECF No. 78-1. After conferring with Complainant 1, two other female students at Grinnell College, Complainant 2 and Complainant 3, filed reports against Moe. *See* ECF No. 77-1 ¶¶ 34–35, 52; ECF No. 78-1 at P-APP 000744–45, 000150–52.

The Complainants alleged Moe engaged in nonconsensual sexual intercourse with Complainant 1 and Complainant 2, and engaged in nonconsensual sexual contact with Complainant 3. *Id.* at P-APP 000806. The Title IX office pursued Formal Resolution of the allegations against Moe. *See* at P-APP 000755. Sarah Moschenross, Grinnell College's Dean of Students, provided Moe with a letter of notice regarding the allegations and banned him from campus. ECF No. 78-1 at P-APP 000755. The notice incorrectly stated all Complainants alleged he engaged in nonconsensual sexual intercourse. *Id.* at P-APP 000755. The investigator issued the final investigation report on May 17, 2018. Pl.'s Sealed App. Part One Supp. Resist. Def.'s Mot. Summ. J. P-APP 000219–47, ECF No. 78 (final investigation report). The adjudicator reviewed the final investigation report and conducted adjudication meetings with Moe, Complainant 1, and Complainant 2. *See* ECF No. 78-1 at P-APP 000806–07. Then the adjudicator issued the case opinion. *Id.* at P-APP 000805–37 (case opinion).

The adjudicator found Moe had nonconsensual sexual intercourse with Complainant 2 and nonconsensual sexual contact with Complainant 3, as alleged in the complaints. *Id.* at

---

[3] Moe refers to Complainants as Complainant 1, Complainant 2, and Complainant 3. *See* ECF No. 1 *passim*. The Court follows suit.

P-APP 000817, 000821. The adjudicator found Moe did not engage in nonconsensual sexual intercourse with Complainant 1. *Id.* at P-APP 000832. However, the adjudicator found Moe engaged in nonconsensual sexual contact with Complainant 1, which Complainant 1 had not alleged in her complaint. *See id.* at P-APP 000806, 832.

### 1.    Complainant 1

Complainant 1 and Moe became friends in their first year at Grinnell College. ECF No. 78 at P-APP 000504. In early December 2018, Complainant 1 stayed at Moe's house for several days. *Id.* at P-APP 000505. During her stay, Complainant 1 and Moe drank alcohol at a party at Moe's house. *Id.* at P-APP 000505–07. During the party, Complainant 1 "announced she felt like making out with 'anyone.'" *Id.* at P-APP 000505, 508. Then Moe kissed Complainant 1. *Id.* at P-APP 000508. Complainant 1 told Moe, "not right now." *Id.* Complainant 1 provided the investigator with the names of five witnesses present at the party when Moe and Complainant 1 kissed. *Id.* at P-APP 000511. Complainant 1 and Moe kissed several times at the party. *Id.* at P-APP 000512, 537. Complainant 1 estimated she consumed seven to eight alcoholic drinks d uring the party. *Id.* at P-APP 000522.

At the end of the party, Complainant 1 and Moe laid in Moe's bed with Moe's friend C.M. *Id.* at P-APP 00512–13. Complainant 1 kissed C.M. *Id.* at P-APP 000513, 540. After C.M. left the room, Moe and Complainant 1 engaged in sexual intercourse and oral sex. *Id.* at P-APP 000514–15. Moe told the investigator

> it happened very fast. . . . [s]he started kissing me . . . . I remember asking for consent from her and her saying yes . . . . I was . . . nervous. I was feeling like if I didn't . . . give her what she wanted, she would be mad or upset with me.

*Id.* at P-APP 000538. Complainant 1 told the investigator she "seemed enthused" during the sexual encounter "but only because [she] was drunk and [she] wasn't really paying attention to who it was." *Id.* at P-APP 000514. She did not remember if Moe asked for consent to have sex. *Id.* Moe

states Complainant 1 embraced and kissed him; was enthused, energetic, and responded affirmatively during sexual intercourse; and responded to Moe's questions about what she liked during sexual intercourse. *See id.* at P-APP 000525–28. Moe stated Complainant 1 was able to converse and walk on her own. *Id.* at P-APP 000542.

Moe alleges after Complainant 1 and Moe had sex, Complainant 1 and Moe discussed the "build up of sexual tension" between Complainant 1 and Moe with C.M. *Id.* at P-APP 000542. Complainant 1 denies this conversation happened. *Id.* at P-APP 000523. The next day, Complainant 1 spoke with her friend A.B. about the sexual encounter. *Id.* at P-APP 000515.

### 2.     Complainant 2

The events alleged in Complainant 2's Title IX complaint occurred on February 18, 2017, when Moe and Complainant 2 were acquaintances. *See* ECF No. 78 at P-APP 000559–65, 576–94. That evening Complainant 2 and her friend H.A. attended a concert. *Id.* at P-APP 000560. Complainant 2 states she consumed alcohol before the concert. *Id.* H.A. believes Complainant 2 consumed alcohol at the concert. *Id.* at P-APP 000590. H.A. explained Complainant 2 was "relatively drunk," but she could speak and walk with no problems. *Id.* at P-APP 000591–92. H.A. believes Complainant 2 was unable to provide consent based on her level of intoxication. *Id.* at P-APP 000593. At some point in the evening, Moe and Complainant 2 attended a party where they consumed alcoholic beverages. *See id.* at P-APP 000560–61, 577–78, 589.

Complainant 2 states she and H.A. attended the party with Moe. *Id.* at P-APP 000560–61. She also contends H.A. asked Moe to bring Complainant 2 home from the party because Complainant 2 was drunk. *Id.* at P-APP 000561. H.A. and Moe state H.A. did not attend the party. *Id.* at P-APP 000584–85, 589. H.A. recalls Moe was at the concert. *Id.* at P-APP 000591. H.A. recalls Moe said he would go to the party with Complainant 2. *Id.* at P-APP 000592.

Prior to attending the party, Moe took Xanax and smoked marijuana to calm down from a

panic attack. *Id.* at P-APP 000577–78. Moe drank a few drinks at the party. *Id.* Complainant 2 alleges Moe was "not intoxicated." *Id.* at P-APP 000562. Moe recalls Complainant 2 drank alcohol at the party. *Id.* at P-APP 000579. Complainant 2 alleges she was so intoxicated she could not stand. *Id.* at P-APP 000561. During the party, Moe and Complainant 2 crawled through a window to a porch where they had an extended conversation. *See id.* at P-APP 00568, 579.

After the party, Moe walked Complainant 2 back to her dorm. *Id.* at P-APP 000561. Moe alleges Complainant 2 was able to walk and talk. *Id.* at P-APP 000580. Complainant 2 states she "was really tired" and "wanted to go to sleep." *Id.* at P-APP 000561, 569. She let Moe sleep at her dorm because his dorm was far away. *See id.* at 000561, 569. Complainant 2 states there was "no sexual activity before [she] crawled into bed." *Id.* at P-APP 000570. Complainant 2 alleges "all of a sudden [Moe was] . . . on top of [her] . . . having sex." *Id.* at P-APP 000561. Complainant 2 alleges Moe pulled down his pants and then pulled down her pants and penetrated her. *Id.* at P-APP 000562. Complainant 2 alleges she just laid there and did not participate. *Id.* at P-APP 000570. The next morning Complainant 2 alleges she was "very freaked out . . . and [she] felt like [she] had nonconsensual sex." *Id.* at P-APP 000561. Complainant 2 told H.A. about the sexual encounter. *Id.* at P-APP 000565.

Moe alleges he did not intend to have sexual intercourse with Complainant 2. *Id.* at P-APP 000579. Moe states:

> We headed back to her room at which point I asked her if I could come inside, she said yes, she was getting ready for bed. . . . I was planning on staying with her for a little bit and talking while . . . we were . . . winding down . . . but she started kissing me . . . and was . . . physically . . . aggressive . . . physically forward. . . She was . . . kind of pressing her body against mine . . . pressing my leg between her legs . . . and kissing me aggressively . . . so I responded . . . with some more.

*Id.* Moe alleges during the encounter he asked Complainant 2 if she wanted him to perform oral sex on her. *Id.* at P-APP 000582. Moe alleges Complainant 2 said "yes." *Id.* Moe removed

Complainant 2's pants and performed oral sex on her for about ten minutes. *Id.* Then Moe alleges

he "asked her if . . . she wanted to have sex and she said yes and . . . manipulated [him] into the

positions that [Complainant 2] desired." *Id.* Moe contends Complainant 2 talked about what felt

good and asked Moe to adjust his position. *Id.* at P-APP 000583. Complainant 2 confirmed they

had oral sex but could not recall consenting to it. *Id.* at P-APP 000570. Complainant 2 also stated

it was possible she had given Moe directions during sex, but she could not recall. *See id.*

### 3.    Complainant 3

Complainant 3 and Moe were in the same friend group. *Id.* at P-APP 000605. They engaged

in sex as a group on two occasions. *See id.* at P-APP 000607–08. Complainant 3's complaint

alleged in April 2017, Moe sketched her for his art class. *Id.* at P-APP 000609. After Moe

finished, he and Complainant 3 laid down on his bed, fully clothed, and watched television.

*Id.* at P-APP 000669. Complainant 3 reported that as they laid on the bed, Moe "kind of, like,

pressed up against [her] and had an erection." *Id.* Complainant 3 expressed her discomfort to Moe.

*Id.* They continued to lay on the bed. *Id.* Then Moe came close to her again, and Complainant 3

told Moe she did not feel comfortable getting physical with her friends. *Id.* Complainant 3 stated

she believed Moe rubbed up against her intentionally. *Id.* at P-APP 000610.

### 4.    Investigation

Grinnell College hired an attorney from Husch Blackwell to investigate the Complainants'

allegations. *See* ECF No. 78 at P-APP 000475. The investigator interviewed Moe, Complainant 1,

Complainant 2, Complainant 3, and H.A. *See* ECF No. 78 at P-APP 000476–77; *id.* at

P-APP 000536–42, 572–87 (Parts I and II interview transcript with Moe); *id.* at P-APP 000504–

20 (interview transcript with Complainant 1); *id.* at P-APP 000559–69 (interview with

Complainant 2); *id.* at P-APP 000588–94 (interview transcript with H.A.); *id.* at P-APP 000605–

614 (interview with Complainant 3); *id.* at ECF No. 78-1 at P-APP 000770–77 (Part III interview

transcript with Moe). The investigator conducted follow up interviews with the Complainants and Moe. *See* ECF No. 78 at P-APP 000526–35, 549–58, 595–604 (Moe's follow-up interview transcript); *id.* at P-APP 000521–25 (Complainant 1's follow-up interview transcript); *id.* at P-APP 000566–71 (Complainant 2's follow-up interview transcript); *id.* at P-APP 000615–22 (Complainant 3's follow-up interview).

The investigator did not interview the five witnesses to the kiss between Complainant 1 and Moe, Moe's friend C.M., or Complainant 1's friend A.B. *See id.* at P-APP 000476–77. C.M. was studying abroad and did not respond to the investigator's inquiries. *See* ECF No. 78-1 at P-APP 000780. Grinnell College did not reprimand C.M. for his failure to participate in the interview. *See* Asberry Dep. 157:5–7, ECF No. 78-2 at P-APP 001194.

The investigator drafted a preliminary investigation report, and Moe provided comments. *See id.* at P-APP 000219–463 (preliminary investigation report); *id.* at P-APP 000466–71 (Moe's comments). On May 17, 2018, the investigator issued the final investigation report to the adjudicator. *See id.* at P-APP 000475–727 (final investigation report). The investigator did not make any findings in the final report. *See id.* The investigator included a section broadly listing potential Policy violations; it did not include the specific allegations against Moe. *See id.* at P-APP 000477–78.

### 5.    Adjudication and Appeal

Marsha Ternus, former Chief Justice of the Iowa Supreme Court, served as Grinnell College's adjudicator. *See* ECF No. 77-1 ¶ 164. Complainant 1, Complainant 2, and Complainant 3's allegations were consolidated into one Title IX action. *See* ECF No. 78-1 at P-APP 000806. Ternus conducted adjudication meetings with Complainant 1, Complainant 2, and Moe in separate video conferences. *Id.* at P-APP 000806–07. Complainant 3 declined to meet with Ternus. *Id.* at P-APP 000806. For the case opinion, the adjudicator relied on the final investigation

report, including its attachments and copies of the audio recordings made at the adjudication meetings. *Id.* at P-APP 000807. Ternus did not meet with the investigator. Ternus Dep. 52:15–23, ECF No. 63 at App 080.

As to Complainant 1, the adjudicator found Moe did not engage in nonconsensual sexual intercourse. ECF No. 78-1 at P-APP 000832. However, although nonconsensual sexual contact was not alleged in Complainant 1's complaint, the adjudicator found "a preponderance of the evidence shows that [Moe] engaged in nonconsensual sexual contact with [Complainant 1]." *Id.*; *see id.* at P-APP 000806; *see also id.* at P-APP 000755 (Title IX letter to Moe); *id.* at P-APP 000762 (notice of investigation). The adjudicator did not recount the nonconsensual sexual contact for which she found Moe responsible. *See id.* at P-APP 000828–32. The adjudicator found Moe was not credible in his statements about Complainant 1 based on the assessment of his credibility in Complainant 2's case. *See id.* at P-APP 000816, 832. The adjudicator determined Moe took advantage of Complainant 1's impaired state to initiate sexual contact. *Id.* at P-APP 000828. The case opinion stated, there is "not a preponderance of the evidence to establish that [Complainant 1] did not indicate her consent to *sexual intercourse* with [Moe]." *Id.* at P-APP 000830. The adjudicator found Complainant 1's testimony suggested that "in the middle" of sexual intercourse with Moe, Complainant 1 "acted in a way that indicated to [Moe] her willingness to engage freely in sexual activity." *Id.*

Ternus determined Moe engaged in nonconsensual sexual intercourse with Complainant 2. *Id.* at P-APP 000817. Because Moe kissed Complainant 2 on the cheek when they got into bed, Ternus concluded Moe was "inconsistent and not credible" when he stated he "had no intention of engaging in sexual activity with [Complainant 2]." *Id.* at P-APP 000816. Ternus stated, "[w]hile a kiss could be platonic, a preponderance of the evidence demonstrates otherwise here because . . . this adjudicator finds [Complainant 2]'s account . . . more credible." *Id.* Ternus also

13

found Moe to be inconsistent about who initiated oral sex. *Id.* She found Moe's assertions about Complainant 2's intoxication "unbelievable" based on H.A.'s and Complainant 2's testimony. *Id.* For these reasons, the adjudicator did not credit Moe's version of events. *Id.* The case opinion concluded:

> Given [Complainant 2's] high level of intoxication, it is more likely than not that [she] was tired and just wanted to sleep when she returned to her dorm room, as she has stated. That [Complainant 2]—in her diminished physical state—would become sexually aggressive with someone in whom she had expressed no romantic interest either before or after February 18, 2017, is unlikely.

*Id.* at P-APP000817.

As to Complainant 3, the adjudicator found Moe responsible for nonconsensual sexual contact because he did "not assert that [he] asked [Complainant 3] for her consent to the sexual contact that occurred or that [Complainant 3] otherwise affirmatively consented to being touched in a sexual manner." *Id.* at P-APP 000821. The adjudicator found Complainant 3 to be "very confident in her recollection." *Id.* The adjudicator found it unlikely Moe

> would have been unaware of any sexual touching that occurred. If [Moe] was aroused enough to have an erection, it is unlikely that [he] would have touched or rubbed [his] penis to or against [Complainant 3] without being aware of doing so. Moreover, [Moe's] acknowledgement that [he] may have had an erection that evening is inconsistent with [his] denial of any sexual interest in [Complainant 3].

*Id.*

The case opinion included a section entitled "Evidence of Pattern of Prohibited Conduct." *Id.* at P-APP 000832–33. The adjudicator relied on this analysis to recommend the punishment of suspension or expulsion stating, the "evidence of substantially similar conduct by [Moe] in the three complaints at issue showed—by a preponderance of the evidence—a predatory pattern of prohibited conduct." *Id.* at P-APP 000833. The adjudicator found Moe "had a practice of initially engaging in rather harmless or innocuous physical contact with a woman . . . and then escalating that contact into sexual activity of increasing intimacy without first obtaining consent." *Id.* Finally,

the case opinion stated, "[Moe] preyed on women who were intoxicated and approaching incapacitation if not incapacitated." *Id.*

Ternus submitted her findings and recommended sanctions to Moschenross. *Id.* at P-APP 000805. On June 12, 2018, Moschenross issued three identical outcome letters to Moe regarding Complainant 1, Complainant 2, and Complainant 3. *See id.* at P-APP 00870–74 (outcome letter re: Complainant 3); *id.* at P-APP 000875–79 (outcome letter re: Complainant 1); *id.* at P-APP 000880–84 (outcome letter re: Complainant 2). The letter regarding Complainant 3 incorrectly stated Moe was responsible for nonconsensual sexual intercourse with Complainant 3. *Id.* at P-APP 000870. Moschenross dismissed Moe from Grinnell College effective June 12, 2018. *See id.* at P-APP 000872, 000877, 000882.

Moe submitted a timely appeal "on the grounds that the adjudicator made substantial errors in the processing of evidence, substantially affecting the fairness of the decision." *Id.* at P-APP 000886–88; *see also id.* at P-APP 000885. Vice President of Student Affairs Andrea Connor handled Moe's appeal. *Id.* at P-APP 00891. In June 2018, Connor denied Moe's appeal stating, "based on a review of the record, there is no evidence of a procedural error in the conduct process that had a material impact on the outcome, nor have you provided any new evidence that could be outcome-determinative." *Id.* at P-APP 000891–92. The Title IX proceedings took six months to complete. *See id.*; ECF No. 1 ¶ 95; ECF No.

Additional factual findings are set forth below as necessary.

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the Court must grant a party's motion for summary judgment if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists where the issue "may reasonably be resolved in

favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

To defeat summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248. In analyzing whether a party is entitled to summary judgment, a court "may consider only the portion of the submitted materials that is admissible or useable at trial." *Moore v. Indehar*, 514 F.3d 756, 758 (8th Cir. 2008) (internal quotation marks omitted) (quoting *Walker v. Wayne Cnty.*, 850 F.2d 433, 434 (8th Cir. 1988)). The nonmoving party "receives the benefit of all reasonable inferences supported by the evidence, but has the obligation to come forward with specific facts showing that there is a genuine issue for trial." *Atkinson v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (internal quotation marks and citation omitted). "In order to establish the existence of a genuine issue of material fact, a plaintiff may not merely point to unsupported self-serving allegations." *Anda v. Wickes Furniture Co., Inc.*, 517 F.3d 526, 531 (8th Cir. 2008) (internal quotation marks and citation omitted), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial," and the moving party is entitled to judgment as a matter of law. *Torgerson*, 643 F.3d at 1042–43 (internal quotation marks omitted) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

## IV.   DISCUSSION

Moe alleges four claims against Grinnell College: discrimination on the basis of sex, in violation of Title IX (Count I); breach of contract, in violation of Iowa law (Count II); breach of

the implied covenant of good faith and fair dealing, in violation of Iowa law (Count III); and wrongful discipline, in violation of Iowa law (Count IV). ECF No. 1 ¶¶ 206–58. Now before the Court is Grinnell College's motion for summary judgment on all counts. ECF No. 57. Moe resists. ECF No. 77. Neither party requests a hearing. *See id*; *see* ECF No. 57. Finding the parties' briefing and exhibits adequately present the issues, the Court decides the motion without oral argument. *See* LR 7(c); Fed. R. Civ. P. 78(b).

The Court finds Moe puts forth evidence sufficient to generate genuine issues of material fact as to Counts I and II. The Court denies Grinnell College's motion on these counts. Finding Moe fails to raise a genuine issue of material fact as to Moe's claim for breach for the implied covenant of good faith and fair dealing, the Court grants Grinnell College's motion on Count III. Finally, because Iowa law does not recognize a claim for wrongful discipline, the Court grants Grinnell College's motion for summary judgment on Count IV.

## A.     Title IX (Count I)

In Count I, Moe alleges sex was "a motivating factor in [Grinnell College's] decision to discipline" him, in violation of Title IX. ECF No. 1 ¶ 212. He alleges Grinnell College exhibited sex bias during the Title IX investigation and adjudication proceedings through the investigator, adjudicator, and Title IX officers. *See id*. ¶¶ 218, 229, 230–35.

Grinnell College argues it is entitled to summary judgment because Moe fails to demonstrate sex bias by any decision maker. Def.'s Br. Supp. Mot. Summ. J. 3–7, ECF No. 65. Grinnell College also argues it did not apply the Policy against Moe in a biased manner. *Id*. at 7–10. Additionally, Grinnell College argues Ternus's case opinion "does not demonstrate sex bias." *Id*. at 13. Finally, Grinnell College argues dismissing Moe's appeal is not evidence of sex bias. *Id*. at 22–23.

Moe resists, arguing procedural irregularities in the Title IX proceedings demonstrate

genuine issues of material fact as to whether sex was a motivating factor in determining Moe violated the Policy. Pl.'s Br. Supp. Resist. Def.'s Mot. Summ. J. 13–28, ECF No. 81. Moe also argues the adjudicator treated female respondents more favorably in Title IX proceedings. *Id.* at 29. Finally, Moe argues Moschenross publicly exhibited biased views as to sex and Connor was not impartial. *Id.* at 29–39. Finding genuine issues of material fact exist as to whether bias on the basis of sex influenced Grinnell College's Title IX proceedings against Moe, the Court denies Grinnell College's motion for summary judgment as to Count I.

### 1. Applicable law

Title IX provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance. . . ." 20 U.S.C. § 1681(a). To state a Title IX claim, a plaintiff "must allege adequately that the [college] disciplined him on the basis of sex—that is, because he is a male." *Doe v. Univ. of Ark.-Fayetteville*, 974 F.3d 868, 864 (8th Cir. 2020) (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019)). To survive summary judgment, Moe must set forth "sufficient evidence to allow a reasonable jury to find that [Grinnell College] disciplined him on the basis of sex." *Rossley v. Drake Univ.*, 979 F.3d 1184, 1192 (8th Cir. 2020) (alteration in original) (quoting *Purdue Univ.*, 928 F.3d at 667–68).

Differing treatment of similar sexual behavior by men and women may indicate sex bias in Title IX proceedings. In *Doe v. Washington & Lee University*, a genuine issue of material fact existed as to whether the university discriminated against the male plaintiff (Doe) on the basis of sex. No. 6:19-cv-00023, 2021 WL 1520001, at *13 (W.D. Va. Apr. 17, 2021) (applying the standard adopted by the Eighth Circuit). There, the female respondent (Roe) testified to her "personal rule" that she only had "full sexual intercourse with partners if she [was] interested in a

relationship," while she engaged in oral sex even if she was not interested in a relationship. *Id.* Because Roe was not interested in a relationship with Doe, she testified the penetrative vaginal sex they engaged in was not consensual but oral sex they engaged in was consensual. *Id.* at *6, *13. Doe testified that when Roe performed oral sex on him, "he thought it was weird" due to their friendship. *Id.* at *4 (internal quotation marks omitted). The disciplinary panel credited Roe's personal rule but did not find Doe credible. *Id.* at *13. It "had trouble" reconciling Doe's contention that receiving oral sex from a friend was weird. *Id.* The court found the "determination of responsibility was predicated on biased assumptions regarding the sexual preferences of men and women." *Id.* The court stated:

> the . . . panel's starkly different treatment of . . . Roe's and Doe's testimony and its credibility determinations could lead a reasonable jury to find that [the panel] . . . followed its Policy in accepting that . . . a female student could credibly draw boundaries to the type of sexual conduct she wished to engage in and with whom, but . . . treated as doubtful the fact that a male student could credibly draw the same boundaries.

*Id.* at *14.

Biases based on stereotypes about women's and men's sexual behavior may provide sufficient evidence to demonstrate sex bias in a Title IX adjudication. In *Doe v. Grinnell College*, this Court held a reasonable jury could find the college discriminated on the basis of sex. 473 F. Supp. 3d 909, 922 (S.D. Iowa 2019). The Court based its reasoning, in part, on its finding that "the determinations of responsibility relied upon by Grinnell [College] to dismiss [the male student] were based on a biased perspective regarding the behavior of women during sexual encounters." *Id.* at 927. There, the adjudicator relied on the complainant's lack of birth control to support the finding the complainant did not want to have sex. *See id.* at 928–29. The Court found "a reasonable jury could conclude the determination of responsibility was influenced by the assumption that a woman without birth control would not consent to sex." *Id.* at 929. In

addition, the Court found, the adjudicator failed to engage with evidence indicating the complainant "*chose* to engage in sexual activity—even if she was motivated only by a desire to 'get [it] over with.'" *Id.* at 928 (alteration in original). Such an omission was sufficient to demonstrate a dispute of material fact as to sex bias. *Id.*

A university's procedural deficiencies in a Title IX investigation and adjudication may also indicate sex bias. In *Menaker v. Hofstra University*, the plaintiff stated a plausible Title IX claim by alleging the university disregarded its written procedures when it failed to interview witnesses; failed to provide the respondent with written determination of probable cause; and failed to provide the respondent with the opportunity to submit a written response to the allegations against him. *See* 935 F.3d 20, 34–35 (2d Cir. 2019). "[S]ubstantial and particularized procedural flaws" in Title IX proceedings may provide additional support demonstrating a genuine issue of material fact when an adjudication panel credits similar male and female sexual behavior differently. *Wash. & Lee Univ.*, 2021 WL 1520001, at *15; *but see Rossley*, 979 F.3d at 1193 (finding procedural deficiencies including not interviewing duplicative witnesses, did not indicate sex bias because "they did not result in findings so devoid of substantive content as to be unworthy of credence").

### 2.   Analysis

In support of his resistance to the motion for summary judgment, Moe provides comparator evidence, evidence the adjudicator's case opinion relied on sex stereotypes, and evidence of procedural deficiencies in the Title IX proceedings. Based on the totality of this evidence, a reasonable jury could find Grinnell College discriminated against Moe on the basis of sex.

A 2015 Grinnell College sexual misconduct case opinion authored by Ternus is comparator evidence. *See* Pl.'s Sealed App. Part Three supp. Resist. Def.'s Mot. Summ. J. P-APP 001135–58, ECF No. 78-2 (2015 case opinion). There, a female complainant alleged a female respondent

engaged in nonconsensual sexual intercourse with the complainant. *Id.* at P-APP 001135. The Policy language at issue in the 2015 case is the same language as Moe's case. *Compare Id.* at P-APP 001136–38 (relevant Policy language for 2015 case opinion), *with* ECF No. 78-1 at P-APP 000807–10 (relevant Policy language for Moe's case opinion). At issue were conflicting accounts of a sexual encounter between two female friends after drinking alcohol. *See id.* at P-APP 001135. The parties engaged in oral sex and digital penetrative vaginal sex. *See id.* at P-APP 001140, 001148–49. The complainant alleged she was blacked out during the sexual encounter and did not consent. *Id.* at P-APP 001140. The respondent alleged the complainant consented. *Id.* at P-APP 001149.

The adjudicator considered testimony, video evidence, and text messages. *See id.* at P-APP 001138–48. The adjudicator determined there was insufficient evidence to find by a preponderance of the evidence that the complainant exhibited signs of incapacitation. *Id.* at P-APP 001157. The case opinion stated, "[i]ncapacitation is defined as the inability, temporarily or permanently, to give consent, because an individual is mentally and/or physically helpless, asleep, unconscious, or unaware that the sexual activity is occurring." *Id.* at P-APP 001156. The case opinion also stated, "[a] person is not incapacitated merely because they have been drinking. [The respondent's] awareness that [the complainant] was really drunk is not equivalent to knowledge that [the complainant] was incapacitated and incapable of making a rationale, reasonable decision about whether to engage in sexual activity." *Id.* The adjudicator found "no witnesses observed [the complainant] slurring her words, walking unsteadily, or showing other signs of incapacitation." *Id.* Additionally, the adjudicator found on the morning after the alleged incident, the complainant statements indicated she remembered having sexual intercourse with the respondent. *Id.* at P-APP 001157. The adjudicator then concluded the complainant "was not asleep, unconscious, or unaware that sexual activity was occurring during their sexual encounter." *Id.*

Thus, the adjudicator determined the complainant was not unable to give consent. *Id.*

The adjudicator found "[b]oth students were credible and sincere in their accounts of what happened" and "consumption of alcohol impacted their judgment." *Id.* The case opinion did not explain why the adjudicator found them credible. *See id.* The respondent stated, "she felt she was giving into [the complainant's] desire for sexual contact with [the respondent]." *Id.* The adjudicator found respondent's statement credible and relied on it, in part, for the determination that there was not a preponderance of the evidence complainant did not consent to sexual intercourse. *Id.* The adjudicator concluded the respondent was not responsible for the charge of nonconsensual sexual intercourse with the complainant. *Id.* at P-APP 001158.

There are notable differences between the analyses and credibility findings of the 2015 case and Moe's case. In the 2015 case opinion, the adjudicator found both the female respondent and female complainant credible. Although the complainants in both cases indicated they had not consented to sexual intercourse, in the 2015 case opinion, the adjudicator did not address whether the initial sexual contact between the parties was consensual. The adjudicator considered whether the initial sexual contact between Moe and Complainant 1 was consensual. Also, unlike Moe's case, the adjudicator did not make findings regarding the uncharged conduct of nonconsensual sexual contact in the 2015 case. Finally, in the 2015 case opinion, the adjudicator credited the female respondent's testimony that the complainant "was an active participant in their sexual activities." *Id.* at P-APP 001157. The adjudicator did not credit similar testimony by Moe.

The framework the adjudicator applied in both cases is similar. *Compare* ECF No. 78-2 at P-APP 0011335–58 (2015 case opinion), *with* ECF No. 78-1 at P-APP 000806–37 (Moe's case opinion). In both case opinions, the adjudicator's conclusions rely on the credibility of the complainant and the respondent because there is little eyewitness testimony or evidence about the alleged sexual encounters. Although, other factors may explain the difference in treatment, the

case framework and opinion language suggest the respondent's sex could have played a role in the adjudicator's differing assessments of the 2015 case and Moe's case. The Court does not make a finding as to why the treatment of the respondents' credibility differ. The adjudicator's different treatment of the respondents may not be indicative of sex bias. *Cf. Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 930. However, as the Eighth Circuit makes clear, "sex discrimination need not be the only plausible explanation or even the most plausible explanation for a Title IX claim to proceed." *Doe v. Regents of the Univ. of Minn.*, 999 F.3d 571, 579 (8th Cir. 2021) (internal quotation marks and citation omitted). A reasonable jury could, but does not have to, draw the inference that the respondents were credited differently because of sex. *Cf. Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 927.

The use of biased perspectives or stereotypes in Title IX proceedings is sufficient for a reasonable jury to infer discrimination on the basis of sex. *Cf. Wash. & Lee Univ.*, 2021 WL 1520001, at *13. In light of differential treatment between Moe and the female respondent identified above, a jury could find the adjudicator's assessment about Moe's credibility was based on biased notions as to men's sexual intent. The adjudicator determined Moe was not forthright when he said prior to entering Complainant 2's dorm room, he did not intend to engage in sexual activity with her. *See* ECF No. 78-1 at P-APP 000816. The adjudicator reasoned that because Moe kissed Complainant 2 on the cheek, he in fact intended to engage in sexual activity with her; and thus, he was not credible. *See id.* As to Complainant 3, the adjudicator found it

> unlikely . . . that [Moe had] been unaware of any sexual touching that occurred. If [Moe] was aroused enough to have an erection, it is unlikely that [he] would have touched or rubbed [his] penis to or against [Complainant 3] without being aware of doing so. Moreover, [Moe's] acknowledgement that [he] may have had an erection that evening is inconsistent with [his] denial of any sexual interest in [Complainant 3].

ECF No. 78-1 at P-APP 000821. The adjudicator relied in part on the inferences she drew about the intent behind Moe's physical actions to assess his credibility. *See id.* The adjudicator's credibility finding then formed the basis for finding Moe responsible for violations alleged by Complainant 2 and Complainant 3. *See, e.g.*, ECF No. 78-1 at P-APP 000815–17, 821. When viewed in light of the adjudicator's assessment about the meaning of the female respondent's physical actions in the 2015 case, a reasonable jury could determine the adjudicator's inferences as to Moe were based on stereotypes about male sexual intent. As such, a reasonable jury could determine the adjudicator made findings about Moe on the basis of sex.

Evidence of procedural deficiencies buttresses the conclusion that a reasonable jury could find sex affected Moe's Title IX proceedings. *Cf. Menaker*, 935 F.3d at 34–35; *Wash. & Lee Univ.*, 2021 WL 1520001, at *15. Moe provides evidence demonstrating Grinnell College's Title IX investigation did not conform to the Policy. Moe provides evidence demonstrating the investigator failed to interview witnesses that could have corroborated aspects of his testimony, *see* ECF No. 78-2 at P-APP 001029; ECF No. 78 at P-APP 000503, 508, 511; the adjudicator did not meet with the investigator before the adjudication, *see* Ternus Dep. 52:23–53:9, ECF No. 78-2 at P-APP 001249; a part of the transcript of Moe's interview with the investigator was not provided in time for Ternus to review prior to the adjudication meetings, *see* ECF No. 78-1 at P-APP 768–77; ECF No. 1 ¶ 119; ECF No. 78-3 ¶ 234; the final investigation report did not state the charges against Moe; *see* ECF No. 78 at P-APP 000475–727; ECF No. 77-3 at P-APP 000048; and the adjudicator did not know the charges against Moe when adjudicating his responsibility, *see* ECF No. 78-1 at P-APP 000789. Procedural deficiencies may be indicative of sex bias in Title IX proceedings. *Cf. Menaker*, 935 F.3d at 32–33; *Wash. & Lee Univ.*, 2021 WL 1520001, at *15. Considering the evidence of procedural deficiencies in light of the comparator evidence, there is a genuine issue of material fact as to whether the procedural irregularities resulted

from sex. *Cf. Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 584 (E.D. Va. 2018); *Wash. & Lee*, 2021 WL 1520001, at *15.

Considering the totality of the evidence, a reasonable jury could find Grinnell College discriminated against Moe on the basis of sex during the Title IX proceedings. *Cf. Regents of the Univ. of Minn.*, 999 F.3d at 579. The Court may not weigh the evidence Moe provides and makes no conclusion as to whether Grinnell College violated Title IX. However, so long as there is evidence that could support a finding in Moe's favor, summary judgment is not appropriate. *Cf. Anderson*, 477 U.S. at 248. The Court denies Grinnell College's motion for summary judgment as to Count I.

### B.    Breach of Contract (Count II)

In Count II, Moe alleges Grinnell College breached the Policy during the Title IX proceedings, in violation of Iowa law. ECF No. 1 ¶¶ 242(i)–243. Grinnell College argues it is entitled to summary judgment on Count II because Moe cannot show it breached the Policy. ECF No. 65 at 24. Moe resists, arguing a genuine issue of material fact exists as to whether Grinnell College breached the Policy and whether the breach was material. ECF No. 81 at 39.

Finding there is a factual dispute over whether Grinnell College's deviations from the Policy amount to breach of contract, the Court denies Grinnell College's motion for summary judgment as to Count II.

"The relationship between a university and a student is contractual in nature." *Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984). The Iowa Court of Appeals has recognized a viable contract claim where a private university fails to abide by the disciplinary procedures promulgated in the Student Handbook. *See Harvey v. Palmer Coll. of Chiropractic*, 363 N.W.2d 443, 445–446 (Iowa 1984). The Court has previously addressed breach of contract claims between private university students and their universities for alleged deficiencies in

Title IX proceedings. *See Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 931–35; *Rossley*, 342 F. Supp. 3d at 941, 944–46, *aff'd*, 979 F.3d 1184 (8th Cir. 2020). Here, the parties do not contest the Policy formed a contract between Grinnell College and Moe. *See* ECF No. 65 at 24; ECF No. 81 at 39. The parties' disagreement is limited to whether Grinnell College breached the terms of the Policy, such that Moe was harmed. *See* ECF No. 65 at 24–28; ECF No. 81 at 39–42.

> To establish a breach of contract claim under Iowa law, a plaintiff must demonstrate:
>
> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Mortg. Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110–11 (Iowa 2013) (internal quotation marks omitted) (quoting *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998)). "Interpretation, the meaning of contractual words, is . . . an issue for the court. . . ." *Molo Oil Co.*, 578 N.W.2d at 225. "[W]hen [the court] interpret[s] contracts, [it] look[s] to the language contained within the four corners of the document." *DuTrac Cmty. Credit Union v. Radiology Grp. Real Estate, L.C.*, 891 N.W.2d 210, 216 (Iowa 2017). The Court will strictly construe a contract "if its words are clear and unambiguous." *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 586 (Iowa 2002); *see also Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (finding the terms of a financial aid agreement between a student and university were unambiguous). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Molo Oil Co.*, 578 N.W.2d at 225. The doctrine of substantial performance permits a party to fulfill its obligations under a contract with a performance that "despite deviations from the contract requirements, provides the important and essential benefits of the contract to the promisee." *SDG Macerich Props., L.P.*, 648 N.W.2d at 586 (internal quotation marks and citation omitted).

The doctrine "excuses contractual deviations or deficiencies which do not severely impair the purpose underlying a contractual provision." *Id.* Whether there has been substantial performance "turns on the facts of each case," and is ordinarily a question of fact for the jury. *Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 935 (internal quotation marks and citations omitted).

The doctrine of substantial performance is typically applied in the construction contract context. *See SDG Macerich Props., L.P.*, 648 N.W.2d at 586. The Eighth Circuit has permitted application of the doctrine of substantial performance in a non-construction breach of contract claim under Illinois law. *See In re Interstate Bakeries Corp. v. Interstate Brands Corp.*, 751 F.3d 955, 963 (8th Cir. 2014) ("[W]e are not convinced that Illinois law limits consideration of the doctrine of substantial performance to construction cases."). Like Illinois, Iowa typically applies substantial performance in construction contract cases. *See, e.g.*, *Flynn Builders v. Lande*, 814 N.W.2d 542, 544–46 (Iowa 2012). In *Doe v. Grinnell College*, the Court applied the doctrine of substantial performance to analyze a breach of contract claim based on Grinnell College's alleged deviations from its Title IX policy. 473 F. Supp. 3d at 933–35. Since the Court's decision in *Doe v. Grinnell College*, the Iowa Supreme Court has not provided guidance about the application of the doctrine of substantial performance in non-construction breach of contract claims. The Court considers the doctrine of substantial performance for Moe's breach of contract claim. *Cf. id.*

Moe provides evidence that the following deviations occurred during the Title IX process: Grinnell College did not provide him with the requisite written explanation of the over sixty-day delay in resolving the Title IX Complaints, and the Title IX response team did not request an expedited investigation, *see* Asberry Dep. 149:3–9, ECF No. 78-2 at P-APP 001192; ECF No. 77-3 at P-APP 000008, 41; the investigator received no training on "how to conduct Title IX investigation pursuant to [Grinnell College's] Title IX policy," despite the Policy requiring

27

investigation by "a trained investigator," Peterson Dep. 14:16–23, ECF No. 63 at App 151; ECF No. 77-3 at P-APP 000044; the Title IX Coordinator was not involved in Moe's Title IX proceedings, *see* Voos Dep. 10:5–8, ECF No. 78-2 at P-APP 001201; ECF No. 77-3 at P-APP 000008; the adjudicator did not meet with the investigator prior to the adjudication meetings with the parties, Ternus Dep. 52:15–53:10, ECF No. 78-2 at P-APP 001249; the final investigation report does not indicate the Policy violations alleged by each complainant against Moe, ECF No. 78 at P-APP 000479; *see* ECF No. 77-3 at P-APP 000048; the adjudicator was not aware of the charges against Moe when she initially submitted her case opinion to Moschenross, ECF No. 78-1 at P-APP 000789; and part of Moe's investigation interview transcript was not timely included in the final investigation report for the adjudicator's review before Moe's adjudication meeting, *see* ECF No. 78-1 at P-APP 000768–77; ECF No. 1 ¶ 119; ECF No. 78-3 ¶ 234.

The Policy's "Purpose and Intent" section states, Grinnell College "will respond promptly and equitably [to Policy violations] while tailoring the resolution to best fit the facts and circumstances and the goals of Title IX." ECF No. 77-3 at P-APP 000002. Considering the evidence here collectively, a reasonable jury could conclude Grinnell College's deviations from the Policy, in the aggregate, prevented Grinnell College's substantial performance of the Policy's purpose. *Cf. Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 933–35. That is not the only conclusion a reasonable jury could reach. *Cf. SDG Macerich Props., L.P.*, 648 N.W.2d at 586; *Doe v. Grinnell Coll.*, 473 F. Supp. 3d at 933–35. The Court may not weigh the evidence Moe provides. The Court reaches no conclusion on whether Grinnell College breached the Policy. Because Moe has provided evidence sufficient to support a finding in his favor, the Court denies Grinnell College's motion for summary judgment on Count II.

28

### C.      Breach of Implied Covenant of Good Faith and Fair Dealing (Count III)

In Count III, Moe alleges Grinnell College breached the Policy's implied covenant of good faith and fair dealing during the Title IX proceedings. ECF No. 1 ¶ 249; *see* ECF No. 81 at 43–44. Grinnell College argues Moe's claim fails as a matter of law because Moe was dismissed for sexual misconduct as permitted under the Policy. ECF No. 65 at 29. Additionally, Grinnell College argues the dismissal decision and denial of Moe's appeal do not indicate decision makers lacked independent judgment. *Id.* at 30. Finally, Grinnell College contends Moe fails to identify the "unwritten procedures" he alleges Grinnell College employed. *Id.* Moe resists, arguing there is sufficient evidence to generate a genuine issue of material fact about whether Grinnell College breached the covenant of good faith and fair dealing. ECF No. 81 at 42–44.

The Court finds Moe fails to provide sufficient evidence to generate a genuine issue of material fact as to whether Grinnell College breached the implied covenant of good faith and fair dealing. The Court grants Grinnell College's motion for summary judgment as to Count III.

Iowa law recognizes an implied covenant of good faith and fair dealing in all contracts. *See Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014). "[T]he duty of good faith is meant to give the parties what they would have stipulated for at the time of contracting if they could have foreseen all future problems of performance." *Am. Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 551 (Iowa Ct. App. 2011) (quoting 3 Richard A. Lord, *Williston on Contracts* § 38.15 (4th Ed. Supp. 2011)) "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Am. Tower, L.P.*, 809 N.W.2d at 550 (quoting 13 Richard A. Lord, *Williston on Contracts* § 38.15, at 437 (4th Ed. 2000)). "'Good faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations

29

of the other party.'" *MYA Logistics, LLC v. Phoenix Newton LLC*, No. 4:18-cv-00249-SBJ, 2019 WL 5106773, at *6 (S.D. Iowa Mar. 27, 2019) (internal quotation marks omitted) (quoting *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 34 (Iowa 1982)). The covenant is breached "when a party to a contract acts in a manner that is offensive to community standards of decency, fairness, and reasonableness." *In re Gansen*, No. 12-0106, 2012 WL 5954584, at *10 (Iowa Ct. App. Nov. 29, 2012) (internal quotation marks omitted) (quoting *Kooyman*, 315 N.W.2d at 34).

"This implied covenant generally operates upon an express condition of a contract, the occurrence of which is largely or exclusively within the control of one of the parties." *Am. Tower, L.P.*, 809 N.W.2d at 550. "[T]he covenant does not give rise to new substantive terms that do not otherwise exist in the contract." *Bagelmann v. First Nat. Bank*, 823 N.W.2d 18, 34 (Iowa 2012) (internal quotation marks omitted) (quoting *Mid-Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005)). It requires " a contract term to which it can be attached." *Id.* It "prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate Co.*, 406 F.3d at 974.

Moe fails to identify Policy terms to which he can attach his allegations of Asberry's bad faith. *Cf. Bagelmann*, 823 N.W.2d at 34. Moe alleges Asberry met and communicated with Complainants as a group and she acted as the Title IX Coordinator, although her role was Title IX Deputy Coordinator. ECF No. 81 at 43. The Policy permits the Title IX response "team," including the Deputy Title IX Coordinator, to "assist[] in the review, investigation, and/or resolution of the report." ECF No. 77-3 at P-APP 000009. The Policy does not prevent the Deputy Title IX Coordinator from meeting with individuals or multiple complainants together and is silent regarding procedures for multiple complainant situations. *See* ECF

No. 77-3 at P-APP 000029–34; *see also id.* at P-APP 000034–36, 46. Without identifying substantive Policy terms prohibiting group meetings, Moe's evidence is insufficient to support his claim. *Cf. Bagelmann*, 823 N.W.2d at 34. Moe also fails to present evidence indicating the meetings were "offensive to community standards of decency, fairness, and reasonableness" implied in the Policy. *In re Gansen*, 2012 WL 5954584, at *10 (internal quotation marks and citation omitted). The Policy does not specify the Deputy Coordinator's support role. *See id.* at P-APP 000034, 36, 44, 46. Because the Policy permits the Deputy Title IX Coordinator to include the tasks of the Title IX Coordinator, Moe cannot rely on Asberry's actions as Deputy Title IX Coordinator to support his claim. *Cf. Bagelmann*, 823 N.W.2d at 34.

Moe also fails to identify substantive Policy terms to which he can attach other allegations of bad faith during the Title IX proceedings. *Cf. Bagelmann*, 823 N.W.2d at 34. Moe alleges Complainant 1 discussed Complainant 2 in Complainant 1's adjudication meeting; the adjudicator communicated with Moschenross about the case opinion prior to its issuance; and Moschenross relied on information from other students about Moe when imposing sanctions in his case. *See* ECF No. 81 at 43–44. The Policy does not limit the topics a complainant may discuss. *See id.* at P-APP 000050–51. Evidence about Complainant 1's discussion in her adjudication meeting does not lend support to Moe's claim. *Cf. Bagelmann*, 823 N.W.2d at 34. Similarly, the Policy is silent as to whether the adjudicator may share or discuss the case opinion with the Dean of Students prior to issuing a decision. *See id.* at P-APP 000051. Evidence of the adjudicator's discussion with Moschenross does not lend support to Moe's claim. *Cf. Bagelmann*, 823 N.W.2d at 34. The Policy permits the Dean of Students to consider "mitigating or aggravating circumstances" when determining the applicable sanctions. ECF No. 77-3 at P-APP 000052–53. It does not indicate what such circumstances may entail. *See id.* As such, evidence Moschenross relied on information from other, non-complainant students about Moe when imposing his sanction

31

does not lend support to Moe's claim. *Cf. Bagelmann*, 823 N.W.2d at 34.

Moe fails to provide evidence sufficient to generate a genuine issue of material fact about whether various actions during the Title IX proceedings "destroy[ed]" his rights under the Policy. *Cf. Am. Tower, L.P.*, 809 N.W.2d at 550. Moe alleges Asberry's "friendly" relationship with Complainant 1; Asberry's failure to email him about the adjudication meeting; Grinnell College's abuse of its discretion under the Policy by pursuing Formal Resolution and failing to sanction C.M.; and Connor's alleged friendship with Moschenross raise genuine issues of material fact as to breach of the implied covenant of good faith. ECF No. 81 at 43–44. The email communication Moe points to between Complainant 1 and Asberry provides no indication Asberry did anything on behalf of Complainant 1 to taint the Title IX proceedings in a manner inconsistent with the Policy. *See* ECF No. 78-2 at P-APP 001332. The email does not indicate Asberry's actions were inconsistent with her support role as identified in the Policy. *See id.*; ECF No. 77-3 at P-APP 000008, 26. The record demonstrates Moschenross communicated with Moe regarding the adjudication meeting. ECF No. 78-2 at P-APP 001008. The absence of an email from Asberry to Moe regarding the adjudication meeting fails to demonstrate Grinnell College acted in a manner "contrary to that for which the [Policy] was made." *Mid-Am. Real Estate Co.*, 406 F.3d at 974. Moe provides no indication Grinnell College pursued formal resolution so as to prevent Moe from receiving his benefits under the Policy. *Cf. Mid-Am. Real Est. Co.*, 406 F.3d at 974. Additionally, the record provides no evidence to suggest Grinnell College's failure to impose sanctions on C.M. was an effort to avoid comporting with the "common purpose" of the Policy. *Kooyman*, 315 N.W.2d at 34. There is no evidence demonstrating Connor acted in a manner "offensive to community standards of decency, fairness, and reasonableness" or that her relationship with Moschenross affected her independence or objectivity in assessing Moe's appeal. *In re Gansen*, 2012 WL 5954584, at *10 (internal quotation marks and citation omitted). This

evidence is insufficient to raise a genuine issue of material fact as to whether Grinnell College "destroy[ed]" Moe's rights under the Policy. *Cf. Am. Tower, L.P.*, 809 N.W.2d at 550.

The evidence Moe provides demonstrating procedural deficiencies in the Title IX proceedings is insufficient to create a genuine issue of material fact as to Grinnell College's breach of the covenant of good faith. Moe provides evidence Asberry did not request to expedite the investigation; the adjudicator did not hold an adjudication meeting with Moe regarding nonconsensual sexual contact with Complainant 1; and Moschenross believed it appropriate for Ternus to include information in the final case opinion as to nonconsensual sexual contact with Complainant 1 to "contextualize her decision." *See* Asberry Dep. 149:5–9, ECF No. 78-2 at P-APP 001192; Moschenross Dep. 67:16–68:11, 70:23–71:2, ECF No. 78-2 at P-APP 001221–22. The Court finds Moe fails to provide evidence from which a reasonable jury could conclude Grinnell College did anything having "the effect of destroying or injuring" his right to receive "the fruits of the contract." *Am. Tower, L.P.*, 809 N.W.2d at 550. The evidence Moe points to fail to rise to a level demonstrating Grinnell College breached the covenant of good faith because there is no indication these deficiencies violated Moe's right to receive the "fruits" of the Policy. *Am. Tower, L.P.*, 809 N.W.2d at 550. As to the contextualizing information contained in the case opinion, the Policy permitted the adjudicator latitude in drafting the case opinion. *See* ECF No. 77-3 at P-APP 000048–51. Importantly, email correspondence and deposition testimony indicate Moschenross communicated with Ternus to ensure the case opinion adhered to the Policy. *See* ECF No. 78-1 at P-APP 000789–90 (emails); Moschenross Dep. 66:18–68:11, ECF No. 78-2 at P-APP 001221. This evidence demonstrates Moschenross and Ternus were providing for "decency, fairness, and reasonableness" in the application of the Policy to Moe. *In re Gansen*, 2012 WL 5954584, at *10.

Moe fails to identify Policy language to which he can attach many of his allegations.

33

*Cf. Bagelmann*, 823 N.W.2d at 34. Although Moe points to evidence that may demonstrate deficiencies in the Title IX proceedings, it is insufficient to demonstrate Grinnell College attempted to use "technical compliance . . . as a shield from liability when [it was] acting for a purpose contrary to that for which the contract was made." *Mid-Am. Real Estate Co.*, 406 F.3d at 974. There is no evidence indicating Grinnell College acted contrary to the purpose of the Policy. *See id.* Even if the bias or deficiencies Moe alleges occurred in the proceedings, without evidence indicating Grinnell College acted in a manner "offensive to community standards of decency, fairness, and reasonableness," Moe's fails to generate a genuine issue of material fact as to Grinnell College's lack of good faith in endeavoring to abide by the Policy. *In re Gansen*, 2012 WL 5954584, at *11 (internal quotation marks and citation omitted). The Court grants Grinnell College's motion for summary judgment as to Count III.

### D.     Wrongful Discipline (Count IV)

In Count IV, Moe alleges Grinnell College wrongfully disciplined him because the Title IX proceedings lacked "fundamental fairness and due process." ECF No. 1 ¶ 253. Moe alleges Grinnell College failed "to conduct a thorough, fair, and impartial investigation and adjudication of the claims against" him. *Id.* ¶ 254. Moe seeks an injunction reversing Grinnell College's Title IX outcome as to Complainant 1, Complainant 2, and Complainant 3, expungement of his disciplinary record, and damages. *Id.* ¶¶ 257–58.

Grinnell College argues it is entitled to summary judgment on Count IV because Iowa law does not recognize wrongful discipline claims. ECF No. 65 at 31. Grinnell College contends even if Iowa recognized a wrongful discipline claim, Moe fails to meet the alleged criteria. *Id.* at 33. Moe resists, arguing *Harvey v. Palmer College of Chiropractic* creates a wrongful discipline cause of action. ECF No. 81 at 44; *see Harvey*, 363 N.W.2d at 444. Additionally, Moe contends the Title IX proceedings against him were "devoid of fundamental fairness." *Id.* at 44–45. Finding

Iowa law does not permit a cause of action for wrongful discipline, the Court grants Grinnell

College's motion for summary judgment as to Count IV.

Moe relies on language from *Harvey* to argue Iowa acknowledges a wrongful discipline

cause of action. *See* Br. Supp. Pl.'s Resist. Def.'s Mot. Certify Question 3–7, ECF No. 28-1. The

Court considered *Harvey*'s holding in the Order Denying Defendant's Motion to Certify Question.

ECF No. 55 at 5. The Court also addressed *Pflepsen v. University of Osteopathic Medicine,*

*College of Podiatric Medicine*, 519 N.W.2d 390, 391 (Iowa 1994), and *Petro v. Palmer College of*

*Chiropractic*, 945 N.W.2d 763, 780 (Iowa 2020), both of which discuss *Harvey*'s implications.

*See* ECF No. 55 at 6–7. The Court incorporates by this reference its discussion in the Order

Denying Defendant's Motion to Certify Question. *See id.*

*Harvey* did not create an independent cause of action. The *Harvey* court acknowledged a

"private university may not expel a student arbitrarily, unreasonably, or in bad faith" immediately

after stating, "Courts have analyzed the relationship between a student and a private university

under several legal theories, including the law of contracts and the law of associations. Neither

theory fits perfectly, and therefore, should not be rigidly applied." 363 N.W.2d at 444. (internal

citations and quotation marks omitted). First, the "rigid application" language is dicta. *See id.*

It acknowledges that under either the law of contracts or the law of associations a private college

may not expel a student arbitrarily. With the "rigid application" language, the court recognizes the

nuance of its involvement—as a judicial body—in a private university's disciplinary process, but

it confirms such involvement is proper. It does not create a new claim upon which to argue a

student was arbitrarily expelled. Second, the court grounds its analysis squarely in the realm of

law, not equity, with the language about which theory of law—contracts or associations—to apply.

The court also stated the cause of action arose in law. *See id.* ("Our review of this action at law is

on assigned error."). The firm placement of *Harvey* in law—not equity—demonstrates the claim

was already established; the *Harvey* court did not create an independent claim. Also, the call of the case—the appeal of three existing and unique causes of action—and the court's reversal, indicates the court did not create a cause of action through its language. *See id.* at 444, 446. Finally, the Iowa Supreme Court's *Petro* case confirms *Harvey* was brought as a contract claim. 945 N.W.2d at 780 ("In [*Harvey*] our court of appeals found that an expelled student raised a potentially viable claim against Palmer for breach of contract.").

Because the Court finds Iowa does not recognize a cause of action for wrongful discipline, the Court grants Grinnell College's motion for summary judgment as to Count IV.

## V.  CONCLUSION

The Court finds a genuine issue of material fact exists as to whether Grinnell College exhibited sex bias in its Title IX proceedings against Moe. Additionally, the Court finds a genuine issue of material fact exists as to whether Grinnell College's deviations from the Policy amounted to breach of contract. The Court finds Moe fails to present evidence sufficient to raise a genuine issue of material fact as to whether Grinnell College breached the Policy's implied covenant of good faith. The Court finds Iowa law does not permit a claim for wrongful discipline. As such, the Court denies summary judgment on Counts I and II and grants summary judgment on Counts III and IV.

Accordingly, **IT IS ORDERED** that Defendant Grinnell College's Motion for Summary Judgment, ECF No. 57 is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED.**

Dated this 23rd day of August, 2021.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE